## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VENOCO, LLC, *et al.*[1] | Case No. 17-10828 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| EUGENE DAVIS, in his official capacity as Liquidating Trustee of the Venoco Liquidating Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50908 (JTD) |
| STATE OF CALIFORNIA, and CALIFORNIA STATE LANDS COMMISSION, | |
| Defendants. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE INVERSE CONDEMNATION CLAIMS

OFFICE OF THE CALIFORNIA ATTORNEY GENERAL

Rob Bonta
Attorney General of California
Christina Bull Arndt
Supervising Deputy Attorney General
Mitchell E. Rishe
Deputy Attorney General
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6394

DELAWARE DEPARTMENT OF JUSTICE

Edward K. Black (DE No. 5302)
Deputy Attorney General
820 North French Street, C600
Wilmington, Delaware 19801
Telephone: (302) 577-4209

*Counsel for the State of California*

TROUTMAN PEPPER HAMILTON SANDERS LLP

David M. Fournier (DE No. 2812)
Joanna J. Cline (DE No. 5873)
Kenneth A. Listwak (DE No. 6300)
Hercules Plaza
1313 Market Street, Suite 5100
Wilmington, DE 19801
Telephone: (302) 777-6500

LOEB & LOEB LLP
Steven S. Rosenthal (admitted *pro hac vice*)
Marc S. Cohen (admitted *pro hac vice*)
J.D. Taliaferro (admitted *pro hac vice*)
Alicia M. Clough (admitted *pro hac vice*)
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: (310) 788-2000

*Co-Counsel to California State Lands Commission*

---

[1]The debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Venoco, LLC. (3555); TexCal Energy (LP) LLC (0806); Whittier Pipeline Corporation (1560); TexCal Energy (GP) LLC (0808); Ellwood Pipeline, Inc. (5631); TexCal Energy South Texas, L.P. (0812) (collectively, the "Debtors.") The mailing address for the Venoco Liquidating Trust, for purposes of these Chapter 11 cases, is: 5 Canoe Brook Drive, Livingston, NJ 07039.

## TABLE OF CONTENTS

                                                                                        **Page**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ...............................1

SUMMARY OF ARGUMENT ........................................................................................2

STATEMENT OF FACTS .............................................................................................4

ARGUMENT ...............................................................................................................7

I.      THE COMMISSION'S NON-EXCLUSIVE USE OF THE EOF DID NOT
        DAMAGE THE EOF, OR AT A BARE MINIMUM, THE EXISTENCE OF
        DAMAGE TO THE TRUST IS THE SUBJECT OF FACTUAL DISPUTE
        PRECLUDING THE GRANT OF SUMMARY JUDGMENT TO THE
        TRUST...........................................................................................................7

II.     THE COMMISSION'S USE OF THE EOF IS NOT A TAKING OF
        PRIVATE PROPERTY UNDER THE TAKINGS CLAUSE OF THE
        CALIFORNIA CONSTITUTION...................................................................11

        A.      The California Takings Clause Provides for Compensation for
                Damages Arising from Public Works or Improvements, but that a
                Taking Does Not Occur From an Exercise of the State's Police Power
                to Remedy Risk to Human Health, Safety, or the Environment..........................12

        B.      The Commission's Actions on the EOF Were an Exercise of the Police
                Power to Remedy Risk to Public Health, Safety, and the Environment...............16

        C.      The Commission's Actions on the EOF Were Taken in Response to
                Emergency Conditions. ......................................................................19

III.    THE COMMISSION'S USE OF THE EOF FALLS WITHIN THE POLICE
        POWERS EXCEPTION TO A TAKING OF PROPERTY UNDER THE
        UNITED STATES CONSTITUTION'S FIFTH AMENDMENT TAKINGS
        CLAUSE. ........................................................................................................23

IV.     THE COMMISSION'S USE OF THE EOF WAS NOT A TAKING
        BECAUSE IT DID NOT INTERFERE WITH THE TRUST'S
        REASONABLE INVESTMENT-BACKED EXPECTATIONS AS TO THE
        EOF'S USE. ....................................................................................................26

CONCLUSION...........................................................................................................28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AmeriSource Corp v. United States*,
525 F.31 1149 (Fed. Cir. 2008) ............................................................................23

*In re Application of Rameriz*,
193 Cal. 633 (1924) ...............................................................................................16

*Arkansas Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) .............................................................................................4, 26

*Aztec Minerals Corp. v. Romer*,
940 P.2d 1025 (Colo. App. 1996) ..........................................................................14

*Bachman v. United States*,
134 Fed. Cl. 694 (Fed. Cl. 2017) ...........................................................................24

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) ...........................................................................................25

*City of Oroville v. Superior Court*,
7 Cal. 5th 1091 (2019) ...........................................................................................15

*Customer Co. v. Sacramento*,
10 Cal. 4th 368 (1995), *cert. denied*, 515 U.S. 1116 (1996) .........................*passim*

*People ex rel. Dep't of Trans. v. Desert Outdoor Advert., Inc.*,
68 Cal. App. 3d 440 (1977) ....................................................................................14

*People ex rel. Dep't of Trans. v. Hadley Fruit Orchards*,
59 Cal. App. 3d 49 (1976) ......................................................................................14

*Feiner v. City of Am. Canyon*,
2005 U.S. Dist. LEXIS 42456 (N.D. Cal. March 8, 2005) .....................................15

*Feiner v. City of Am. Canyon*,
2005 U.S. LEXIS 42456 (N.D. Cal. Mar. 8, 2005) ................................................13

*Flahive v. City of Dana Point*,
72 Cal. App. 4th 241 (1999) ...................................................................................14

*Goldblatt v. Town of Hempstead*,
369 U.S. 590 (1969) ...............................................................................................24

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

**Cases**

*Golden Gate Water Ski Club v. Cnty. Of Contra Costa,*
165 Cal. App. 4th 249 (2008) ...............................................................14

*Gray v. Reclamation Dist. No. 1500,*
174 Cal. 622 (1917)...................................................................... 13, 16

*Hardy v. Cnty. of El Dorado,*
2008 U.S. Dist. Lexis 6417 (E.D. Cal. Jan. 28, 2008) ........................13

*HFH, Ltd. v. Superior Court of L.A. Cty.,*
15 Cal. 3d 508 (1975)..........................................................................8

*Holtz v. Superior Court of S.F.,*
3 Cal. 3d 296 (1970)......................................................................3, 19

*House v. L.A. County Flood Control Dist.,*
25 Cal.2d 384 (1944).........................................................................19

*Johnson v. Manitowac County,*
635 F.3d 331 (7th Cir. 2011) ..............................................................24

*Keystone Bituminous Coal Assoc. v. DeBenedictis,*
480 U.S. 470 (1987)............................................................................24

*Lech v. Jackson,*
791 Fed. App'x. 711 (10th Cir. 2019), *cert denied*, 141 S.Ct. 160 (2020)............................23

*Los Osos Valley Assoc. v. City of San Luis Obispo,*
30 Cal. App. 4th 1670 (1994) ............................................................20

*Miller v. Scheone,*
276 U.S. 272 (1928) ...........................................................................24

*Minot v. Freelander,*
426 N.W. 2d 556 (N.D. 1988) ...........................................................14

*Mugler v. Kansas,*
123 U.S. 623 (1887)...........................................................................24

*Nassr v. Commonwealth,*
477 N.E. 2d 987 (1985) ......................................................................14

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

**Cases**

*New Orleans Gas Light Co. v. Drainage Com. Of New Orleans*,
  197 U.S. 453 (1905) ................................................................................................16

*Niles Sand & Gravel Co. v. Alameda Cnty. Water Dist.*,
  37 Cal. App. 3d 924 (1974) ....................................................................................14

*Odello Bros. v. City of Monterey*,
  63 Cal. App. 4th 778 (1998) ...................................................................................14

*Outfront Media, LLC v. City of San Diego*,
  2012 U.S. Dist. LEXIS 103728 (S. D. June 1, 2021).............................................8

*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001) ................................................................................................26

*Penn Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978) ................................................................................................26

*Property Reserve, Inc. v. Superior Court*,
  1 Cal. 5th 151 (2016)...............................................................................................13

*San Diego Gas & Elec. Co. v. Superior Court*,
  13 Cal. 4th 893 (1996).............................................................................................8

*Sonoma County Organization v. County of Sonoma*,
  1 Cal. App. 4th 267 (1991) .....................................................................................20

*Starzenski v. City of Elkhart*,
  659 N.E. 2d 1132 (Ind. Ct. App. 1996) .................................................................14

*United States v. Northeastern Pharm. & Chem. Co.*,
  810 F.2d 726 (8th Cir. 1986) ..................................................................................14

*Williams v. Moulton Niguel Water Dist.*,
  22 Cal. 5th 1198 (2018)...........................................................................................13

*Zitter v. Pertucelli*,
  744 F.App'x. 90 (3d Cir. 2018) ..............................................................................23

**Statutes**

11 U.S.C. § 105..............................................................................................................1

## <u>TABLE OF AUTHORITIES (CONT'D)</u>

**Page(s)**

**Statutes**

42 U.S.C. § 9605 .................................................................................................22

Cal. Gov't Code § 8574.1 ....................................................................................22

Cal. Resources Code § 6829.4(e) .................................................................. 17, 18

**Other Authorities**

Cal. Const. Art. I, § 19 ................................................................................ *passim*

Cal. Const. Art. I, § 19(e)(5) ...............................................................................13

U.S. Const. amend. V .................................................................................. *passim*

The State of California (the "State") and the California State Lands Commission (the "Commission" or the "SLC" and, together with the State, the "Defendants"), by and through their undersigned counsel, hereby oppose *The Liquidating Trustee's Motion for Partial Summary Judgment on the Inverse Condemnation Claims* [Adv. Proc. D.I. 181].

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

This adversary proceeding was commenced by Eugene Davis (the "Trustee" or "Plaintiff"), in his official capacity as Liquidating Trustee of the Venoco Liquidating Trust ("Trust") against the State and Commission on October 16, 2018. Fact discovery is complete, and the parties have agreed that the case will be ready for trial on or about March 7, 2022. Defendants moved on December 23, 2021 ("Defendants' Opening Brief" or "Op. Br.") for summary judgment [Adv. Proc. D.I. 134, 135] on the following bases: (1) Defendants are entitled to summary judgment on Count I of the *Plaintiff's First Amended Complaint for Inverse Condemnation* [Adv. Proc. D.I. 117] (the "FAC") because the Commission's presence on the Ellwood Onshore Facility (the "EOF") is an exercise of the State's police power and, as such, does not constitute a taking of property under either Takings Clause of the California Constitution or the Fifth Amendment to the U.S. Constitution; (2) Defendants are entitled to summary judgment on Count II of the FAC because section 105 of the Bankruptcy Code, 11 U.S.C. § 105, does not create an independent right to relief; and (3) even if Plaintiff has a claim for inverse condemnation, such claim would commence on October 15, 2018, which is the first date on which the Commission was present on the EOF without Venoco's permission. The Trustee filed a combined brief on January 13, 2022 [Adv. Proc. D.I. 158] ("Tr. Br.") seeking a ruling in his favor on the police power limitation on takings and opposing Defendants' motion for summary judgment. Defendants filed a combined brief on January 31, 2022 [Adv. Proc. D.I. 185] ("Defendants' Combined Reply" "Def. Comb.

Br.") opposing the Trustee's motion for summary judgment and a reply in support of their motion

for summary judgment.  On January 26, 2022, the Trustee filed a separate motion for summary

judgment on liability on its inverse condemnation claim.  [Adv. Proc. D.I. 181]. The present brief

is Defendants' brief in opposition the Trustee's most recent motion.

## SUMMARY OF ARGUMENT

1.    The Trustee has moved for summary judgment on liability on his inverse

condemnation claim under both the Takings Clause of the California Constitution, Cal. Const.

Art. I, § 19, and the Fifth Amendment to the United States Constitution.  Defendants oppose the

motion, and the Trustee is not entitled to a finding of liability on at least the following four bases.

2.    First and foremost, the Trustee's contention that the Trust was damaged by the

Commission's actions on the EOF is vigorously contested by Defendants.  Not only has the Trust

made no effort to sell or rent the EOF since 2017, the Trustee has offered no evidence that there

is any person who has an interest in purchasing or renting the property.  Moreover, the EOF has

no rental or sale value for multiple reasons: a) the EOF could not lawfully be put to its present

use in oil and gas production by a successor, b) there is no reasonable prospect that the property

could be used other than for open recreational uses, and c) given the EOF's nearly one century-

long use first as an oil and gas storage site and then as an oil and gas production facility the

property has extensive hydrocarbon soil contamination, requiring $19.7 million or more to

remediate.  Clough Decl., Exh. D at 6, 8 (Padre Associates Expert Report).  At minimum, the

issue whether the Trust has suffered damages is in bona fide dispute precluding entry of summary

judgment for the Trust.

3.    Second, as set forth in detail in Defendants' two earlier briefs, Op. Br. 11-21, Def.

Comb. Br. 13-25, the Commission's actions on the EOF do not constitute a taking under the

California Takings Clause because the actions were an exercise of the State's police power undertaken to remedy risk to public health, safety, or the environment, and the Clause does not apply outside the construction or operation of public works. *Customer Co. v. Sacramento*, 10 Cal. 4th 368, 378 (1995), *cert. denied*, 515 U.S. 1116 (1996). This principle is not merely a defense to liability for a taking; it is a limitation on the scope of the California Takings Clause. The Trustee contends in his prior summary judgment briefs that the only exercises of the police power that fall outside the California's Takings Clause are those taken in response to very narrowly defined emergencies. While California case law is replete with non-emergency exercises of the police power found not to be takings, the Commission's actions on the EOF were taken in response to "emergency conditions," since they were taken "under the pressure of public necessity and to avert public peril." *Holtz v. Superior Court of S.F.*, 3 Cal. 3d 296, 305 (1970). Moreover, since the Trustee fails to raise substantial factual disputes as to the risks to public health, safety, and environment posed by $H_2S$ gas and its byproduct sulfur dioxide from the EOF, and as to the risks posed by oil and gas leaking from the Platform Holly Wells, and that the continuous safe operation of the EOF and the plugging and abandonment of the Wells is necessary to prevent those risks, these facts, at minimum, prevent entry of summary judgment in the Trustee's favor on whether the Commission's action were exercises of the police power and/or taken in response to emergency conditions.

4.    Third, as set forth in Defendants' prior two briefs, Op. Br. 21-23, Def. Comb. Br. 25-30, the Commission's actions on the EOF are also not a taking under the Fifth Amendment of the U.S. Constitution, because case law under that the Federal Takings Clause recognizes that governmental exercise of the police power to respond to risks to public health, safety, or the environment do not constitute takings of property, as demonstrated by the numerous cases and

statutes authorizing such exercises without resort to eminent domain or payment of just compensation.

5.        Fourth, there was no taking under the Federal Takings Clause because the Commission's actions on the EOF did not interfere with the owner's "reasonable investment-backed expectations regarding the . . . [EOF's] use." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 39 (2012).  Venoco knew when it purchased the EOF, at the same time as it assumed the offshore leases, that the EOF was operationally-linked to Platform Holly and the offshore wells and that the operation of the EOF was necessary both to prevent releases of $H_2S$ and sulfur dioxide to the environment and for any eventual plugging and abandonment of the undersea wells.  Venoco also knew that such necessary post-production operation of the EOF would not be revenue-generating.

## STATEMENT OF FACTS

The following four factual statements are not reasonably disputable and are supported by substantial evidence.  These four statements alone raise disputed issues which preclude entry of summary judgment for the Trustee:

1.        The Commission assumed operation and maintenance of the EOF after Venoco notified the Commission that it was unwilling or unable to operate and maintain the EOF and to plug and abandon the Platform Holly Wells.

2.        The Commission continues to operate and maintain the EOF in order to assure the safe operation of the EOF, which is integral to the P&A activities necessary to decommission Platform Holly and permanently close the Platform Holly Wells, which activities are necessary to prevent substantial risk to the environment.

3.      The Commission continues to operate and maintain the EOF to prevent the release of $H_2S$, a toxic gas, from the EOF, the safe operation of which is necessary to prevent a substantial risk to human health, safety, and the environment.

4.      The Commission's presence on and operation of the EOF was with permission until the termination of the Gap Agreement on October 15, 2018.[2]

A complete statement of facts is contained in Defendants' prior summary judgment briefs, which are adopted here by reference.  Op. Br. 4-11; Def. Comb. Br. 5-13.  While there is no need to repeat the factual background provided the court previously, Defendants respond briefly to two factual issues raised recently by the Trustee in order to demonstrate that both present disputed issues precluding entry of summary judgment.

First, the Trustee seeks to use the inability of the Commission and the Trustee to reach a settlement to avoid this litigation as a cudgel to allege that the Commission somehow abused the bankruptcy process and as evidence that the Commission had conceded that it did not have the right to exercise its police powers to use the EOF without engaging in eminent domain.  There is ample evidence that the Commission entered into the Gap Agreement in order to ensure that there was adequate staffing on the EOF to avoid potential harm from $H_2S$ releases from the facility. *See, e.g.*, Second Supplemental Affidavit of Jennifer Lucchesi ("Second Supp. Lucchesi Aff.") [Adv. Proc. D.I. 186], ¶ 5.  During the approximately one-year period during which the Gap Agreement was in effect, the Commission was engaged in constant good faith efforts to settle its disputes with Venoco and to avoid litigation over its use of the EOF.  *Id.*, ¶¶ 12-13.  The Commission, in fact, "made multiple offers to Venoco to assume the property [EOF] and all the decommissioning and

---

[2] *See Declaration of Alicia Clough in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment on the Inverse Condemnation Claims*, filed concurrently herewith ("Clough Decl."), Exs. A-J.

5

remediation liability associated with the EOF." *Id*., ¶ 16.  The Commission had good reason to believe that its offers to assume liability for Venoco's decommissioning and remediation liability had "tremendous value," given the anticipated soil and groundwater remediation costs for the EOF and the value of obtaining a release and waiver of all future liability. *Id*., ¶¶ 16, 18.  The Commission engaged in other settlement efforts, including numerous settlement meetings and communications and the hiring of an appraiser at the Commission's expense to value the equipment on the EOF.  *Id*., ¶¶ 13, 15.

Moreover, the Commission's Executive Officer states that the Commission repeatedly articulated to Venoco and its counsel that the Gap Agreement, payments made under the Agreement, and the extensions of the Agreement were done in pursuit of settlement and that the payments made to Venoco "were intended to serve as placeholder payments that would ultimately be applied toward the final settlement amount if and when the [parties] reached agreement on the amount." *Id*., ¶ 10.  The fact that the Trustee did not accept the Commission's settlement offers to avoid this litigation in no sense demonstrates an abuse of the bankruptcy process.  As importantly, the failure to reach a settlement in no way proves either that the Commission believed it was legally obligated to make payments to the Trustee in the absence of the Gap Agreement or that the Commission believed it lacks police powers to engage in non-exclusive use of the EOF.

Second, as discussed hereafter, there is an absence of evidence establishing damage to the Trust, a necessary element of Trustee's inverse condemnation claim.  Indeed, there is substantial evidence that the EOF was not harmed by the Commission's presence.  The Trustee has never offered the EOF for sale or rent and could not identify what he considers to be a bona fide

expression of interest in the property.[3]  Clough Decl., Exh. A at 150:9-151:7.There is expert

testimony that the cost of removing old equipment and remediating the soil and groundwater of

decades of hydrocarbon contamination substantially exceeded the value of the land itself.  Clough

Decl., Exh. D.  The Trustee's valuation expert performed his valuation without taking account of

the inability of a successor to use the site for oil and gas production and, further, on the assumption

that there was no pollution on the site. The evidence also shows that the Commission's presence

resulted in improvements to the EOF. Thus, at the most, the factual issue whether the EOF was

damaged is disputed and its resolution must await trial.

## ARGUMENT

**I.    THE COMMISSION'S NON-EXCLUSIVE USE OF THE EOF DID NOT DAMAGE
       THE EOF, OR AT A BARE MINIMUM, THE EXISTENCE OF DAMAGE TO THE
       TRUST IS THE SUBJECT OF FACTUAL DISPUTE PRECLUDING THE GRANT
       OF SUMMARY JUDGMENT TO THE TRUST.**

The Trust devotes barely a page in its brief to its contention that the Commission's use of

the EOF harmed the Trust.  Tr. Liab. Br. 9 – 10.  The Trust provides no evidence whatsoever that

the Trust could have rented or sold the EOF had the Commission not been using the site nor any

other evidence that the EOF was in fact damaged by the Commission's actions.  In fact, the

available evidence supports the conclusion that the EOF had no rental or sales value given that its

only future permissible use would be as an open recreational area, which would require incurring

the cost and expense of removing the existing oil and gas production facilities on the site, and the

remediation of the hydrocarbon contaminated soil on the site at a cost of $19.7 million or more.

---

[3] No attempt by the Trustee was ever made to visit the property or to place it for sale.  Clough Decl., Exh. A at 81:2-8; 191:18-193:19 (1/3/2022 Deposition of Eugene Davis).  Moreover, to the extent the Trustee was prevented from trying to sell the EOF, the Trustee had a convenient forum to either gain access to the EOF or to oust the SLC – this Court.

Clough Decl., Exh. D at 6.    Indeed, the evidence supports a finding that the Commission's maintenance and improvement of the EOF during their presence benefited the site, and did not damage the site.    In an inverse condemnation case, the plaintiff must prove that "damage" to property has occurred to state a claim.    *See San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 939-42 (1996); *HFH, Ltd. v. Superior Court of L.A. Cty.*, 15 Cal. 3d 508, 518 (1975); *Outfront Media, LLC v. City of San Diego,* 2012 U.S. Dist. LEXIS 103728, at *19 (S. D. June 1, 2021).

The Trustee's assertion of harm to the Trust by reason of the Commission's actions is based exclusively upon the Trustee's own conclusory statements, none of which provide evidence of loss by the Trust.    First, the Trustee states that the Trust received no payment from Defendants for their use or occupancy of the EOF, starting October 15, 2018, although he concedes that the Trust has been reimbursed certain costs, including property taxes, electricity, and insurance.    Declaration of Nancy Davis ("N. Davis Decl."), Exh. B at 7; *id*. Exh. E at 19:6-7; 39:4-16; 153:19-154:6.    The absence of income from Defendants does not, of course, prove that the Trust would have received income from another source or that the Trust otherwise suffered damage.    Second, the Trustee states, in conclusory fashion, that the Commission's use of the EOF prevented the Trust from selling the site and providing a potential purchaser with quiet possession.    N. Davis Decl. Exh. E at 154:11-155:9; 155:14-19; 266:16-24; 268:3-23.    Even if this statement is true, which it is not, it provides no evidence that there was the prospect of a potential purchaser for the EOF, especially given its condition.    The Trustee did not point to any efforts to sell, rent or market the property. The Trustee created no marketing materials and hired no investment bankers or brokers.    Lastly, Trustee states that, in the absence of payment from the Commission (presumably in an amount he considered satisfactory), he was required to pursue this proceeding and could not wind up the

Trust. N. Davis. Decl. Exh. B at 8. This assertion ignores that the Trustee is currently engaged in litigation against the Plains All-American Pipeline, which is also delaying the resolution of the Trust. *Venoco LLC v. Plains Pipeline LP*, Case No. 2:16-cv-02988-PSG-JEM (C.D. Cal); appeal pending 21-55193 (9th Cir.) (oral argument schedule March 10, 2022). Moreover, even if this litigation were the only thing preventing resolution of the Trust, pursuing litigation, with its attendant delays, does not constitute damage for purposes of inverse condemnation. Even if it were, it would not constitute damage to the Trust's interest in the EOF.

Not only is there an absence of evidence establishing damage to the Trust, there is substantial evidence that the EOF has not been harmed by the Commission's presence. First, at his deposition, the Trustee made a number of damaging admissions. The Trustee admits that the Trust never placed the EOF on sale or offered the EOF for rent, nor has it ever communicated with a real estate professional about the possible sale or rental of the EOF. Clough Decl., Exh. A at 150:9-151:7. The Trustee states that the Trust received, what he characterizes as, "one or two crazy proposals" to buy the EOF, "one for a few hundred thousand dollars to buy it, and another one might have been like a million-2." The Trustee characterized these as "nonsense offers. They were from tire-kickers." Otherwise, he did not remember who these offers were from. *Id*. at 151:8-151:24. Although the Trustee identifies Exxon Corporation as a potential lessor of the EOF, the Trustee admits that he never contacted Exxon about renting or purchasing the EOF. Indeed, the Trustee states that "[s]ince the Commission never pursued Exxon to take on its liability in this case, Exxon had no reason to contact me." *Id.* at 159:12-21. In short, the Trustee never identifies what he believes to be a bona fide purchaser or renter of the property, much less a credible offer to purchase or rent the EOF.

Demonstrating that the EOF lacked sale or rental value, and, therefore, that there was no damage to the Trust by reason of its use by the Commission, is the following testimony: (1) Bradley Lofgren, MAI, an experienced real estate appraiser, concluded that the EOF has zero value, explaining: "This is a result of the fact that the cost to remove the existing improvements and remediate the site far exceed the value of the property assuming these issues did not exist." Clough Decl., Exh. B at 3 (Peregrine Expert Report); (2) Timothy G. Skillman, with long experience managing and advising on oil and gas exploration and production operations, concluded that the fair market rental value of the equipment of the equipment at the EOF was less than zero, because the sale price as of October 15, 2018 from which that value was derived was more than offset by the appreciation in value of the equipment since that date. Clough Decl., Exh. C at 5 (CR3 Partners Expert Report); (3) Ryan M. Zukor, P.G., an experienced geologist and environmental scientist, concluded that a "rough order of magnitude cost estimate for remediation of soil and groundwater remediation at the Project Site [EOF] is $19,686,818." Clough Decl. Exh. D at 8 (Padre Expert Report); (4) the Trustee's valuation expert, Michael Neal Arnold, estimated the value of the land and improvements of the EOF at $5.75 to $6.0 million, from which he derived a monthly rental values. Mr. Arnold freely admitted at his deposition that his valuation assumed that the EOF could continue be used as an industrial site, as a petroleum processing facility, which he characterized as a "hypothetical condition," because it was contrary to known facts, *i.e.*, the zoning of the site, and that hypothetical condition could have affected his market rent opinion. Clough Decl., Exh. E at 67:6-69:5, 70:8-71:15 (1/14/2022 Deposition of Michael Arnold). As importantly, Mr. Arnold admitted that his appraisal assumed that was no pollution on the EOF that could affect the value of the property other than in its current use. *Id.* at 83:23-84:19.

Second, in the course of the Commission's maintenance and operation of the EOF, the Commission made necessary improvements to the EOF, which rather than harming the property, improved the property.  Thus, the Commission's Executive Officer testified that the Commission modified the EOF to add the  ability to truck oil when the storage tanks at the EOF need to be emptied.  Clough Decl., Ex. F at 135:16-136:1 (12/21/2021 Deposition of Jennifer Lucchesi).

In sum, there is substantial evidence that could lead a trier of fact to conclude that the EOF was not damaged by the Commission's non-exclusive use of the EOF.  At a minimum, the issue whether the EOF was damaged is contested, thus, precluding entry of summary judgment on liability in favor of the Trust.

## II.    THE COMMISSION'S USE OF THE EOF IS NOT A TAKING OF PRIVATE PROPERTY UNDER THE TAKINGS CLAUSE OF THE CALIFORNIA CONSTITUTION.

California case law adjudicating claims under the California Takings Clause, Cal. Const., article I, section 19, has long recognized that a taking does not occur where the government's use of real property is not proximately caused by a public work or improvement, but instead result from an exercise of the State's police powers.  This principle is a limitation on the scope of the California Takings Clause and not merely a defense to liability.  The undisputed facts demonstrate that the Commission's use of the EOF was an exercise of the State's police power. As a result, the Trustee's summary judgment motion grounded in California's Takings Clause should be denied.

A.    **The California Takings Clause Provides for Compensation for Damages Arising from Public Works or Improvements, but that a Taking Does Not Occur From an Exercise of the State's Police Power to Remedy Risk to Human Health, Safety, or the Environment.**

Judicial interpretation of the California Takings Clause draws a sharp distinction between damages to real property proximately caused by public works or improvements, for which compensation is required, and damages to real property caused by an exercise of the State's police power to remedy risk to public health, safety, or the environment, which do not come within the Clause.

Perhaps the California Supreme Court's best-known exposition of this principle of California takings law is in *Customer Company v. Sacramento*, 10 Cal. 4th 368 (1995), *cert. denied,* 516 U.S. 1116 (1996).  In that case, the owner of a convenience store brought a claim for inverse condemnation in order to recover extensive damage to the store and its contents resulting from police activities seeking to apprehend a criminal fugitive hiding in the store.  The Court held that plaintiff failed to state an inverse condemnation claim under California's Takings Clause, Cal. Const., article I, section 19, and explained the basis for its holding as follows:

> As is demonstrated by both the history and the consistent judicial interpretation of section 19, that provision was never intended, and never has been interpreted, to impose a constitutional obligation upon the government to pay "just compensation" whenever a governmental employee commits an act that causes loss of private property . . . Neither the 'taken' nor the 'or damaged' language has ever been extended to apply outside the realm of eminent domain or public-works to impose a Constitution-based liability, *unamenable to legislative regulation*, for property damage incidentally caused by the actions of public employees in the pursuit of their public duties.

*Id*. at 378 (emphasis in original).[4]

The holding of *Customer Company* was reiterated more recently by the California

Supreme Court in *Property Reserve, Inc. v. Superior Court*, 1 Cal. 5th 151 (2016), as follows:

> [N]umerous statutes grant public entities and employees the authority to enter and
> engage in official activities on private property for a wide range of purposes.
> Common examples include entries to execute search warrants, to conduct health
> and safety inspections, to enforce fish and game regulations, to carry out workplace
> inspections, and to investigate and eliminate nuisances . . . As a general matter, in
> the absence of any connection with the construction or operation of a public
> improvement, conducting such entries and activities on private property, even when
> such activities result in damage to the property, has not been considered to
> constitute either the taking of a compensable property interest in property or the
> damaging of property so as to entitle the property owner to just compensation under
> the state takings clause.

*Id*. at 191 (emphasis in original) (citing *Customer Co.*, 10 Cal. 4th at 378).  *See also, Williams v.*

*Moulton Niguel Water Dist.,* 22 Cal. 5th 1198, 1209 (2018) ("Neither the 'taken' nor the 'or

damaged' language ever has been extended to apply outside the realm of eminent domain or public

works to impose a Constitution-based liability, unamenable to legislative regulation, for property

damage incidentally caused by the actions of public employees in the pursuit of their public

duties.").

The following are examples of non-emergency California cases involving an exercise of

the police power in which a taking was not found, drawn from Defendants' prior summary

judgment briefs.  Op. Br. 12-14, 15 n 10; Def. Comb. Br. 17-18:  *Feiner v. City of Am. Canyon*,

2005 U.S. LEXIS 42456, at *16, *17-18 (N.D. Cal. Mar. 8, 2005); *Hardy v. Cnty. of El Dorado*,

2008 U.S. Dist. Lexis 6417 (E.D. Cal. Jan. 28, 2008); *Gray v. Reclamation Dist. No. 1500*, 174

---

[4] In 2008, Cal. Const., article I, section 19, was amended by Proposition 99 to add new provisions prohibiting certain acquisitions of real property by eminent domain.  Those provisions contain a definition of "public work or improvement" that makes clear that the term is limited to facilities or infrastructure constructed for the delivery of public services.  Cal. Const., article I, section 19(e)(5).  This Constitutional provision, although added for a different purpose, provides a useful definition of the facilities, the construction of which gives rise to a compensable just compensation claim under section 19.

Cal. 622 (1917); *People ex rel. Dep't of Trans. v. Desert Outdoor Advert., Inc*., 68 Cal. App. 3d

440, 448 (1977); *People ex rel. Dep't of Trans. v. Hadley Fruit Orchards*, 59 Cal. App. 3d 49, 53

(1976); *Niles Sand & Gravel Co. v. Alameda Cnty. Water Dist*., 37 Cal. App. 3d 924 (1974);

*Flahive v. City of Dana Point*, 72 Cal. App. 4th 241 (1999); *see also Golden Gate Water Ski*

*Club v. Cnty. Of Contra Costa*, 165 Cal. App. 4th 249 (2008) (notwithstanding the fact that

county took no enforcement action for 35 years, the county acted lawfully in demolishing and

removing structure that violated health code).

　　　　The following are examples of non-emergency cases from other jurisdictions holding that

physical entry onto property to respond to a risk to public health, safety, or the environment not

in response to an emergency is not a taking: *Nassr v. Commonwealth,* 477 N.E. 2d 987 (1985);

*United States v. Northeastern Pharm. & Chem. Co.,* 810 F.2d 726 (8th Cir. 1986); *Aztec*

*Minerals Corp. v. Romer*, 940 P.2d 1025 (Colo. App. 1996); *Starzenski v. City of Elkhart,* 659

N.E. 2d 1132 (Ind. Ct. App. 1996); *Minot v. Freelander*, 426 N.W. 2d 556 (N.D. 1988).

　　　　Remarkably, the Trustee in his two prior briefs discussing the California Takings Clause

never presents a cogent response to Defendants' foregoing explication of relevant California law.

First, and foremost, the Trustee never provides a single example in which a court applying the

California Takings Clause has awarded compensation for the entry upon, use of, or injury to real

property resulting from governmental officials acting to remedy risk to public health, safety or the

environment pursuant to the police power.  Even the one intermediate appellate case on which the

Trustee places reliance, *Odello Bros. v. City of Monterey,* 63 Cal. App. 4th 778 (1998), which was

a public works case, did not find liability, but remanded for trial on disputed issues of fact.  In fact,

all the reported awards of compensation for entry or damage to real property brought under

California law, of which Defendants are aware, were the result of the construction or operation of a public work or improvement.

Second, while the Trustee asks this Court to focus on the term "public use" in the Takings Clause, it is the verbs "taken" and "damaged" in the Clause on which the above case law focusses. As those cases state: "Neither the 'taken' nor the 'or damaged' language has ever been extended to apply outside the realm of eminent domain or public works[.]" *Customer Co.*, 10 Cal. 4th at 378. Even more explicitly, Judge William Alsup sets forth the applicable California law as follows: "Inverse condemnation requires a showing of physical injury to real property that was proximately caused by the public work or improvement as deliberately constructed or planned . . . as a public work or improvement." *Feiner v. City of Am. Canyon*, 2005 U.S. Dist. LEXIS 42456, at *16-17 (N.D. Cal. March 8, 2005). The Trustee cites dicta from *City of Oroville v. Superior Court,* 7 Cal. 5th 1091, 1103 (2019), for the proposition that "inverse condemnation law covers the proverbial waterfront of public improvements." However, not only did that case actually involve that most prosaic of public works, a sewage system, it found that no taking had taken place by reason of a sewage system backup.

Third, the Trustee believes he presents a telling argument by noting that Defendants have cited cases in which governmental officials enter and occupy private property in order to abate nuisances or pursuant to authority granted by the environmental laws. The Trustee completely misses the point. The point is that in none of those cases was the government held to have engaged in a taking or required to pay just compensation. Nuisance abatement and environmental remediation are merely categories of the police power requiring entry onto property among many other categories (*e.g.*, control of fish and game, preventing the spread of disease or pestilence, rescuing livestock, property, and person). *The fact that some entries onto private property may be*

15

*expressly authorized by statute is also beside the point, since a statute could not authorize violation of the Takings Clause had the entries, in fact, contravened the California Constitution.*  Even the Trustee's briefs recognize that governmental actions taken in response to emergencies, do not constitute takings under California law.  Tr. Br. at 16-17.  All the cases exemplify the principle of California law, going back at least as far as *Gray v. Reclamation Dist. No. 1500,* 174 Cal. 622 (1917), that exercises of the police power do not constitute takings under California's Takings Clause.

For these and the reasons in our prior briefs, neither the "taken" nor the "or damaged" language of the California Takings clause applies to the actions of public employees in the exercise of the police powers.

**B.     The Commission's Actions on the EOF Were an Exercise of the Police Power to Remedy Risk to Public Health, Safety, and the Environment.**

The Commission's actions on the EOF fall well within the long-recognized purview of the State's police powers, *i.e.*, actions undertaken to protect the health, safety, and general welfare of the community.  *In re Application of Rameriz,* 193 Cal. 633 (1924).  Indeed, furtherance of the public health and welfare is one of the most important purposes for which the police power can be exercised.  *New Orleans Gas Light Co. v. Drainage Com. Of New Orleans*, 197 U.S. 453 (1905).  Specifically, the Commission initially financed Venoco's operation and maintenance of the EOF and then commenced direct operation and maintenance of the EOF for two reasons: (1) Platform Holly Wells are producing unsafe levels of the toxic $H_2S$ gas which can only be safely treated by the EOF, and (2) the proper operation of facilities on the EOF is necessary to the P&A of the Platform Holly Wells.  Op. Br. 5, 6-7, 17-18.  The Trustee does not raise a triable issue as to the existence of either of these reasons.

The Commission commenced operation of the EOF, and continues to operate the EOF because its facilities are needed to receive, separate, treat, and store the oil, water and gas, including toxic $H_2S$ gas, which build to unsafe levels within the annual spaces of certain Platform Holly Wells and are otherwise produced as part of P&A of the Platform Holly Wells.[5] The Trustee admits that the safety monitoring equipment on the EOF services Platform Holly and the interconnecting pipelines, the electrical substation for Platform Holly runs through the EOF and is integrated with the EOF electrical systems, the switchgear for Platform Holly is located on the EOF, and the gas system needed to operate critical equipment on Platform Holly (*e.g.*, the platform's emergency flare) is integrated with the EOF system. Planck Aff. [Adv. Proc. D.I. 188], ¶ 20. The $H_2S$ gas produced as part of the P&A activities is flammable and toxic and its uncontrolled release would pose a risk to public health and the environment. Platform Holly alone cannot treat the volumes of high concentration $H_2S$ created by its wells and the excess $H_2S$ must be captured in Platform Holly's piping collection system and transported and treated at the EOF in order to prevent the buildup of excessive $H_2S$ gas pressure in the Platform Holly Wells.[6] These facts and those set forth in Defendants' prior summary judgment brief, at minimum, raise triable issues preventing entry of summary judgment in the Trustee's favor.

The Commission has exercised police power to remedy risks to the public health, safety, and environment previous to this case. Def. Comb. Br. at 20-21. Moreover, Cal. Resources Code § 6829.4(e) ratified the exercise of the police power in this case: "If the commission or

---

[5] *See* Affidavit of Jeffrey Planck [Adv. Proc. D.I. 188], ¶¶ 16-17; Affidavit of Keith Wenal [Adv. Proc. D.I. 190], ¶ 8 (toxicity of $H_2S$ gas), ¶¶ 14-15 (interrelated infrastructure of Platform Holly and EOF); Affidavit of Jennifer Lucchesi [Adv. Proc. D.I. 136], ¶¶ 10, 20-23.

[6] If not treated, the $H_2S$ can flare in an unintended release. Moreover, the greater threat from $H_2S$ at Platform Holly is that multiple wells have poor cement jobs that allow gas to migrate up the annulus from the reservoir to the water surface in an uncontrolled manner. The only remedy for this uncontrolled release is that the gas is captured at the wellhead and pumped to the EOF for treatment. If the EOF was not available, the gas would build pressure at the surface and release, as would oil. Planck Aff. [Adv. Proc. D.I. 188], ¶ 13.

another state agency, due to the failure of a lessee, assignee, transferee, sublessee, or operator to meet its obligations for the plugging and abandonment of a well or the decommissioning of a production facility or related infrastructure, conducts those activities to preserve public health or protect the environment, those activities shall be deemed an exercise of the police power of the state."[7]

The Trustee himself concedes the statute was enacted "specifically in response to the facts of this case."  The legislative history states that it "clarif[ied] the police powers of SLC" to step in to operate and safely maintain the EOF in order "to preserve public health and protect the environment."  Tr. Br. Ex. W, at 2.  Although the Trustee contends that the statute could not have retroactive effect (which we do not concede), the fact remains that the statute requires no form of retroactivity to authorize the Commission's exercise of the police power from and after its effective date of January 1, 2020.

In sum, the Commission's entry onto and activities on the EOF were undertaken as an exercise of California's police power in the reasonable belief, ratified by statute (Cal. Public Resources Code § 6829.4(e)), that the safe operation and maintenance of the facility was necessary to prevent risk to public health, safety, and the environment.  This Court should not grant the Trustee's motion for summary judgment on the inverse condemnation claim under California law.  Absent that, at a bare minimum, the Court should hold that there exists a triable issue as to whether the Commission's activities constitute a taking under California law.

---

[7] California Resources Code Section 6829.4(e) was enacted in 2019 and was effective as of January 1, 2020.  While certainly applicable since that date, it is equally instructive as a declaration of the scope of the police power prior to that date.

C.    **The Commission's Actions on the EOF Were Taken in Response to Emergency Conditions.**

*Customer Co., supra,* discusses the "so-called emergency exception to the just compensation requirement," and it describes the exception as "a specific application of the general rule that damage to, or even destruction of, property pursuant to a valid exercise of the police power often requires no compensation under the just compensation clause."  10 Cal. 4th at 383. For explication of the exception, *Customer Co.* references *Holtz v. Superior Court,* 3 Cal. 3d 296, 305, and specifically the following language from *Holtz*, which defines a taking or damaging of property under "emergency conditions" as follows: "when damage to private property is inflicted by government 'under the pressure of public necessity and to avert public peril."  This standard of what constitutes emergency conditions, was, in turn, adopted from *House v. L.A. County Flood Control Dist.*, 25 Cal.2d 384, 391 (1944).  The standard for what is to be regarded as "emergency conditions," set forth twice by California's highest court, must, therefore, be treated as controlling in this Court.

While the standard does require "public necessity" and the "avert[ing of] pubic peril," it does not impose requirements beyond these two benchmarks, contrary to what the Trustee contends.  Thus, for example, the California Supreme Court does not require that "emergency conditions" must also involve "an unforeseen condition," or that there be no alternatives to the action being taken.  After all, fires, civil unrest, human error, or criminal activity are not exactly unforeseen conditions, but when these events do occur they still may give rise to a public necessity and public peril.  Similarly, public authorities are frequently faced with a number of alternatives for responding to emergency conditions.

In its prior summary judgment brief, the Trustee relies upon only a single intermediate court case for the proposition that the emergency exception requires "an unforeseen situation." Tr. Br. at 16, 19 (citing *Los Osos Valley Assoc. v. City of San Luis Obispo,* 30 Cal. App. 4th 1670 (1994). In seeking to define the term "emergency," *Los Osos* makes no reference to either *Holtz* or *House,* but instead quotes an opinion that defines emergency in the context of a labor-management dispute. *Id*. at 1681 (quoting *Sonoma County Organization v. County of Sonoma,* 1 Cal. App. 4th 267, 276 (1991)). Other than adopting this use of the term emergency in an unrelated context, *Los Osos* never explains why the "emergency circumstances" justifying exercise of police powers must in all circumstances involve "an unforeseen situation." No other case cited by the Trustee equates an "emergency situation" with "an unforeseen situation."

The Trustee cites no case law whatsoever for the proposition that, in order to come within the emergency exception, there must be no alternatives available to the actions taken. As previously stated, to impose such a condition for the emergency exception makes no sense.

In the present case, Defendants submit that there is no genuine dispute that the Commission assumed operation and maintenance of the EOF at a time that it reasonably believed that it was the operator of last resort, and it has continued to operate and maintain the EOF for two reasons: (1) the safe operation and maintenance of the EOF is necessary to treat and prevent the release of dangerous levels of $H_2S$ gas produced from the Platform Holly Wells, and, (2) the safe operation and maintenance of the EOF is required to support the plug and abandonment of the Platform Holly Wells, which in the absence of plug and abandonment present a threat to the marine environment.

In support of the risk presented from untreated releases of $H_2S$ gas from the EOF, the Commission also submits the expert report of Robert Ettinger of Geosyntec, which modeled air

dispersion of untreated gas from the EOF.  *See* Second Supp. Lucchesi Aff. [Adv. Proc. D.I. 186], ¶ 22, Exh. H.[8]

These facts establish, as matter of law, the requisite two elements that the Commission's actions were taken in response to "emergency conditions," *i.e.*, they were taken under "pressure of public necessity" and in order "to avert public peril."

In his prior summary judgment brief, the Trustee contends that no threat of *imminent* harm existed when the Commission assumed operation of the EOF or since.  Tr. Br. at 20-23.  The Trustee is able to reach his conclusion only because he asks the wrong question.  The question to be asked, according to *Holtz*, is whether the Commission's actions would "avert a public peril," to which the answer is clearly yes.  The "public peril" is that if the EOF is not safely operated and maintained a poisonous gas will be released.  The Beacon West witnesses upon which the Trustee places such heavy reliance attest that absent continued safe operation of the EOF, the EOF presents a risk to human health and safety from poisonous gas.  *See* Affidavit of Larry Huskins [Adv. Proc. D.I. 189], ¶¶ 6-9, 11-12; Affidavit of Keith Wenal [Adv. Proc. D.I. 190], ¶¶ 5, 7-10.  Contemporaneous documents from 2017 and 2018 and testimony from expert witnesses also establish that the EOF must continue in safe operation to prevent the release of $H_2S$ gas.  Second Supp. Lucchesi Aff. [Adv. Proc. D.I. 186], ¶¶ 5-10, Exhs. A-C.  There is literally no evidence to

---

[8] The modeling results show that maximum one-hour concentrations of $H_2S$ exceeding the health based REL used by CalEPA (30 ppbv) are predicted to impact areas outside the EOF property boundary including the agricultural area north of U.S. Highway 101, residential area northwest of EOF, the two businesses adjacent to EOF, and over one mile of the public recreational beach area south of the facility.  Concentrations above the acute REL in these areas may cause adverse health effects.  $H_2S$ concentrations above 100 ppbv and in some areas over 300 ppbv are predicted to be present outside the EOF property boundary including the Bell Canyon Creek area west and southwest of EOF.  This property is a natural riparian habitat that supports rare animals (e.g., federally endangered red-legged frog and tidewater goby) and is an autumnal site for the monarch butterfly (a California Species of Special Concern).  This area has been identified as an Environmentally Sensitive Habitat (California Coastal Commission, 2013 and AECOM, 2012).  Potential $H_2S$ concentrations in air due to untreated gas emissions at EOF are expected to have an adverse impact to this habitat, resulting in unacceptable ecological impacts.  *Id.*

contradict the fact that if the EOF is not safely operated and maintained, H2S gas will be released into the air and that such a release would satisfy anyone's definition of a "public peril."

The same line of argument applies to the need to safely maintain and operate the EOF in order to P&A the Platform Holly Wells.  The Trustee impliedly contends, without evidence, that "shutting in" the wells, is an effective and final solution for preventing the discharge of oil and gas from the Wells.  In truth, the evidence shows that the offshore wells have been seeping oil underwater and discharging oil and gas, which require the operation of Platform Holly and the EOF in order to control, otherwise oil and gas will be released into the marine environment. Huskins Aff. [Adv. Proc. D.I. 189], ¶ 10.  There is, therefore, a second public peril that the Commission's safe operation of the EOF is required to avert.

The Trustee also contends that the Commission knew of, and anticipated, that Venoco would quitclaim its leases, and, therefore, cannot claim an emergency when it did so.  Government authorities constantly plan for and establish contingency plans in the event of public perils.  Indeed, the law frequently requires that public authorities plan for and establish contingency plans for identifiable perils.  *See, e.g.,* 42 U.S.C. § 9605 (requiring the President to "revise and republish the national contingency plan for the removal of oil and hazardous substances", including a "national hazardous response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants."); Cal. Gov't Code § 8574.1 (California Oil Spill Contingency Plan to respond to oil spills wherever they may occur in the State).

In this case, even assuming the Commission could be charged with anticipating that Venoco would declare itself no longer able to operate and maintain Platform Holly and the EOF, thus requiring that the Commission operate and maintain those facilities as operator of last resort, that does not mean that when the eventuality does occur it does not create a public necessity.

Similarly, that the Commission requires lessors to post bonds that may be called upon to reimburse the State for actions the lessee fails to perform does not negate the existence of public necessity when the State is forced to undertake actions that if not performed by the lessor would result in public perils.

In sum, the actions of the Commission on the EOF satisfy both elements of having been undertaken under emergency conditions and this Court, therefore, has additional grounds for dismissing the Trustee's takings claims.   At minimum, the Commission has established the existence of triable issues of fact as to emergency conditions requiring rejection of the Trustee's motion for summary judgment.

## III.    THE COMMISSION'S USE OF THE EOF FALLS WITHIN THE POLICE POWERS EXCEPTION TO A TAKING OF PROPERTY UNDER THE UNITED STATES CONSTITUTION'S FIFTH AMENDMENT TAKINGS CLAUSE.

The Takings Clause of the Fifth Amendment to the U.S. Constitution also provides that an exercise of the police power, such as that of the Commission in this case, does not constitute a taking for which compensation is required.

Four recent U.S. Courts of Appeals decision, decided under the Fifth Amendment, draw the distinction between the State's police power and the power of eminent domain in cases involving the government's direct physical interference with private property, each holding that no taking occurred where the government has acted pursuant to its police power.  *Lech v. Jackson,* 791 Fed. App'x. 711, 719 (10th Cir. 2019), *cert denied*, 141 S.Ct. 160 (2020) ("We likewise reject the [Plaintiff's] assertion that the police power does not encompass the state's ability to seize property from an innocent owner."); *AmeriSource Corp v. United States,* 525 F.31 1149 (Fed. Cir. 2008) (government seizure of pharmaceuticals); *Zitter v. Pertucelli,* 744 F.App'x. 90 (3d Cir.

2018) (seizure of oysters and oyster-farming equipment); *Johnson v. Manitowac County*, 635 F.3d 331 (7th Cir. 2011) (damage to home); *see also Bachman v. United States*, 134 Fed. Cl. 694, 696 (Fed. Cl. 2017) ("[W]hen private property is damaged incident to the exercise of the police power, such damage is not a taking for the public use, because the property has not been altered or turned over for public benefit.").

These decisions have deep historical roots going back to the formative years of Fifth Amendment Takings law.  In *Mugler v. Kansas*, 123 U.S. 623 (1887), the Supreme Court held that the destruction, and prohibition on use, of plaintiff's brewery and related property for the manufacture of alcoholic beverages was a valid exercise of the State's police power and did not require compensation under the Fifth Amendment.   While acknowledging the purposes of the Takings Clause, the Court nonetheless held "[t]hese principles have no application to the case under consideration" because the state's action was "exerted for the protection of the health, morals, and safety of the people."  *Id.* at 668.  The court held all property is subject to the State's police power.  *Id.* at 665.[9]

Relatedly, in two cases involving governmental exercises of the police power to restrict or prohibit the use of land, the Supreme Court upheld the governmental action against a due process challenge.  In *Miller v. Scheone,* 276 U.S. 272 (1928), the Court upheld cutting cedar trees on plaintiff's property because the trees presented a threat of spreading disease to apple orchards, which were judged by the community to be of greater economic value.  In *Goldblatt v. Town of Hempstead*, 369 U.S. 590 (1969), citing *Mugler v. Kansas, supra,* the Supreme Court upheld a prohibition of further excavation on plaintiff's land.

---

[9] *Mugler* continues to be cited as authority to this day.  *See, e.g., Keystone Bituminous Coal Assoc. v. DeBenedictis,* 480 U.S. 470 (1987); *Bachman v. United States*, 134 Fed. Cl. 694, 696 (Fed. Cl. 2017).

In response to this case law recognizing various circumstances in which exercises of the police power have been recognized as not giving rise to a taking under the Fifth Amendment, the Trustee cites *Cedar Point Nursery v. Hassid,* 141 S. Ct. 2063 (2021).  In that case, a California regulation granted labor unions a right of access for a specified number of hours and days to an agricultural employer's property in order to solicit support for unionization.  The Court  held that the regulation constituted a per se physical taking of the employer's property.  The case, of course, did not involve the government taking in response to a risk to public health, safety, or the environment, whether in an emergency of not.  Much more importantly, however, the Court devotes  the final section of its opinion  stating that the fear that the opinion would "will endanger a host of state and federal governmental activities involving entry onto private land . . . is unfounded."  *Id.* at 2078.  While not intending to provide an exhaustive listing of all such governmental activities involving entry onto property, the Court does note as one example, "entry to avert serious harm to a person, land, or chattels."  *Id.* at 2079.  *Cedar Point Nursery*, thus, provides no basis for the Trustee's contention that it overturns existing precedent and imposes a blanket rule that all governmental entries onto private property constitute a Fifth Amendment taking.  If that proposition were true, one would think the Trustee could cite a case in which a government entry onto property to respond to risk to public, health, and the environment constitutes at taking, but they do not.

In the present case, for reasons discussed previously, there is no genuine dispute that as an integral part of oil and gas processing facilities that include Platform Holly, related undersea wells, and interconnecting pipelines, power, communications and safety monitoring equipment, the proper operation and maintenance of the EOF is necessary to the plug and abandonment and decommissioning of Platform Holly and its wells, and that a failure to safely operate and

maintain the EOF would result in risk to human health, safety, and the environment.  Neither Venoco, the Trustee, nor any other party volunteered to operate and maintain the EOF.  By stepping into the breach to operate and maintain the EOF, the Commission's actions were quintessential exercises of the police power intended to protect the community and the environment.

Moreover, even if it were true that there were feasible alternatives to use of the EOF in performing the necessary decommissioning and plugging and abandonment activities at Platform Holly and its wells, which there are not, that would not make the Commission's activities any less an exercise of the State's police powers.  Defendants have identified no case in which the government's presence and use of land in order to abate a potential health, safety, or environmental risk, whether the risk emanated on the land or nearby, gave rise to an award of Fifth Amendment just compensation.

## IV.    THE COMMISSION'S USE OF THE EOF WAS NOT A TAKING BECAUSE IT DID NOT INTERFERE WITH THE TRUST'S REASONABLE INVESTMENT-BACKED EXPECTATIONS AS TO THE EOF'S USE.

*Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104 (1978), sets forth a number of factors to be considered in determining whether a regulation of property constitutes a taking, the most important of which, for present purposes, is "the extent to which the regulation has interfered with distinct investment-backed expectations" of the property owner.  *Id.* at 124.  More recently, the Court has applied the property owner's "reasonable investment-backed expectations regarding the land's use" to physical takings cases as a substantial factor in determining whether a taking has occurred.  *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 39 (2012); *Palazzolo v. Rhode Island,* 533 U.S. 606, 618 (2001).

Applying this factor to the present case, Venoco – when it purchased the EOF, at the same time as it assumed the offshore leases with the Commission – knew that the EOF was inextricably linked to Platform Holly and the offshore wells.  Op. Brief at 6-7.  Indeed, Venoco knew that it was contractually required to P&A the Platform Holly Wells and that the EOF was necessary for that purpose.  Op. Brief at 7-8.  It was only because of Venoco's default on its obligations that the Commission undertook the work that Venoco failed, or was unable, to perform.  Everything that the Trustee asserts that the Commission was aware of at the time the leases were transferred, Venoco was itself aware of at the same time.  Tr. Br. at 8, 18.  Venoco, therefore, knew that if it quitclaimed its leases or was otherwise unable to maintain and operate Platform Holly and its wells, personnel required to control emissions of $H_2S$ gas from Platform Holly, and to plug, abandon, and decommission Platform Holly and its wells, would have to enter onto the EOF in order to maintain safe operations on the EOF.  Planck Aff. [Adv. Proc. D.I. 188], ¶¶ 11-17; Huskins Aff. [Adv. Proc. D.I. 189], ¶¶ 5-12; Wenal Aff. [Adv. Proc. D.I. 190], ¶¶ 10-16.  Therefore, Venoco's (and by extension, the Trustee's) reasonable expectation was that the EOF would eventually need to be used for precisely the sorts of activities that the Commission is engaging in on the EOF.  Venoco further knew that these activities would not be revenue generating, but a back-end cost of its prior oil and gas production.  Venoco, thus, at the time it acquired the EOF, had every expectation that the EOF would need to be used exactly as it is being used by the Commission and that such use would not be revenue-generating.  Therefore, applying the "reasonable investment-backed expectations" standard, the Commission's use of the EOF did not constitute a Fifth Amendment taking.

**CONCLUSION**

For the foregoing reasons, this Court should deny the Trustee's Motion for summary judgment.

Dated: February 15, 2022

Rob Bonta
Attorney General of California
Christina Bull Arndt
Supervising Deputy Attorney General
Mitchell E. Rishe
Deputy Attorney General
OFFICE OF THE CALIFORNIA
ATTORNEY GENERAL
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6394
Email: Mitchell.Rishe@doj.ca.gov


*/s/ Edward K. Black*
Edward K. Black (DE No. 5302)
Deputy Attorney General
DELAWARE DEPARTMENT OF
JUSTICE
820 North French Street, C600
Wilmington, Delaware 19801
Telephone: (302) 577-4209
Email: edward.black@delaware.gov

*Counsel for the State of California*

Respectfully submitted,

TROUTMAN PEPPER HAMILTON
SANDERS LLP

*/s/Kenneth A. Listwak*
David M. Fournier (DE No. 2812)
Joanna J. Cline (DE No. 5873)
Kenneth A. Listwak (DE No. 6300)
Hercules Plaza
1313 Market Street, Suite 5100
Wilmington, DE 19801
Telephone: (302) 777-6500
Email: david.fournier@troutman.com
joanna.cline@troutman.com
ken.listwak@troutman.com

-and-

Steven S. Rosenthal (admitted *pro hac vice*)
Marc S. Cohen (admitted *pro hac vice*)
J.D. Taliaferro (admitted *pro hac vice*)
Alicia M. Clough (admitted *pro hac vice*)
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: (310) 788-2000
Email: srosenthal@loeb.com
mscohen@loeb.com
jtaliaferro@loeb.com
aclough@loeb.com

*Co-Counsel to California State Lands
Commission*