**Exhibit A**

**Trustee's Proposed Findings of Fact and Conclusions of Law**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| VENOCO, LLC, | Case No. 17-10828 (JTD) |
| Liquidating Debtor. | |
| EUGENE DAVIS, in his capacity as Liquidating Trustee of the Venoco Liquidating Trust, | |
| Plaintiff, | Adv. Pro. No 18-50908 (JTD) |
| v. | |
| STATE OF CALIFORNIA and CALIFORNIA STATE LANDS COMMISSION, | |
| Defendants. | |

**THE LIQUIDATING TRUSTEE'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.    INTRODUCTION

1.      Eugene Davis, in his capacity as Liquidating Trustee (the "Trustee") of the Venoco Liquidating Trust (the "Trust") submits the following proposed findings of fact and conclusions of law following trial on the merits of the Trustee's claims for inverse condemnation against the State of California (the "State") and the California State Lands Commission (the "Commission") (the State and the Commission together, the "Defendants") (Defendants, together with the Trustee, the "Parties").

## II.    PROCEDURAL POSTURE

2.      The Trustee filed this lawsuit against the State and the Commission on October 16, 2018. A.D.I. 1. In the Complaint, the Trustee alleged claims for inverse condemnation under the Fifth Amendment of the Constitution of the United States of America and under California law, as well as a claim under section 105 of the Bankruptcy Code. *Id.*

3.      On November 15, 2018, Defendants moved to dismiss this adversary proceeding on the grounds (among others) that the Court lacked subject matter jurisdiction and that the Defendants enjoyed sovereign immunity from suit. *See* A.D.I. 8, 9, 10, 11, 12. Defendants' motion was denied by this Court on January 2, 2019, and Defendants filed a Notice of Interlocutory Appeal on January 8, 2019. The District Court granted leave for Defendants to appeal only the Court's ruling on sovereign immunity and did not allow interlocutory appeal of other issues.[1] *See In re Venoco LLC*, 998 F.3d 94, 100 (3d Cir. 2021), cert. denied sub nom. *California State Lands Comm'n v. Davis*, 142 S. Ct. 231 (2021).

4.      Defendants' sovereign immunity arguments were rejected by the District Court and unanimously by the Third Circuit, and Defendants' petition for writ of certiorari to the United States Supreme Court was likewise denied. *See In re Venoco LLC*, 998 F.3d at 99, 109 (concluding that U.S. Supreme Court precedent forecloses Defendants' immunity from suit under the Eleventh Amendment of the U.S. Constitution and that Defendants forfeited any argument that they are immune from liability under state law because they failed to raise the issue before this Court).

5.      The Trustee filed an Amended Complaint on November 22, 2021. A.D.I. 117. After the completion of fact discovery, all parties moved for summary judgment. A.D.I. 134, 135, 157, 158, 181, 182. The Court granted summary judgment for Defendants on the Trustee's claim under section 105 of the Bankruptcy Code and denied summary judgment on the Trustee's claims for inverse condemnation and Defendants' police power affirmative defense. A.D.I. 261.

6.      Prior to trial, four *Daubert* challenges were filed. Defendants challenged the expert testimony of Kathy Spletter, David Goesling, and Nicolas Serieys. *See* A.D.I. 191, 193, 196. The Trustee challenged the expert testimony of Timothy Skillman. *See* A.D.I. 197. For the reasons

---

[1] Defendants also sought to appeal exhaustion of remedies and jurisdiction.

stated below, the Court denies Defendants' *Daubert* motions. Mr. Skillman was not called to testify at trial, and therefore the Trustee's *Daubert* motion regarding Mr. Skillman's testimony is denied as moot.

7.      The Court held a five-day trial on the merits from March 7-11, 2022. The Court makes the following findings of fact and conclusions of law.

### III.      FINDINGS OF FACT[2]

#### A.      The Parties.

8.      The Trust was formed on October 1, 2018, pursuant to the *Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidating Proposed by the Debtors* (Case No. 17-10828, D.I. 922-1) (as revised and supplemented, the "Plan") and the *Order (I) Approving Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation Proposed by the Debtors as Containing Adequate Information on a Final Basis and (II) Confirming Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation Proposed by the Debtors* (Case No. 17-10828, D.I. 922). On the same day, Eugene Davis was appointed by this Court as the Trustee of the Trust. A.D.I. 242-1 at 8 ¶ 8; Mar. 7 Trial Tr. 34:3–5, 39:19–22; Ex. P42. Mr. Davis served on Venoco, LLC's ("Venoco") board of directors after Venoco's first filing for bankruptcy. Mar. 7 Trial Tr. 38:10–39:18. Mr. Davis has served on the board of a number of companies that have been through some sort of financial or operational distress, including Delta Airlines, Atlas Worldwide Holdings, and many others. *Id*. at 36:12–37:15. In total, Mr. Davis has served on corporate boards close to 300 times. *Id*. at 36:12–15. He has also been asked by beneficiaries of liquidating trusts in other

---

[2] Certain facts stated herein may be considered either a "finding of fact" or a "conclusion of law," or may involve both findings of fact and conclusions of law. To the extent any finding of fact is considered by the Court to be a conclusion of law, or vice-versa, the Trustee requests that the Court treat it as such.

cases to serve as a liquidating trustee, and Mr. Davis has done so upwards of 20 times. *Id*. at 37:20–38:9.

9.      The Commission is a land resource management agency that acts on behalf of the State to manage onshore and offshore public lands. Mar. 9 Trial Tr. 187:23–188:2. The Commission's executive officer is Jennifer Lucchesi, and she has served in that role since December 2012. *Id*. at 188:20–189:3. Ms. Lucchesi manages the Commission's staff, which acts pursuant to direction and policy set by the Commissioners. *Id*. at 188:23–25. Ms. Lucchesi was designated as Defendants' 30(b)(6) representative. *Id*. at 187:19–22. Among other things, the Commission oversees the offshore wells in the South Ellwood Field (the "Wells") and Platform Holly. *Id*. at 188:3–7. By virtue of the Commission's claims against Venoco in the bankruptcy, the Commission is also a beneficiary of the Trust. A.D.I. 242-1 at 12 ¶ 51.

10.      The Trust, Commission, ExxonMobil, and others are parties to a settlement agreement approved by the Court pursuant to Rule 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019. *See* Case No. 17-10828 D.I. 1236. That settlement agreement provides, among other things, that ExxonMobil and the Commission "shall have a single allowed general unsecured claim against Venoco in the amount of $350,890,000.00 on account of [the costs of plugging and abandonment of wells and decommissioning of facilities used in the operation of three of Debtors' leases in the South Ellwood Field] which shall be treated as an Allowed General Unsecured Claim against Venoco under the Plan." *Id*. at 5. Distributions on account of that claim under the Plan are to be split equally between ExxonMobil and the Commission. *Id*.

11.      Defendants are public entities. A.D.I. 242-1 at 12 ¶ 50.

**B.      The EOF.**

12.      The Ellwood Onshore Facility (the "EOF") is an oil and gas processing facility. It is situated on a triangular-shaped, 4.46-acre site improved with various fixtures, equipment, and

machinery, located at 7979 Hollister Avenue in Goleta, California. A.D.I. 242-1 at 8 ¶¶ 5, 11. The

EOF is located between the Ritz Carlton Bacara Resort and the Sandpiper Golf Course. Mar. 7

Trial Tr. 61:20–25. To the west of the EOF is the Bell Canyon Creek and an estuary, and to the

north and east of the EOF are residential communities and open space areas. Mar. 10 Trial Tr.

68:2–14.

13.     Processing equipment at the EOF includes fired heaters, pressure vessels, heat

exchangers, compressors, pumps, instrumentation, and thousands of feet of interconnecting pipe.

A.D.I. 242-1 at 8 ¶ 12. The EOF site also has utilities systems, electrical gear, storage tanks,

custody transfer units, and a building that houses the switchgear, as well as a control room,

laboratory, offices, and miscellaneous personal property. *Id.* at ¶ 13. The EOF also has a Title V

air permit, without which the EOF processing equipment cannot be operated in compliance with

applicable law. *See* Mar. 9 Trial Tr. 115:10–19; *id.* at 229:12–15.

14.     The EOF is private property. A.D.I. 242-1 at 8 ¶ 6. Venoco owned the EOF until

October 1, 2018, when ownership was transferred to the Trust with the support of the beneficiaries.

*See id.* at ¶ 9; Ex. P43 at P43.0019, P43.0058. The Trust is the current and sole owner of the EOF.

Mar. 7 Trial Tr. 40:2–9. Defendants do not own the EOF. A.D.I. 242-1 at 8 ¶ 10.

15.     The EOF is currently zoned by the City of Goleta as "REC" (Recreation), Open

Space/Active Recreation (General Plan) and is not zoned for any other use, including for

residential or commercial use. *Id* at 9 ¶ 14; *see also* Mar. 10 Trial Tr. 70:17–19. Nevertheless, the

EOF has been continuously operated as an oil and gas processing facility since the mid-1970s.

Mar. 11 Trial Tr. 30:21–31:13. Thus, the current use of the EOF as an oil and gas processing

facility is legally permitted as a "non-conforming use." A.D.I. 242-1 at 9 ¶ 15; *see also* Mar. 10

Trial Tr. 72:4–7, 72:21–23.

**C.    The Commission, On Behalf Of The State, Leased The South Ellwood Field.**

16.    In 1964, the State, acting by and through the Commission, entered into certain oil and gas leases, PRC 421.2, PRC 3120.1, and PRC 3241.4 (the "Leases"). A.D.I. 242-1 at 7 ¶ 1. The Leases encompassed the South Ellwood Field, an offshore oil and gas field located in State waters, consisting of 30 offshore wells (the "Wells"), and Platform Holly, an offshore platform located off the California coast in state waters used to conduct operations in the South Ellwood Field from offshore wells associated with the Platform. *Id*. at 7 ¶ 2. The Leases entitled the lessee a unilateral right to quitclaim the Leases back to the Commission on behalf of the State. Ex. P1 at P1.0006–7 ("Lessee may at any time make and file with the State a written quit-claim or relinquishment of all rights under this lease . . . ."); *see also* Mar. 9 Trial Tr. 192:15–23.

17.    The Leases also required the lessee to pledge a bond in favor of the State in support of the obligations in the Leases. Ex. P1 at P1.0009 ("The Lessee shall, at the time of execution of this lease, furnish and thereafter maintain a good and sufficient bond in favor of the State of California . . . ."); *see also* Mar. 9 Trial Tr. 193:5–10.

18.    The oil and gas produced from the Leases contains hydrogen sulfide. Mar. 7 Trial Tr. 82:11–23. The composition of the oil and gas produced from the Wells on the Leases has not changed over time; there has been hydrogen sulfide present in the Wells for the entire time that they have been under production. *Id*. The existence of hydrogen sulfide in the oil and gas in the South Ellwood Field was a fact that was "well-known" and "well-understood" by the Commission. Mar. 9 Trial Tr. 244:14–245:22.

**D.    Mobil Sold The EOF And Transferred The Leases To Venoco.**

19.    The Leases provided that they could not be assigned without the Commission's approval. Ex. P1 at P1.0005–6 ("Unless approved by the State no assignment, transfer or sublease hereof shall be of any effect."); *see also* Mar. 9 Trial Tr. 193:14–16. The Commission approved

the 1997 transfer of the Leases from Mobil, the predecessor in interest to ExxonMobil, to Venoco. Mar. 9 Trial Tr. 193:25–194:2; A.D.I. 242-1 at 8 ¶ 3. At the time it acquired the Leases, Venoco also acquired from Mobil fee simple ownership of the EOF. A.D.I. 242-1 at 8 ¶ 5. Thus, ExxonMobil is Venoco's predecessor in interest to the Leases, certain of the Wells, and the EOF. *Id*. at 8 ¶ 7.

**E.      The Commission Required Venoco To Maintain A Bond In Favor Of The State To Secure Venoco's Obligations Under The Leases.**

20.     Venoco, as lessee of the Leases in the South Ellwood Field, had an obligation to maintain financial assurance for its obligations under the Leases. *See* Mar. 9 Trial Tr. 194:3–5. The Commission determines the type of financial assurance that is required for the Leases, and for Venoco, the Commission required financial assurance in the form of a bond (the "Bond"). *Id*. at 194:9–12. Among other things, the Bond was intended to ensure that the State was protected if the leased premises were abandoned, and the State became responsible for them. *Id*. at 194:13–17.

21.     Venoco maintained the Bond in favor of the State in an amount that was scheduled for periodic increases up to $30 million. *Id*. at 194:18–23; *see also* A.D.I. 242-1 at 8 ¶ 4. In setting the amount of the Bond, the Commission used estimates and information from the federal government for the cost of plugging, abandoning, and decommissioning the Wells and Platform Holly. Mar. 9 Trial Tr. 195:8–13.

22.     The Commission knew in 1997, when the Leases were transferred from Mobil to Venoco, that the EOF provided electricity and natural gas to Platform Holly, and that Platform Holly relied on the EOF for telecommunication. *Id*. at 196:12–197:3. When it set the amount of the Bond, the Commission knew that it did not have any ownership interest in the EOF. *Id*. at 195:17–19. And yet, the Commission did not contemplate the costs associated with using the EOF in setting the amount of the Bond. *Id*. at 196:10–11. Ms. Lucchesi admitted that "in hindsight, we

did not negotiate a bond high enough to cover the ultimate plugging and abandonment and decommissioning of the facilities." Mar. 10 Trial Tr. 18:11–13.

**F.      Venoco's Commercial Production From The Wells And The EOF Occurred From 1997 Until 2015 When Plains Pipeline 901 Ruptured And Commercial Production Ceased.**

23.      Venoco historically used Platform Holly to operate its 100% working interest in the Leases in the South Ellwood Field. A.D.I. 242-1 at 9 ¶ 16. Produced gas, hydrocarbon liquids, and water were separated on Platform Holly, and the produced gas could either be recompressed for gas-lift or sent to the EOF for processing. *Id*. at 9 ¶ 18. Oil and gas from Platform Holly were transported through certain pipelines that connect Platform Holly to the EOF, where oil and gas were then processed and carried to market via Plains All American Pipeline Company's Line 901 ("Plains Pipeline 901"). *Id*.

24.      Venoco's operations in the South Ellwood Field were disrupted in May 2015 by the rupture of Plains Pipeline 901. A.D.I. 242-1 at 9 ¶ 19. Plains Pipeline 901 was the principal, if not the only route, by which hydrocarbons were brought to market from the Venoco assets in the South Ellwood Field. A.D.I. 242-1 at Ex. A (E. Davis Dep.) at 94:19–95:9. Absent use of Plains Pipeline 901, Venoco could not commercially sell oil and gas produced from the South Ellwood Field. A.D.I. 242-1 at 9 ¶ 20. Mr. Davis described the effect of the Plains Pipeline rupture on Venoco as "extremely negative." A.D.I. 242-1 at Ex. A (E. Davis Dep.) at 94:19–95:9.

25.      Since the rupture of Plains Pipeline 901, there has been no commercial production from Platform Holly to the EOF.[3] A.D.I. 242-1 at 9 ¶ 22.

---

[3] In the period since September, 2017, the Commission made a single sale of oil from the EOF, which was necessary to clear the holding tanks on the EOF, which were reaching capacity. This single, one-time sale on December 1, 2020, was a sale of 3,717.8 barrels of oil for the amount of $135,550.00. A.D.I. 242-1 at 9 ¶ 22.

**G.    Venoco And Certain Affiliates First Filed For Bankruptcy In March 2016 And The Commission Increased The Amount Of Venoco's Bond.**

26.    Venoco and certain affiliates filed for bankruptcy for the first time in March 2016. *Id*. at 9 ¶ 21, of which the Commission was aware. Mar. 9 Trial Tr. 198:25–199:5. During and after Venoco's first bankruptcy, the Commission renegotiated and increased the amount of the Bond. *Id*. at 199:9–14. The Bond amount that was ultimately agreed upon was an amount that was acceptable to the Commission. *Id*. at 199:15–18.

**H.    The Plains Pipeline Remained Offline And Venoco Prepared To Quitclaim The Leases In Coordination With The SLC.**

27.    The Commission knew after Venoco's first bankruptcy in 2016 that Plains Pipeline 901 remained offline and that Venoco still could not get its product to market. Mar. 10 Trial Tr. 58:22–59:2. On March 30, 2017, counsel for Venoco sent an email to Mr. Seth Blackmon, Senior Staff Counsel for the Commission stating: "Seth—attached please find a draft [Transition Services Agreement] for your consideration." Ex. P8 at P8.0003. Mr. Blackmon responded that he would call counsel for Venoco the following day. *Id*.

28.    On March 31, 2017, counsel for Venoco responded to Mr. Blackmon providing "a timeline for each of the scenarios currently under consideration," which referenced the execution of a Transition Services Agreement ("TSA") and quitclaim of the Leases. *Id*. at P8.0001–2. The two scenarios contemplated in that email were (1) Venoco executes a TSA with the Commission and quitclaims the South Ellwood Field leases; or (2) ExxonMobil agrees by April 10th to pay Venoco a monthly fee for Venoco's covenant not to quitclaim its South Ellwood facility Leases until the earlier of a court-approved sale, rejection, abandonment, or quitclaim. *Id*.

29.    On April 12, 2017, Mr. Michael Wracher, Venoco's Chief Operating Officer, emailed Ms. Jennifer Lucchesi, the Executive Officer of the Commission. Ex. P10. Mr. Wracher stated:

As we have discussed with you and your staff, Venoco sees no economically viable future or market value for these assets, and the Company will soon be unable to continue meeting its obligations under the South Ellwood Field Leases. We anticipate further direction from our Board of Directors at their April 13, 2017, meeting, including a potential decision to surrender and quitclaim Venoco's rights, title and interests in the South Ellwood Field in the near future. As we have discussed, Venoco intends to work with the SLC to facilitate a safe and responsible transition for the South Ellwood Leases and to ensure that the assets remain prepared for the plug and abandonment process. With that commitment in mind, while Venoco remains the owner of the [EOF], the Company intends to allow for continued operational support from EOF recognizing that it is operationally necessary for the plugging and abandonment of the South Ellwood Field.

*Id.* at P10.0001. Mr. Wracher further relayed Venoco's commitment to maintain current operations, at its expense, through April 30, 2017, and a willingness to maintain current operations for a short transition period beyond that date provided an acceptable reimbursement agreement could be finalized. *Id.*

30.     Mr. Wracher explained that prior to sending this email on April 12, 2017, he had spoken with Ms. Lucchesi and her staff about the fact that Venoco would soon be unable to meet its obligations under the Leases. A.D.I. 242-1 at Ex. B (Wracher Dep.) at 28:7–18. Specifically, Mr. Wracher testified that Venoco "stayed in fairly regular contact with the [Commission] on our attempt to save the company," and that phone calls and in-person meetings were "ongoing in the last, you know, three or four months as it became apparent that -- that we didn't have a way out, that those meetings occurred." *Id.* at 28:20–29:12. Mr. Wracher further testified that the purpose of notifying the Commission was to make sure that there was an orderly transition from Venoco to the Commission, and that Venoco expressed to Ms. Lucchesi or her staff that Venoco oversight would continue. *Id.* at 30:12–31:19 Mr. Wracher testified that Venoco coordinated with the SLC in quitclaiming the Leases because that timing was important to ensure an orderly transition of the assets. *Id.* at 39:14–40:6

31.     Mr. Larry Huskins, Venoco's operations manager and the current Chief Operating Officer of Beacon West, testified that Venoco had a team of people who worked on the transition of the assets from Venoco to the Commission. Mar. 7 Trial Tr. at 180:1–4. As the person responsible for the safe operation of the EOF and Platform Holly, Mr. Huskins testified that operations were safely transitioned from Venoco to Beacon West, the Commission's designated contractor. *Id*. at 180:5–8.

## I.     Venoco And The Commission Executed The Reimbursement Agreement On April 14, 2017.

32.     On April 14, 2017, the Commission and Venoco finalized and executed the Reimbursement Agreement that they had started negotiating in March 2017. Ex. P12. Mr. Davis testified that the Reimbursement Agreement was part of an overall process to effectuate an orderly transition of the operation of the EOF and Platform Holly. Mar. 7 Trial Tr. 41:16–42:9. He further testified that the purpose was to effectuate that transition in three stages—(i) first, Venoco would pay for a period of weeks to keep its employees on site; (ii) second, it would make those employees available to run the facility on behalf of the Commission but would be reimbursed by the Commission for those costs; and (iii) third, the transition agreement would be replaced with a longer term lease for the facility when the Commission determined who it wanted to operate the facility. *Id*. at 41:23–42:9. Mr. Wracher also testified that the purpose of the Reimbursement Agreement was to ensure an orderly transition of the assets. A.D.I. 242-1 at Ex. B (Wracher Dep.) at 44:5–19.

33.     As outlined in Mr. Wracher's email, the Reimbursement Agreement provided that Venoco would maintain operations at the EOF and Platform Holly at its expense through April 30, 2017, and after that time, Venoco would continue to work at the EOF and Platform Holly and the actual costs of that work would be reimbursed by the Commission. Ex. P12. The Commission

agreed to pay an initial deposit of $1,120,000.00, which would be applied to the costs actually incurred by Venoco in connection with Venoco's continued work, such as actual overhead, general and administrative costs, and out-of-pocket costs and expenses such as costs to acquire, renew, or maintain licenses, permits or approvals and employee salary or wages, among other things. *See Id*. at P12.0007–8. Venoco employees stayed on the property after the execution of the Reimbursement Agreement. Mar. 7 Trial Tr. 42:10–12.

**J.     Venoco Quitclaimed The Leases And Venoco And The Other Debtors Filed For Bankruptcy For The Second Time On April 17, 2017.**

34.     On April 17, 2017, immediately before filing a bankruptcy petition for the second time, Venoco quitclaimed the Leases, pursuant to which it surrendered all of its rights, title, and interests in the Leases to the Commission. A.D.I. 242-1 at 10 ¶ 29; *see also* Ex. P11. After the quitclaims became effective, Venoco had no possessory or ownership interest in the Leases, the Wells, or the real property underlying the Leases; all such interests reverted to the Commission by operation of the Leases and applicable law. A.D.I. 242-1 at 10 ¶ 30. Venoco and the other Debtors then filed for bankruptcy for the second time that same day immediately following the quitclaims. *See* D.I. 1.

**K.     The Commission Called Upon Venoco's Bond And Looked To Venoco's Predecessor-In-Interest, ExxonMobil**

35.     After the quitclaim, the Commission notified Venoco through its Chief Operating Officer Michael Wracher that the Commission intended to call upon the Bond. Mar. 9 Trial Tr. 209:19–22; Ex. P13. Specifically, the Commission wrote a letter to Mr. Wracher dated April 17, 2017, stating that "Commission staff have no choice but to call upon Venoco's surety, Aspen American Insurance Company, to commit the total amount of its performance bond to reimburse the state for as much of Venoco's continuing liability as it will cover." Ex. P13 at P13.0001–2.

36.     The Commission copied Aspen American Insurance Company and ExxonMobil on the April 17, 2017 letter to Mr. Wracher. *Id*. ExxonMobil was copied on the letter because the Commission believed ExxonMobil had responsibility to perform and meet the obligations for plugging and abandonment work and decommissioning if Venoco was unable to do so. Mar. 9 Trial Tr. 210:20–23.

37.     The amount of the Bond at the time of Venoco's quitclaim was $22 million. *Id*. at 199:25–200:1. The State was paid the entire $22 million amount of the Bond. *Id*.

**L.     The Commission Solicited Bids To Hire A Contractor To Operate The Wells, And On September 1, 2017, The Commission Hired Beacon West.**

38.     On May 17, 2017, the Commission put out a Solicitation for Statements of Interest to hire an engineering consultant. *Id*. at 211:9–11. The Solicitation for Statements of Interest "announce[d] [the Commission's] need to retain an Offshore Oil & Gas Facilities Engineering Consultant to conduct the continued safe operation of Venoco's Ellwood Facilities, and to Plug & Abandon 30 wells on Platform Holly and two 'onshore' wells in the surf zone accessible from the Ellwood Onshore Facility." Ex. P20 at P20.0001. The Commission received several responses to the Solicitation for Statements of Interest and interviewed the applicants. Mar. 9 Trial Tr. 213:21–23.

39.     On September 1, 2017, the Commission executed a contract with Beacon West (the "Beacon West Agreement"). *Id*. at 214:1–3. The term of the Beacon West Agreement is five years starting September 1, 2017, because that was the anticipated duration of the plugging and abandonment program. *Id*. at 214:22–215:5. The maximum amount of payment from the Commission to Beacon West under the Beacon West Agreement is $19 million. *Id*. at 215:7–9; Ex. P25 at P25.0001. The scope of Beacon West's work is defined in the Beacon West Agreement as "perform[ing] the engineering, operations, and administrative services, under the oversight of

the CSLC Project Coordinator . . . and other required duties in order to continue the safe daily operations of Platform Holly (Holly) and the Ellwood Onshore Facility (EOF) at the Current Baseline Conditions . . . ." Ex. P25 at P25.0002.

40.     "Current Baseline Conditions" is defined in the Beacon West Agreement to mean "those conditions pertaining to the scope, type, and intensity of activities and projects necessary for the operation and maintenance of Holly and the EOF in a safe and non-producing state, as they have generally existed during the period of May 1, 2017 and August 31, 2017." Ex. P25 at P25.0002. It is further explained in the Beacon West Agreement that "activities not identified as primary tasks below or activities **in response to emergency or extraordinary events are not considered Current Baseline Conditions**." *Id.* (emphasis added). Nowhere in the Beacon West Agreement is it stated that Beacon West was responding to an emergency. *See* Trial Tr. Mar 9 216:18–20.

**M.     Venoco And The Commission Executed The Gap Agreement September 15, 2017.**

41.     In anticipation of the expiration of the Reimbursement Agreement, the Commission and Venoco entered into the Gap Agreement on September 14, 2017. Ex. P26. Mr. Davis testified that the Gap Agreement was part of a process to establish a longer-term solution for the Commission's use of the EOF, which anticipated that rent would be paid during the period of the Commission's use until a more definitive agreement could be prepared. Mar. 7 Trial Tr. 42:17–43:17. The Gap Agreement was executed effective as of September 15, 2017, and it was in effect when the Trust was formed. *Id.* at 43:22–44:4.

42.     There is an acknowledgement in the Gap Agreement that upon the expiration of the Reimbursement Agreement, "operations related to EOF and other facilities covered by the Reimbursement Agreement will be transitioned to a designated contractor of the Commission." Ex. P26 at P26.0001. It is further provided in the Gap Agreement that:

14

While Venoco and the Commission have not yet agreed upon a payment amount for the Commission's continued non-exclusive use of EOF, the parties recognize that an uninterrupted transition of operations should be accomplished to ensure that the Quitclaimed Facilities (as defined in the Reimbursement Agreement) remain secured and maintained for use during the anticipated Plug and Abandonment Program and the subsequent decommissioning project and lawful abandonment.

Accordingly, pursuant to this letter, Venoco agrees to allow the Commission and its designated contractor to continue non-exclusive use of the EOF, EOF-related machinery or equipment . . . so long as the Commission agrees to the following conditions:

> (a) The Commission continues to negotiate in good faith with Venoco regarding a reasonable payment amount for the Commission's continued non-exclusive use of EOF and the EOF-related equipment and machinery.

> (b) Any periodic payment amount that the Commission agrees to pay Venoco shall be payable retroactive to the Transition Date (the "Catch-Up Payment") […]

Ex. P26 at P26.0001–2.

43.    As contemplated by the Reimbursement Agreement, as of September 15, 2017, operation of the EOF was transitioned from Venoco to Beacon West. Mar. 9 Trial Tr. 214:4–11. The Commission—through Beacon West—maintained its presence at the EOF under the terms of the Gap Agreement, and the EOF was never left unmanned at any point during the transition period from Venoco's operation of the EOF to Beacon West's operation of the EOF. Mar. 7 Trial Tr. 102:14–20 (Wenal testimony); A.D.I. 242-1 at Ex. B (Wracher Dep.) at 43:23–44:4 (Wracher testimony); Mar. 7 Trial Tr. 175:10–16 (Huskins testimony).

44.    The Gap Agreement was amended four times. A.D.I. 242-1 at 12 ¶ 43. The First and Second Amendments to the Gap Agreement simply extended the term of the Gap Agreement. Exs. P28, P29; Mar. 9 Trial Tr. 220:6–8. The Third Amendment to the Gap Agreement provided that the Commission would pay Venoco, within 21 calendar days, a nonrefundable sum of $250,000 in cash for the Commission's use of the EOF from December 15, 2017, to February 28, 2018, and that amount would be contributed toward any final settlement that Venoco and the

Commission might reach. Ex. P31; Mar. 9 Trial Tr. 220:19–221:2. The Fourth Amendment to the Gap Agreement provided that the Commission would pay Venoco by the 15th of each month, beginning in March 2018, a nonrefundable monthly sum of $100,000 in cash for the Commission's continued non-exclusive use of the EOF and EOF-related machinery and equipment, and that amount would be contributed toward any catch-up payment owed by the Commission to Venoco for its use of the EOF and EOF-related machinery and equipment. Ex. P35; Mar. 9 Trial Tr. 221:12–25.

**N.     The Commission Ultimately Made Minimum Payments To Venoco For Use Of The EOF Under The Terms Of The Gap Agreement.**

45.     The Commission failed to make payments under the Gap Agreement for several months, but ultimately paid $100,000 per month for its use of the EOF through October 15, 2018. Mar. 7 Trial Tr. 74:9–18; Mar. 9 Trial Tr. 222:1–3. The payments were made to Venoco prior to the formation of the Trust. Mar. 7 Trial Tr. 74:19–25.

**O.     The Commission Entered Into The Phase 1 Agreement With ExxonMobil On June 28, 2018.**

46.     When the Commission approved the assignment of the Leases from Mobil to Venoco in 1997, the Commission did not release Mobil from its obligations under the Leases in the event that Venoco could not meet its obligations under the Leases. Mar. 9 Trial Tr. 233:25–234:4. Ms. Lucchesi testified at trial that it was the Commission's position that ExxonMobil had the responsibility to plug and abandon the Wells in the South Ellwood Field and decommission Platform Holly if Venoco could not. *Id*. at 235:13–236:1.

47.     On May 15, 2017, California's Department of Conservation, Division of Oil, Gas, and Geothermal Resources ("DOGGR"), a division of the State, Mar. 9 Trial Tr. 234:9–19, entered an order to Venoco to plug and abandon the Wells. *See id*. at 234:20–23; *see also* A.D.I. 242-1 at

11 ¶ 32. The order was appealed by Venoco and did not become final. A.D.I. 242-1 at 11 ¶ 33. At the time the order was issued, Venoco was already in bankruptcy. Mar. 9, Trial Tr. 234:24–25.

48.    On May 19, 2017, DOGGR sent a letter to ExxonMobil placing it on notice that, as the immediately preceding operator, ExxonMobil would be responsible for any remaining unpaid costs to plug and abandon the Wells if Venoco did not have the financial resources to fully cover that cost. Ex. P44 at P44.0005. Despite sending a notice letter, DOGGR never issued an order to ExxonMobil. Mar. 9 Trial Tr. at 235:1–12. Ms. Lucchesi testified that any entity ordered by DOGGR to plug and abandon the Wells on Platform Holly would need to use the EOF. *Id.* at 236:8–18.

49.    The Commission entered into a settlement agreement with ExxonMobil defining ExxonMobil's responsibility for the Leases, which was titled the Phase 1 Agreement. *Id.* at 232:24–233:11; Ex. P44. The Phase 1 Agreement identified Mobil, the predecessor to ExxonMobil, as the Lessee under the Leases prior to Venoco. Ex. P44 at P44.0004. The Commission contended that Mobil was the previous operator of all 32 wells on the Leases, but ExxonMobil contended that Mobil was not the previous operator of a portion of seven of those wells. *Id.* There is an acknowledgement in the Phase 1 Agreement that when the Commission approved Mobil's assignment to Venoco, it did so on the condition that the assignment "shall not release Mobil from any obligations to [the Commission] under the Leases, any conditions in the assignment agreement to the contrary notwithstanding." *Id.* In the Phase 1 Agreement, the Commission reserved its rights to seek fulfillment of all of the obligations in the Leases from ExxonMobil. *Id.*; *see also* Mar. 9 Trial Tr. 233:16–19.

**P.    Venoco Notified The Commission Of Its Intent To Terminate The Gap Agreement On August 22, 2018.**

50.    On August 22, 2018, Venoco's counsel sent a letter to the Commission informing the Commission of Venoco's intention to terminate the Gap Agreement effective October 15, 2018 because the Commission was late on the payments due under the Gap Agreement. Ex. P45; A.D.I. 242-1 at 11–12 ¶ 41; Mar. 7 Trial Tr. 46:20–47:5. The termination letter notified the Commission that the Gap Agreement would terminate unless (a) the SLC cured its late payments under the Gap Agreement; and (b) the SLC and Venoco made substantial progress towards a settlement. A.D.I. 242-1 at 11–12 ¶ 41. During her testimony, Ms. Lucchesi did not recall why the Commission was behind on the payments due under the Gap Agreement. Mar. 9 Trial Tr. 222:21–23. The Commission cured the late payments under the Gap Agreement prior to the proposed termination date but no final settlement regarding the EOF was reached between the parties. A.D.I. 24-12 at 12 ¶ 42.

**Q.    The Commission Continued To Use And Occupy The EOF After Termination Of The Gap Agreement On October 15, 2018.**

51.    The Gap Agreement terminated on October 15, 2018. A.D.I. 242-1 at 12 ¶ 44. After termination of the Gap Agreement, the Commission continued its non-exclusive use and occupancy of the EOF. *Id*. at 12 ¶ 45; Mar. 7 Trial Tr. 44:9–15.[4]

52.    On or about October 15, 2018, the Commission ceased making payments to Venoco under the Gap Agreement. A.D.I. 242-1 at 12 ¶ 47. Defendants asserted that they had the right to use the property without payment by virtue of their police power in response to an emergency. Mar. 7 Trial Tr. 44:16–21. Ms. Lucchesi testified that the only change between when the Commission agreed that it would pay for use and occupancy of the EOF, and October 15, 2018

---

[4] The Commission had continuously engaged in non-exclusive use and occupancy of the EOF since September 15, 2017. A.D.I. 242-1 at 12 ¶ 45.

when the Commission refused to pay, was the stalling of negotiations toward a settlement with Venoco. Mar. 9 Trial Tr. 227:3–6.

**R.      The Commission's Use And Occupancy Of The EOF Is Temporary, Not Permanent.**

53.      Defendants' use and occupancy of the EOF is temporary, not permanent. *See* Mar. 9 Trial Tr. 239:1–4. The Commission does not contend that it owns the EOF by virtue of its police power. *Id*. at 239:9–11. The Commission intends to vacate the EOF after the plugging and abandonment of the Platform Holly Wells. *Id*. at 239:5–8. The Commission does not intend to remove any equipment at the EOF before vacating it. *Id*. at 239:12–14. The Commission does not intend to perform any remediation of soil or groundwater contamination at the EOF before vacating it. *Id*. at 239:15–18. The soil and groundwater conditions at the EOF did not impact the Commission's use and occupancy of the property to support the  plugging and abandonment ("P&A") activities. *See* Mar. 7 Trial Tr. 111:13–112:8 (Wenal testimony); A.D.I. 242-1 at Ex. B (Wracher Dep.) at 66:8–12 (Wracher testimony); Mar. 7 Trial Tr. 187:1–9 (Huskins testimony).

**S.      The Trustee Filed This Lawsuit On October 16, 2018 And The Trust Has Received No Payments For Defendants' Use Of The EOF (Other Than Reimbursements Of Expenses) Since That Time.**

54.      On October 16, 2018, the Trustee filed this adversary proceeding seeking just compensation for Defendants' use and occupancy of the EOF. A.D.I. 1. The Trustee seeks to recover just compensation for the Commission's use and occupancy of the EOF, including the office building, equipment, pipelines, piers, access roads, firewater lines, appurtenances, and other property, permits, easements, licenses, rights-of-way and other rights relating to access, operation, and maintenance of the EOF. *See* A.D.I. 117 at ¶ 8; *see also* Mar. 7 Trial Tr. 45:12–19.

55.      Mr. Davis testified that the Trust has sustained injury as a result of Defendants' unpaid use and occupancy of the EOF because the Trust has not been paid rent, the Trust has incurred significant legal fees and costs to correct this fact, and Defendants' presence at the EOF

has affected the Trustee's ability to market the property. Mar. 7 Trial Tr. 48:11–49:3. With respect to marketing, the Trust has not marketed the property because doing so is not yet possible. *Id*. at 50:23–51:20. The EOF is currently occupied by a tenant who is not paying rent and has not given the Trustee any indication of when the tenant will leave. *Id*. at 51:2–20, 55:4–16. Mr. Davis explained that in order to sell the EOF, he would need access to the property, to engage consultants, engineers, and a broker, none of which has been possible to do while the property is occupied by the Defendants. *Id*.

56.    Mr. Davis testified that because Defendants have not specified when they are leaving,[5] he cannot tell a buyer when he can deliver quiet enjoyment of the property, nor can he assure a broker that the sale will close and a commission will be paid within a reasonable period of time. *Id*. at 51:21–52:4. Mr. Davis was also clear that he will market the property at the appropriate time, but he determined that it would be a waste of Trust assets until he has full access to the property and the ability to deliver title to a third party. *Id*. at 75:13–76:10, 77:20–78:10.

57.    Through the date of trial on the merits, the Commission through its contractor Beacon West, has continued to operate at the EOF. *Id*. at 45:20–23.

58.    Since October 16, 2018, the Trust has received no payments for the Commission's use and occupancy of the EOF, but the Trust has received reimbursement from the Commission's contractor for certain expenses including insurance, utilities, and taxes. *Id*. at 45:24–46:4.

## IV.    CONCLUSIONS OF LAW

### A.    The Court's Jurisdiction.

59.    This Court has jurisdiction over the Trustee's claims for inverse condemnation. At the outset of this adversary proceeding, the Court determined that this is a core proceeding because,

---

[5] Ms. Lucchesi testified that the Commission anticipates that its need to occupy the EOF might end at the end of 2022. Mar. 10 Trial Tr. 55:3–7.

among other reasons, the Defendants' proof of claim[6] and the adversary proceeding have an "enormous" effect on the Debtors' estate. A.D.I. 34 at 11. The Court also found that it has "related to" jurisdiction because the Trustee's success in his suit would assuredly impact the Defendants' proof of claim proceeding and any distribution to creditors, thus establishing that the adversary proceeding bears a close nexus to the Plan and to the administration of the estate. *Id.* at 13. The District Court agreed with this Court in refusing to grant Defendants' appeal of the Court's jurisdiction. Nothing has changed since that time that alters or affects the Court's determination in its earlier opinion that it has subject matter jurisdiction over the Trustee's claim. *See e.g.*, Feb. 16, 2022 Hrg. Tr. 73:2 ("Well, I certainly have jurisdiction . . . ."); *see also id.* at 75:10–14 ("I agree; that's the law of the case. I have jurisdiction. I am going to decide it and the core jurisdiction."). Moreover, after the Trustee filed the Complaint, the Commission filed an administrative setoff claim in which it admitted this Court has core jurisdiction over matters related to the EOF. The Court continues to find that it has jurisdiction over the Trustee's claim.

**B.     The Trustee's Claim For Inverse Condemnation.**

60.     Under both federal and California law, a successful inverse condemnation claimant must prove an invasion or appropriation (a "taking" or "damaging") of some valuable property right which the property owner possesses, by a public entity, and the invasion or appropriation directly and specifically affected the property owner to his injury. *See City of Los Angeles v. Superior Court*, 194 Cal. App. 4th 210 (2011); *see also Pac. Bell v. City of San Diego*, 81 Cal. App. 4th 596 (2000); *see also Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just

---

[6] The Commission filed a proof of claim in the bankruptcy on October 13, 2017, in the amount of $130,000,000.00. *See* Claim No. 106. The claim was described as a "contingent claim against Debtor for recovery of any amounts it may later be determined that Claimant owes in connection with any leases to which Claimant and Debtor may have or have had responsibility." *Id.*

compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."). The Court finds that each of the elements of inverse condemnation under California law and the Fifth Amendment to the Constitution of the United States of America are met as follows.

### i.    Defendants Are Public Entities.

61.    The Court finds that the Defendants are public entities. *See* A.D.I. 242-1 at 12 ¶ 50; *see also* Cal. Gov. Code § 811.2 ("'Public entity' includes the state, . . . a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State.").

### ii.    The EOF Is Private Property Owned By The Trust.

62.    The Court finds that the EOF is private property. A.D.I. 242-1 at 8 ¶ 6. The Court finds that the EOF is owned by the Trust. *Id*. at 8 ¶ 9; Ex. P43 at P43.0019, P43.0058; Mar. 7 Trial Tr. 40:2–9.

### iii.    Defendants Physically Invaded Or Appropriated The EOF.

63.    California law provides that a taking giving rise to a claim for inverse condemnation "is not restricted to a mere change of physical possession, but includes a permanent or temporary deprivation of the owner of the use or enjoyment of his land. *Frustuck v. City of Fairfax*, 212 Cal. App. 2d 345, 364 (Cal. App. 1st 1963) (citing *Pac. Tel. & Tel. Co. v. Eshleman,* 166 Cal. 640, 664 (1913)). Inverse condemnation "may consist of an act of dispossession, or of acts of appropriation, destruction or damage." *Frustuck*, 212 Cal. App. 2d at 364 (citing *People v. Peninsula Title Guar. Co.,* 47 Cal. 2d 29 (1956)); *City of Long Beach v. Aistrup,* 164 Cal. App. 2d 41 (1958).

64.    Similarly, under the Fifth Amendment to the United States Constitution, a permanent physical occupation of property authorized by government is a taking. *Loretto v.*

*Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426 (1982). The Supreme Court has explained:

> We have recognized that the government can commit a physical taking either by appropriating property through a condemnation proceeding or by simply entering into physical possession of property without authority of a court order. In the latter situation, the government's intrusion does not vest it with a property interest recognized by state law, such as a fee simple or a leasehold. Yet we recognize a physical taking all the same. Any other result would allow the government to appropriate private property without just compensation so long as it avoids formal condemnation. We have never tolerated that outcome.

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2076 (2021) (cleaned up).

65.      Under California law and the Fifth Amendment, a taking need not be permanent; temporary injury to or interference with an owner's use of property is compensable under a theory of inverse condemnation. *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012) ("[O]ur decisions confirm that takings temporary in duration can be compensable."); *Cedar Point Nursery*, 141 S. Ct. at 2074 ("a physical appropriation is a taking whether it is permanent or temporary."); *see also City of Needles v. Griswold*, 6 Cal. App. 4th 1881, 1892 (1992) ("[T]he courts of [California] have long held that compensation must be paid in advance, even if the property interest taken is mere possession rather than title."); *see also Steinhardt v. Superior Court*, 137 Cal. 575, 579 (1902) ("To hold that possession of land may be given to a person seeking to acquire a right of way by condemnation, during the pendency of the proceeding and before the amount of compensation has been determined and paid to the owner or into court for him, would be to hold that this so-called temporary possession is not a taking of private property for a public use. But both on authority and reason it is so."); *see also Surfrider Found. v. Martins Beach 1, LLC*, 14 Cal. App. 5th 238, 273 (2017) ("*Steinhart* and *City of Needles* make clear that temporary physical intrusions can be compensable takings under the California Constitution."). "The

duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation." *Cedar Point Nursery*, 141 S. Ct. at 2074 (citing *Loretto,* 458 U.S. at 436–37).

66.    The Court finds that the Commission, on behalf of the State, has physically invaded and appropriated the Trust's right to possession of its property. The Court further finds that the Commission, on behalf of the State, has appropriated the Trust's right to exclude others from its private property. The Commission, through its contractor Beacon West, has been physically present at the EOF since September 15, 2017. Based upon Ms. Lucchesi's unrebutted testimony, the Court finds that the Defendants' physical invasion and appropriation is temporary, and it began on September 15, 2017.[7]

### iv.    Defendants' Use And Occupancy Is A Public Use Under The California Constitution And The Fifth Amendment.

67.    Both the California Constitution and the Fifth Amendment require just compensation for the taking of private property for a "public use." Cal. Const. art. 1§ 9 ("Private property may be taken . . . for a <u>public use</u> and only when just compensation . . . has first been paid to, or into court for, the owner.") (emphasis added); U.S. Const. amend. V ("[N]or shall private property be taken for <u>public use</u>, without just compensation.") (emphasis added).

68.    "Public use" has been "defined as a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government." *See Yox v. City of Whittier*, 182 Cal. App. 3d 347, 352 (Cal. Ct. App. 1986). Defendants argue that their use and occupancy of the EOF is not a "public use" because it is not a "public work or improvement." *See* A.D.I. 135 at 11–17. But California law makes clear that a "public improvement" for purposes of an inverse condemnation claim is broadly defined to involve "(1) a deliberate action by the state

---

[7] The Court addresses below Defendants' argument that their use and occupancy of the EOF from September 15, 2017 through October 15, 2018 is not compensable under a theory of inverse condemnation because the Gap Agreement was in effect during that time. *See* Section IV.D.

(2) taken in furtherance of public purposes." *City of Pasadena v. Superior Court*, 228 Cal. App. 4th 1228, 1234 (Cal. Ct. App. 2014); *see also Mercury Cas. Co. v. City of Pasadena*, 14 Cal. App. 5th 917, 928-29 (Cal. Ct. App. 2017) ("[W]e hold that a tree constitutes a work of public improvement for purposes of inverse condemnation liability if the tree is deliberately planted by or at the direction of the government entity as part of a planned project or design serving a public purpose or use . . . . Our holding is also consistent with a fundamental justification for inverse condemnation liability: the public entity, acting in furtherance of public objectives, took a calculated risk that damage to private property may occur.").

69.     According to the definitions set forth above, Defendants' use and occupancy of the EOF is a "public use" within the meaning of the California Constitution and the Fifth Amendment. Defendants' stated purpose for their presence at the EOF is to pursue the plugging and abandonment program. Mar. 9 Trial Tr. 239:1–4. After the plugging and abandonment of the Wells, the Commission intends to vacate the EOF. *Id*. at 239:5–8. The Commission's presence at the Trust's property for the purpose of plugging and abandoning the Commission's Wells is certainly a deliberate action taken in furtherance of a public purpose.

70.     Defendants have also maintained that their presence at the EOF is for the benefit of public health, safety, and the marine environment. Ms. Lucchesi's testimony to that effect confirms that Defendants' use and occupancy of the EOF is public in nature:

> All actions that we entered in -- or all agreements and all -- that we entered into and all activities we pursued, once we became aware that Venoco planned to abandon its lease obligations and abandon the facilities, *were an exercise of protecting public health and safety and damage to the marine environment*.

*Id*. at 224:15–20 (emphasis added); *see also* Mar. 10 Trial Tr. 32:12–15 ("But the [Commission] was the primary agency that took action to ensure the facilities remained safe and protected public

health and safety."). For the reasons set forth below, the Court finds that the Commission's presence at the EOF for these purposes is also a "public use."

  **v.**  **Defendants' Unpaid Use And Occupancy Of The EOF Affected The Trust To The Trust's Injury.**

  71.  California law requires a successful inverse condemnation claimant to prove a "taking" or "damaging" of his property. *Weiss v. People ex rel. Dep't of Transp.*, 468 P.3d 1154, 1161 (Cal. 2020). This threshold requirement must be met "***before*** the question turns to the amount of compensation due," and it can be satisfied by the plaintiff demonstrating that the government has taken or damaged a cognizable property right. *Regency Outdoor Advert., Inc. v. City of Los Angeles*, 139 P.3d 119, 124 (Cal. 2006) (emphasis added); *see also Ruiz v. County of San Diego*, 47 Cal. App. 5th 504, 514 (Cal. Ct. App. 2020) ("To prevail on inverse condemnation, 'the property owner must show there was an invasion or appropriation (a 'taking' or 'damaging') by a public entity of some valuable property right possessed by the owner, directly and specially affecting the owner to his detriment.'"); *see also Weiss*, 468 P.3d at 1161 (issues of inverse condemnation liability may be addressed on summary judgment by the court, but the determination of just compensation owed to a property owner when a public entity takes the owner's property will be determined by a jury[8]); *see also San Diego Gas & Elec. Co. v. Superior Court*, 920 P.2d 669, 699 (Cal. 1996) (finding that a diminution in property value, or lack thereof, is an element of the measure of just compensation when taking or damage is otherwise proved).

  72.  Similarly, U.S. Supreme Court takings precedent shows that the relevant inquiry is whether Defendants have appropriated any of the rights in the Trust's bundle regarding the EOF. Physical occupation takes "a slice of every strand" from the "bundle" of the Trust's property rights,

---

[8] Defendants waived their right to a jury trial. The Court's scheduling order provided that motions to withdraw the reference based on a jury trial right shall be filed on or before November 5, 2021. A.D.I. 99 at 2. Defendants filed no such motion and therefore waived their right to a jury trial.

which the U.S. Supreme Court has decided includes "the rights 'to possess, use and dispose of'"
the property, *Loretto*, 458 U.S. at 435 (quotation omitted), and "the right to exclude others," which
is "one of the most essential sticks in the bundle of rights that are commonly characterized as
property." *Kaiser Aetna*, 444 U.S. at 176; *see also Yee v. City of Escondido*, 503 U.S. 519, 527
(1992) ("The government effects a physical taking only where it *requires* the landowner to submit
to the physical occupation of his land.") (emphasis in original).

73.    The Court finds that the Trust has been injured by Defendants' unpaid use and
occupancy of the EOF such that a taking has occurred under both California law and the Fifth
Amendment. It is undisputed that Defendants have appropriated the right to possess, use, and
dispose of the EOF, and that Defendants have also appropriated the Trust's right to exclude others
from the EOF. This appropriation has resulted in injury to the Trust because it has received no rent
or other compensation from the Defendants for their use and occupancy of the EOF. The Court
finds that the Trust was further injured by its inability to effectively market and sell the EOF as a
result of Defendants' continuing unpaid use and occupancy. These are the types of injuries
encompassed by takings precedent under California law and the fifth Amendment.

74.    Defendants argue, however, that there has been no loss of potential revenues of any
kind as a result of the Commission's presence, and that the Trust has benefited substantially from
the Defendants' presence at the EOF. Mar. 7 Trial Tr. 21:19–22:2. The Court finds, however, based
on Ms. Lucchesi's testimony, that *anyone* responsible for the plugging and abandonment of the
Wells, including the Commission or ExxonMobil, may have a need to use the EOF or otherwise
arrange for an alternative. *See* Mar. 9 Trial Tr. 236:16–18. The Court finds no evidence of any
benefit to the Trustee as a result of Defendants' use. Defendants argue that they performed work
on the EOF that "first Venoco and then the Trust would have been required to perform, specifically

the safe treatment of the H2S flowing into the EOF," but the Court finds that this argument is contrary to both law and fact. The hydrogen sulfide produced from the state-owned Wells on state-owned Leases was sent to the EOF by the Defendants. Ms. Lucchesi admitted that the Commission knew that in the event Venoco could not meet its obligations under the Leases, the Commission or ExxonMobil would have to figure out a way to deal with the H2S gas. Mar. 10 Trial Tr. 60:10–22. Therefore, the Court does not find that the Trust is responsible for the H2S gas that is only present at the EOF by virtue of Defendants' choice to send it there.

75.    The Court therefore finds that the element of injury to the Trust has been satisfied.

*        *        *        *        *

76.    The Court therefore finds that each element of the Trustee's claim for inverse condemnation under California law and the Fifth Amendment has been met. The Court now turns to the Defendants' argument that, notwithstanding their taking, no compensation is owed under the police power exception.

**C.    Police Power.**

77.    Defendants argue that their presence on the EOF was an exercise of police power in response to emergency conditions. Mar. 7 Trial Tr. 21:13–18, 24:11–13; A.D.I. 126 at 11 ¶ 2, 12 ¶ 9; A.D.I. 127 at 12 ¶ 2, 13 ¶ 9. As the parties asserting the police power defense, the burden of proof is on the Defendants. *See Leppo v. City of Petaluma*, 20 Cal. App. 3d 711, 719 (Cal. Ct. App. 1971). For the reasons stated below, the Court finds that the police power exception is not applicable and does not excuse Defendants' failure to pay just compensation under California law or the Fifth Amendment.

**i.    Police Power Under California Law.**

78.    The police power exception under California law is narrow. *Smith v. County of Los Angeles*, 214 Cal. App. 3d 266, 286 (Cal. Ct. App. 1989) ("Although an exception to the rule

28

authorizing damages for inverse condemnation has been recognized for injury caused by a valid exercise of police powers under emergency conditions, the scope of this exception has been carefully limited."); *Holtz v. Superior Court*, 475 P.2d 441, 446 (Cal. 1970) ("Recognizing that a broad interpretation of this doctrine of noncompensable loss would completely vitiate the constitutional requirement of just compensation [ ], the courts have narrowly circumscribed the types of emergency that will exempt the public entity from liability.").

79.     The "doctrine of noncompensable loss comes into play in connection with more direct 'taking' or 'damaging' of property only under 'emergency' conditions, i.e., when damage to private property is inflicted by government 'under the pressure of public necessity and to avert impending peril.'" *Holtz*, 475 P.2d at 446 (quoting *House v. L.A. Flood Control Dist.*, 153 P.2d 950, 953 (1944)).

80.     An "emergency" justifying the exercise of police power has been defined under California law as follows:

> The term "emergency" has long been accepted in California as an unforeseen situation calling for immediate action. Not only must urgency be present, but the magnitude of the exigency must factor. Emergency is not synonymous with expediency, convenience, or best interests, and it imports more than merely a general public need. Emergency comprehends a situation of grave character and serious moment. It is evidenced by an imminent and substantial threat to public health or safety.

*Los Osos Valley Assocs. v. City of San Luis Obispo*, 30 Cal. App. 4th 1670, 1672–73 (Cal. Ct. App. 1994). California courts have offered the following examples of emergency conditions justifying the exercise of police power, including "the demolition of all or parts of buildings to prevent the spread of conflagration, or the destruction of diseased animals, of rotten fruit, or infected trees where life or health is jeopardized." *House*, 153 P.2d at 953. "In such cases calling for *immediate action* the emergency constitutes full justification for the measures taken to control the menacing condition . . . ." *Id*. (emphasis added).

81.     Under California law, an emergency supporting the exercise of police power is not an anticipated event. *See, e.g.*, *Odello Bros. v. County of Monterrey*, 63 Cal. App. 4th 778, 791 (Cal. Ct. App. 1998) ("[W]e do not think that the public interests are served by simply ignoring County's prior knowledge of the flood threat."); *Thousand Trails, Inc. v. Cal. Reclamation Dist.*, 124 Cal. App. 4th 450, 463 (Cal. Ct. App. 2004) (finding an emergency where, "[i]n the present case, Trails fails to cite to any prior knowledge on the part of District 17 regarding the instability of the levee system. All the evidence points to an extraordinary event . . . .").

### ii.     Police Power Under The Fifth Amendment.

82.     The police power exception to just compensation under the Fifth Amendment is also narrow. *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.")*; Chi., Burlington, & Quincy Ry. Co. v. Illinois*, 200 U.S. 561, 592–93 (1906) ("Private property cannot be taken without compensation for public use under a police regulation relating strictly to the public health, the public morals, or the public safety, any more than under a police regulation having no relation to such matters, but only to the general welfare."). Under the Fifth Amendment, even "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pa. Coal*, 260 U.S. at 416.

83.     Interpretations of police power under the Fifth Amendment similarly hold that an emergency is not an anticipated event. In *In re Upstream Addicks and Barker (Texas) Flood Control Reservoirs*, the government's decision to flood private land during Hurricane Harvey was determined to be a taking of private property and not an exercise of the police power because the flood was an implementation of a 2012 water control manual directive that was established years

before the alleged "emergency" occurred. 146 Fed. Cl. 219, 263-64 (Fed. Cl. 2019). The court determined that "the government [ ] made a calculated decision to allow for flooding these lands years before Harvey, when it designed, modified, and maintained the dams in such a way that would flood private properties during severe storms. Defendant cannot now claim that this harm was unavoidable when it planned for years to impound floodwaters onto plaintiffs' properties." *Id.*; *see also Patty v. United States*, 136 Fed. Cl. 211, 215–16 (Fed. Cl. 2018) (finding the police power exception not applicable where the police seized and used plaintiff's truck as a tool to stage a controlled drug delivery, but neither the plaintiff nor the truck were the subject of or related to the investigation).

### iii.    No Emergency Existed At The EOF, Platform Holly, Or The Wells.

84.    The Court heard testimony from three former Venoco employees who are now employed by Beacon West—Mr. Keith Wenal, Mr. Michael Wracher, and Mr. Larry Huskins— regarding the status of the EOF, Platform Holly, and the Wells as of Venoco's quitclaim in April 2017, as of the beginning of the Gap Agreement on September 15, 2017, and as of the termination of the Gap Agreement on October 15, 2018. All three former Venoco employees were founders and owners of Beacon West, and as explained below they had continuous oversight over the South Ellwood Field assets whether they were employees of Venoco or Beacon West. As described below, the testimony of Messrs. Wenal, Wracher, and Huskins confirm that the EOF, Platform Holly, and the Wells were at all times maintained in a safe manner such that no emergency existed to justify Defendants' purported exercise of police power. Moreover, the testimony from Defendants' other witnesses—Ms. Lucchesi and Mr. Jeffrey Planck—do not adequately support Defendants' assertions to the contrary.

iv.        **Mr. Wenal's Testimony.**

85.        Mr. Wenal was Venoco's Health, Environment, and Safety Manager. Mar. 7 Trial Tr. 87:2–3. In total, Mr. Wenal has more than twenty-five years of experience in health, safety, and environmental management. *Id*. at 88:11–14. At Venoco, Mr. Wenal was responsible for managing the overall safety management programs associated with Venoco's operations, including, among other things, incident management programs, safety training and certification of staff and personnel, hazardous waste management and transportation, incident reviews, and management of air permits, for onshore and offshore assets at Venoco, which included the Wells, Platform Holly, and the EOF. *Id*. at 89:15–91:6.

86.        Venoco had a safety management system that Mr. Wenal oversaw, and according to that system, any safety incident at the Wells, Platform Holly, or the EOF would have been reported to Mr. Wenal. *Id*. at 91:12–92:9.  Mr. Wenal testified that during his employment with Venoco, if there had been any event or condition at the EOF, Platform Holly, or the Wells that posed an imminent threat to health, safety, or the environment, he would have been notified of such an event. *Id*. at 95:12–17.

87.        Mr. Wenal joined Beacon West as Executive Vice President of Health, Environment, Safety, and Regulatory immediately after leaving Venoco, and later he became Beacon West's Chief Compliance Officer, fulfilling the same role he held at Venoco. *Id*. at 96:4–97:3. Beacon West also had a safety management system and injury and incident prevention plan, both of which were modeled, to some extent, after the similar system in place at Venoco. *Id*. at 97:4–14. Beacon West had similar reporting requirements to make sure information about incidents was brought to Mr. Wenal's attention. *Id*. at 97:15–22.

88.        Mr. Wenal testified that up to the execution of the Reimbursement Agreement on April 14, 2017, the Wells in the South Ellwood Field were maintained in a safe manner, and the

Wells continued to be maintained in a safe manner after that date. *Id.* at 100:7–21. Mr. Wenal further testified that in April 2017, he was not aware of any imminent threat to health, human safety, or the environment at the EOF, Platform Holly, or the Wells. *Id.* at 102:21–103:6, 104:19–23.

89.    Mr. Wenal testified that it was his understanding that one of the purposes of the Beacon West Agreement was to ensure the continued safe operation of the EOF, Platform Holly, and the Wells. *Id.* at 105:16–106:2. Mr. Wenal testified that as of September 1, 2017, the date of the execution of the Beacon West Agreement, daily operations at the EOF and Platform Holly were safe, and that since Beacon West assumed operation of the EOF and Platform Holly, daily operations continue to be safe. *Id.* at 106:3–18. Mr. Wenal testified that as of September 1, 2017, he was not aware of any imminent threat to health, safety, or the environment at the EOF, Platform Holly, or the Wells. *Id.* at 106:19–23. He was also not aware of any emergency at the EOF, Platform Holly, or the Wells on September 1, 2017. *Id.* at 106:24–107:2.

90.    Mr. Wenal testified that as of September 15, 2017, there had been no change in the status of those assets, meaning that the EOF, Platform Holly, and the Wells continued to be operated in a safe manner, and that in the two weeks between the Beacon West Agreement and the Gap Agreement (executed as of September 15, 2017), there was no imminent threat to the environment or people. *Id.* at 107:12–22.

91.    Mr. Wenal testified that as of October 15, 2018, the EOF, Platform Holly, and the Wells were still maintained in a safe manner and that their status had not changed. *Id.* at 108:1–8.

**v.    Mr. Wracher's Testimony.**

92.    Mr. Wracher was Venoco's Chief Operating Officer prior to co-founding Beacon West, and Chief Executive Officer of Beacon West. A.D.I. 242-1 at Ex. B (Wracher Dep.) at 14:6–14, 16:2–22. Mr. Wracher had management and oversight responsibility for the EOF, Platform

Holly, and the Wells. *Id*. at 18:14–16, 19:10–19. Mr. Wracher testified that as part of upper management at Venoco from 2015-2018, he would have received reports of safety incidents at the EOF, Platform Holly, or the Wells. *Id*. at 20:11–21:5. Mr. Wracher testified that he believed he would have been notified of an event or condition at any of the South Ellwood assets, including the EOF, Platform Holly, and the Wells, that posed an imminent threat to health, safety, or the environment. *Id*. at 23:20–24.

93.    Mr. Wracher testified that in April of 2017, he was not aware of any imminent threat to health, safety, or the environment at Platform Holly or at the Wells. *Id*. at 33:2–9. He described the Wells as "in a safe state." *Id*. at 33:11–17. Mr. Wracher agreed that up to April 14, 2017, the EOF, Platform Holly, and the Wells were operated in a safe and responsible manner. *Id*. at 40:13–41:9. Mr. Wracher further testified that from April 14, 2017 until the time he left Venoco to join Beacon West, the EOF, Platform Holly, and the Wells were operated in a safe and responsible manner. *Id*. at 41:13–23.

94.    Mr. Wracher testified that as of and after the execution of the Beacon West Agreement on September 1, 2017, daily operations at the EOF and Platform Holly were safe. *Id*. at 60:14–61:10. Mr. Wracher further testified that in September 2017, around the time that operations were transitioning from Venoco to Beacon West, he was not aware of any imminent threat to health, safety, or the environment at the EOF, Platform Holly, or the Wells. *Id*. at 61:11–62:12. He further testified that he was not aware of any emergencies at the EOF, Platform Holly, or the Wells in September 2017. *Id*. at 62:14–20. Mr. Wracher testified that he would have been notified had there been any emergency at any of the South Ellwood Field assets. *Id*. at 62:22–63:1.

95.    In October 2018, when Mr. Wracher was the Chief Executive Officer of Beacon West, he was not aware of any imminent threat to health, safety, or the environment at the EOF,

Platform Holly, or the Wells, and that any such threat would stick out in his mind. *Id*. at 63:11–19.

Mr. Wracher testified that if there had been an emergency at the EOF, Platform Holly, or the Wells, he would have been notified. *Id*. at 65:3–7.

      **vi.**        **Mr. Huskins' Testimony.**

      96.      Mr. Huskins was Venoco's Operations Manager and is the current Chief Operating Officer of Beacon West. Mar. 7 Trial Tr. at 167:10–21. Mr. Huskins worked at Venoco for approximately eight years from 2011 until 2018. *Id*. at 167:25–168:5. As Operations Manager, Mr. Huskins had responsibility for Venoco's Southern California operations, including Venoco's operations in the South Ellwood Field. *Id*. at 169:12–20. Specifically with respect to the EOF and Platform Holly, Mr. Huskins was responsible for the safe operation of the facilities, the budget, and management of the asset. *Id*. at 169:21–170:6.

      97.      Mr. Huskins testified that Venoco had procedures to ensure that personnel reported unsafe conditions to their supervisors. *Id*. at 170:23–25. Those reports would have been sent to Mr. Wenal or Mr. Huskins, and in either event they would have been shared among Mr. Wenal and Mr. Huskins. *Id*. at 171:1–4. If a safety incident occurred at any of the facilities Mr. Huskins oversaw, it would have been reported to him as operations manager, and he was empowered to notify others and take corrective action. *Id*. at 171:16–24.

      98.      Mr. Huskins was employed by Venoco at the time of the quitclaim, and he testified that the Wells at that time were shut in at the surface, which is how the Wells had been maintained since the Plains All American Pipeline rupture in May of 2015. *Id*. at 172:9–18. At the time of Venoco's quitclaim of the Leases, Mr. Huskins did not foresee any imminent threat to the environment or to public health and safety from the EOF, Platform Holly, or the Wells. *Id*. at 173:19–174:5. Mr. Huskins testified that before and after the quitclaim, the assets were operated in a safe and responsible manner. *Id*. at 177:2–10.

99.     Mr. Huskins testified that before and after execution of the Beacon West Agreement on September 1, 2017, daily operations at the EOF and Platform Holly were safe.[9] *Id.* at 182:2–8.

100.    Mr. Huskins explained that ExxonMobil suspended P&A work at the Wells beginning March 2020. *Id.* at 187:10–16. The State Lands Commission announced on November 19, 2021, that "[p]lug and abandonment work on Platform Holly resumed in October 2021, 528 days after the pandemic shut down this work." *See* Ex. P70. Mr. Huskins explained that essentially from the start of COVID until October 2021, there was no P&A work. Mar. 7 Trial Tr. 188:23–189:2. During that time, the Wells were in the same state as they were before the COVID shutdown. *Id.* at 189:6–8. Mr. Huskins testified that if there had been a threat of uncontrolled emissions at any of those wells, COVID would not have prevented any effort to address such a threat. *Id.* at 189:9–12.

### vii.    Defendants' Representatives' Testimony.

101.    Ms. Lucchesi and Mr. Jeffrey Planck also testified regarding the conditions at the EOF, Platform Holly, and the Wells. Neither Ms. Lucchesi's nor Mr. Planck's testimony, however, supports a finding that an emergency existed at the EOF. Ms. Lucchesi articulated her perception that an emergency existed as of her receipt of Mr. Wracher's email on April 12, 2017, because she interpreted it to mean that because Venoco was going to "literally . . . leave the facilities, which meant that the platform[, the ]EOF, and the related facilities were going to be unmanned and unmanaged," and that "created an emergent situation for us because these are facilities that need to be operated and maintained 24 hours a day, 7 days a week." Mar. 10 Trial Tr. 13:1–7. Ms. Lucchesi further testified that Mr. Wracher's email indicated an emergent situation because the

---

[9] In addition to the Beacon West witnesses, Anne Wells, the City of Goleta's advanced planning manager, also testified that the City of Goleta worked well with Venoco to ensure that operations at the EOF were safe for the community. Mar. 10 Trial Tr. 80:1–7, 97:12–16.

Commission had "to obtain immediate funding to enter into a reimbursement agreement with Venoco, so that they could stay beyond April 30th . . . ." *Id*. at 13:24–14:12. But the Court was presented with evidence that on March 30 and 31, 2017, Venoco and the Commission's counsel, Mr. Seth Blackmon, were negotiating the Reimbursement Agreement to ensure that no one would "walk off the job." *Id*. at 56:9–57:7. In those late-March emails between counsel for Venoco and Mr. Blackmon, a number of scenarios were presented, some of which anticipated that Venoco would maintain operations at the EOF at Venoco's expense only until April 25, 2017. Ex. P8 at P8.0001. Thus, the Court does not find credible Ms. Lucchesi's assertion that the April 12, 2017 email caused an "emergency."

102.    Further, each of Messrs. Wenal, Wracher, and Huskins testified at trial that at no time was the EOF left unmanned and at no time was Venoco going to "walk off the job." *See* Mar. 7 Trial Tr. 102:14–20 (Wenal testimony); A.D.I. 242-1 at Ex. B (Wracher Dep.) at 43:23–4 (Wracher testimony); Mar. 7 Trial Tr. 175:10–16 (Huskins testimony).

103.    Ms. Lucchesi agreed that prior to and upon the execution of the Beacon West Agreement, daily operations at Platform Holly and the EOF were safe. Mar. 9 Trial Tr. 218:7–15. Nevertheless, Ms. Lucchesi testified that Beacon West understood that there was "the ***potential*** for an emergency situation that could cause harm to public health and safety if those were not actively managed," and that "without active management of the facilities . . . an emergency situation ***would occur*** . . . ." *Id*. at 217:9–218:1 (emphasis added). This testimony does not support an inference that an emergency was present at the EOF. Indeed, it suggests that no emergency existed at the time of, or prior to, the Beacon West Agreement.

104.    Defendants also presented testimony from Mr. Jeffrey Planck in support of their claims of an emergency at the EOF. Mr. Planck is a retired annuitant and project coordinator for

37

the Commission, and in that capacity since 2018 he has overseen the P&A operations of Platform Holly and the PRC 421 facilities. Mar. 10 Trial Tr. 130:19–131:8. Mr. Planck is not an engineer by training, although he has worked as an engineer. *Id*. at 132:19–133:8. For 38 years, Mr. Planck's position has "[I]n one form or another" involved responsibilities for Platform Holly. *Id*. at 136:6–9.

105.    Mr. Planck also testified that the Commission lacked staff that could take over operation at the EOF, and he confirmed that Venoco continued operating the EOF and Platform Holly until the Commission was able to hire a contractor to take over those operations. *Id*. at 143:1–9. He provided input into the process of soliciting interest from contractors, and one of the "strong points of picking" Beacon West was that the founders were former Venoco employees. *Id*. at 178:22–179:22. Mr. Planck confirmed that those former Venoco personnel had firsthand knowledge of the operations at the EOF and Platform Holly, and that the Commission "didn't have the amount of personnel or the amount of personnel that had knowledge" to staff the EOF and Platform Holly. *Id*. at 180:11–17. Mr. Planck testified that Beacon West was hired "to keep the operation running as it was and mak[e] sure the fluids coming off of Holly were treated successfully and to maintain a safe and working environment." *Id*. at 181:1–6.

106.    Mr. Planck testified that the Wells at Platform Holly need to be plugged and abandoned, as all wells in California do, in order to stop hydrocarbons from flowing to the surface. *Id*. at 137:21–25. Mr. Planck testified that the P&A work was paused as a result of COVID-19, but that the EOF was staffed and maintained during that time by a skeletal crew of seven to eight personnel during the daytime and two at night. *Id*. at 175:12–176:12. Mr. Planck testified that during the time that he has been involved, there has been no opportunity to cease or pause operations at the EOF. *Id*. at 142:17–20. Accordingly, based on Mr. Planck's testimony, the EOF

and Wells were maintained in a safe manner at all times since Defendants took possession of the

EOF.

107.    Indeed, an August 22, 2018 email from Mr. Planck to Ms. Lucchesi reveals that

Defendants' occupation of the EOF was not necessary to address any claimed emergency. In that

email, Mr. Planck was responding to an email from Ms. Lucchesi, which forwarded the letter from

Venoco's counsel terminating the Gap Agreement. *Id*. at 148:7–16. In his response, Mr. Planck

stated that three wells "can flow naturally," and that "the other [sic] could conceivably be P&A'd

without the use of the EOF (although some could be a little tricky) from what we learned during

the slick line work." Ex. P46 at P46.0001. Mr. Planck proposed:

> Perhaps we could offer them 2% of the proceeds of the oil sales for the 'use' of the
> facility, rather than a cash payment for the EOF, and forbearing of all rents owed
> or incurred (approximately a million bucks).

> Just a thought -- I know it would be hard or impossible to divert anything from the
> general funds, especially to these buzzards (or any private entity), but it gives the
> BK estate "income" without a nasty fight or use of our decom funds (which we can
> cut off when we need to wrap up the P&A work).

*Id*.

108.    The following day, on August 23, 2018, Mr. Planck sent a follow-up email to Ms.

Lucchesi apologizing for the typo and stating "conceivably we could P&A the other **25** wells (not

15). Let me know if you think we should "force their hand" by shutting down the EOF operations

on the 15th (Sept)." *Id*. (emphasis in original).

109.    During his testimony at trial, Mr. Planck tried to walk back the statements in his

email. Mr. Planck testified that although he did not recall the specific email, he recalled the

"context at that time in [his] life." Mar. 10 Trial Tr. 148:17–150:20. Mr. Planck attempted to

explain that his proposal regarding the 2% of proceeds "never happened. Never could have

happened," and "doesn't mean anything." *Id*. at 150:9–20.

110. Mr. Planck attempted to disavow his August 2018 statements regarding the possibility of P&A without use of the EOF for 25 of the Wells. He explained "this [was] a long time ago," and he described his email as "a random email." *Id.* at 151:2–10. He was "not sure where the 25 came from," but he testified that "the only thing I can consider is[] that there [were] 15 wells that were low-pressure that we conceivably could get P&A." *Id.* He explained "what we were looking at was . . . do we just flow those two wells and sell the oil? Shortly after this message, within the next couple of months, [] that was all a real bad idea that I had." Id. at 150:9–20. He called the email "a brainstorm" reflecting that he "was grasping at straws and shooting from the hip." *Id.* at 151:11–17.

111. Rather, according to Mr. Planck, the Commission could not allow the pressure to build up on even the five wells (assuming 25 could be P&A'd without the EOF). *Id.* at 162:19–163:5. Mr. Planck could not say where the pressure would go "after a weeks, days or months, but we just couldn't afford that [to] happen." *Id.* When asked why it is necessary that hydrogen sulfide gas be treated at the EOF, Mr. Planck responded "[w]e have no capacity to store gas either on Holly or at the EOF." *Id.* at 171:2–6. It is unclear what Mr. Planck meant by this, but his testimony is not competent evidence that the EOF is necessary.

112. Based on the foregoing, the Court is persuaded that the more credible testimony regarding the conditions at the EOF, Platform Holly, and the Wells, came from Keith Wenal, Larry Huskins, and Michael Wracher, especially given their longstanding familiarity with the EOF as former officers and employees of Venoco. This testimony demonstrates that no emergency existed at any time, contrary to the claims of Defendants.

**viii.      Contemporaneous Records.**

113. In addition to the testimony presented at trial, contemporaneous records also demonstrate that no emergency existed justifying Defendants' purported exercise of their police

power. The Reimbursement Agreement, executed April 14, 2017, three days before Venoco quitclaimed the Leases, provides that the "Commission and Venoco seek to ensure ***continued operation of the Assets in a safe and responsible manner*** . . . ." Ex. P12 at P12.0002. The Commission's May 17, 2017 solicitation of an engineering consultant to work at Platform Holly and the EOF stated that the Commission announced its need to retain a consultant to "conduct the ***continued safe operation*** of Venoco's Ellwood Facilities . . . ." Ex. P20 at P20.0001. The Beacon West Agreement, executed September 1, 2017, provides that Beacon West entered into an agreement with the Commission "to perform the engineering, operations, and administrative services . . . in order to ***continue the safe daily operations*** at Platform Holly [ ] and the [EOF] . . . ." Ex. P25 at P25.0002. The Gap Agreement executed September 14, 2017, provides that the Commission and Venoco seek to "ensure that the Quitclaimed Facilities (as defined in the Reimbursement Agreement) ***remain secured and maintained*** for use during the anticipated Plug and Abandonment Program and the subsequent decommissioning project and lawful abandonment." Ex. P26 at P26.0001.[10]

114.    With respect to these statements, Ms. Lucchesi testified that "[a]ll actions that we entered in -- or all agreements and all -- that we entered into and all activities we pursued once we became aware that Venoco planned to abandon its lease obligations and abandon the facilities, were an exercise of protecting public health and safety and damage to the marine environment. And so those were valid exercises of our police power." Mar. 9 Trial Tr. 224:15–21. While it is

---

[10] The Court was also presented with evidence at summary judgment that the Commission issued a press release on April 17, 2017, announcing that Venoco had quitclaimed its interests in the Leases and Platform Holly, which "effectively ends commercial oil and gas production in state waters at this location in the Santa Barbara Channel . . . ." A.D.I. 159-25. The press release quoted then Commissioner, now Governor, Gavin Newsom as saying that the decision "signifies yet another landmark in the evolution of California's energy portfolio in which the commission is a key participant." *Id*. Notably, the press release did not declare or suggest an emergency—it reassured the public that the Commission would "ensure that the wells and facilities are secured and maintained while it develops a plan . . . to efficiently and safely address the disposition of the wells, platform, and piers." *Id*.

clear that Ms. Lucchesi[11] viewed "all actions" as the exercise of police power after becoming aware of Venoco's intention to quitclaim the Leases, the California law and case law interpretations of the police power exception to the constitutional requirement of just compensation are decidedly narrow, as explained above.

115.    The only document offered into evidence describing the existence of emergency conditions was a memorandum prepared by Mr. Jeff Planck dated October 28, 2018, *after* this adversary proceeding was filed. *See* Ex. P48; *see also* Mar. 10 Trial Tr. 185:17–25. That memorandum was prepared by Mr. Planck at Ms. Lucchesi's direction "[i]n response to a seemingly persistent view that the current situation at Platform Holly and the Ellwood Onshore Facility is not emergent or of great concern to the State of California . . . ." Ex. P28 at P28.0001. This post-lawsuit memorandum describes the situation at the EOF and Platform Holly as an "immediate and ongoing emergency," but no such urgent language was used by the Commission to describe the circumstances prior to the lawsuit being filed. *Id.*

116.    Mr. Planck's memorandum states that "Venoco's desertion of its facilities created a dangerous situation wherein a 50-year old offshore oil and gas platform and its integrated processing facility were going to be left unstaffed." Ex. P48 at P48.0001. When asked about this choice of words at trial, Mr. Planck agreed that Venoco never walked off the job at the EOF and never walked off the job at Platform Holly. Mar. 10 Trial Tr. 186:15–21.

117.    Mr. Planck's memorandum describes the response to the quitclaim as an "immediate and ongoing emergency," and it describes that Commission's actions to ensure staffing as work "to mitigate the continuing emergency." Ex. P48 at P48.0001. Mr. Planck's memorandum

---

[11] Mr. Planck was asked whether it was his understanding, on August 22, 2018, that the Commission had already declared a police power emergency, and he responded "I'm not sure that I'd call it that, but you mean did we take over the lease, yeah." Mar. 10 Trial Tr. 193:6–14. Ms. Lucchesi's perception of the breadth of the Commission's exercise of police power was apparently not shared by Mr. Planck.

states "[u]ntil all 32 wells are plugged and abandoned to DOGGR and the Commission's standards the facilities cannot be claimed safe." *Id.*

118.    The Court finds that this post-lawsuit assertion of an "emergency" is not credible. Mr. Planck's memorandum uses words suggesting emergency (either "emergent" or "emergency") three times in the first paragraph. By contrast, Defendants point to a single instance pre-filing of the lawsuit where the Commission requested "emergency funding." Mr. Planck's post-lawsuit memorandum declares that the "facilities cannot be claimed safe" until the P&A is complete. By contrast, the Commission stated in the Reimbursement Agreement, the Gap Agreement, and the Beacon West Agreement that operations at Venoco's facilities had been maintained safely and would continue to be maintained safely. The significant shift in the Commission's rhetoric after the lawsuit was filed appears to have been a strategy to create documentary evidence of the Commission's belief that an emergency existed.

### ix.    Hydrogen Sulfide.

119.    The Court heard testimony from several witnesses regarding the dangers associated with hydrogen sulfide, and the existence of hydrogen sulfide in the Wells. As described below, however, the existence of hydrogen sulfide in the Wells alone did not generate an emergency despite Defendants' claims to the contrary.

120.    Defendants presented Robert Allen Ettinger, a senior principal with Geosyntec Consultants, who is an environmental specialist focused predominantly on the fate and transport of chemicals through soil, groundwater, and air. Mar. 11 Trial Tr. 67:4–7, 67:15–68:1. Defendants tendered Mr. Ettinger as an expert in the field of emissions and transport of chemicals from releases and release sites and their effect on indoor and outdoor air quality. The Trustee did not object to Mr. Ettinger's qualifications, and he was so admitted. *Id* at 72:18–24.

121.    Mr. Ettinger explained that hydrogen sulfide is a hazardous chemical that is regulated by federal and state agencies. He described it as "very odorous" and capable of causing health effects. *Id*. at 73:2–8. At a concentration of 10 to 50 parts per billion by volume, people will start smelling hydrogen sulfide. *Id* at 73:12–14. CalEPA Office of Environmental Health Hazards Assessment sets the acute reference exposure level, which is the level that will endanger human health at exposure periods of one hour. *Id*. at 73:17–22. The acute reference exposure level is 30 parts per billion by volume. *Id*. at 73:23–74:4. 30 parts per billion by volume is also the California Ambient Air Quality Standard for hydrogen sulfide. *Id*. at 74:8–13.

122.    Mr. Ettinger testified as to the concentration of hydrogen sulfide in the daily flow rate of gas from Platform Holly to the EOF, and he testified that at those high levels, the hydrogen sulfide "must be treated." *Id*. at 77:15–20. He explained that the iron sponge equipment at the EOF removes the hydrogen sulfide from the gas stream so that the emissions at the EOF will not endanger the health, safety, and comfort of the people in the neighborhood. *Id*. at 75:4–9. Specifically, he opined that (1) operation of the gas treatment equipment at the EOF after Venoco quitclaimed the Leases was necessary to meet federal, state, and local regulations; and (2) operation of the gas treatment equipment at the EOF after Venoco quitclaimed the Leases was necessary to protect human health and the environment. *Id*. at 80:23–81:5. In order to arrive at those opinions, Mr. Ettinger assumed that untreated gas was intentionally released prior to the location of the iron sponge vessels, then he created an air dispersion model reflecting the concentrations of hydrogen sulfide outside the boundaries of the EOF. *Id*. at 85:25–86:14.

123.    While the Court finds Mr. Ettinger's testimony to be credible, the Court also finds that it has little relevance to the issues before the Court. Mr. Ettinger assumes that gas will be sent from Platform Holly to the EOF, and that it will be vented into the atmosphere rather than

processed. *Id*. at 96:8–96:15. Mr. Ettinger agreed that no one would ever intentionally vent gas into the atmosphere as supposed in his model, and that the hypothetical situation that is the basis for Mr. Ettinger's model has not happened at the EOF. *Id*. at 96:16–22. Mr. Ettinger also testified that it was his understanding that any gas at the EOF is sent there by the Commission from Platform Holly. *Id*. at 98:2–5. Mr. Ettinger also testified that he was not asked to consider whether there were any alternatives to using the EOF to process the hydrogen sulfide from the Platform Holly wells. *Id*. at 98:6–9.

124.    The Court finds that hydrogen sulfide is not generated at the EOF itself. A.D.I. 242-1 at Ex. B (Wracher Dep.) at 104:21–23. Hydrogen sulfide does not occur naturally at the EOF; it occurs naturally in the oil and gas that is brought to the EOF from the Platform Holly Wells. *See* Mar. 7 Trial Tr. 108:15–18. Oil and gas has to be brought to the EOF in order to be present at the EOF. *Id*. at 108:19–21. Therefore, the Court finds that the existence of hydrogen sulfide in the oil and gas produced from the Wells does not constitute a threat of imminent harm to human health, safety, or the environment at the EOF.

125.    The possible build-up of hydrogen sulfide in the Wells and at Platform Holly was not new as of Venoco's quitclaim in 2017—that possibility had been known of for decades because the Wells always have contained hydrogen sulfide. *Id*. at 108:22–109:8. Indeed, Ms. Lucchesi admitted that the Commission and its staff have "always known" that there was hydrogen sulfide in the gas from the Wells. Mar. 10 Trial Tr. 60:10–14. Ms. Lucchesi further admitted that the Commission also knew that if Venoco could not meet its obligations under the Leases, then the Commission or ExxonMobil would be responsible for the Wells, and the Commission or ExxonMobil would have to figure out a way to deal with the hydrogen sulfide. *Id*. at 60:15–22. Therefore, the Court finds that the existence of hydrogen sulfide in the Wells does not constitute a

threat of imminent harm to human health, safety, or the environment at the EOF. The Court further finds that although the possibility of a buildup of hydrogen sulfide at the Wells exists, it has always existed, and that possibility was always known by the Commission, and the Commission specifically anticipated the possibility that it would be responsible for treating hydrogen sulfide. The Court further finds, as explained below, that alternatives to use of the EOF exist.

x.        **Defendants Anticipated And Planned For Venoco's Quitclaim Of The Leases.**

126.    Additionally, the Court finds that Defendants anticipated the quitclaim of the Leases, further weakening Defendants' claims of an emergency. Defendants anticipated the quitclaim of the Leases in 1964 because the Leases themselves provided the Lessee that unilateral right. *See* Ex. P1 at P1.0006–7. In 1964, Defendants also anticipated that they may be responsible for the cost of plugging, abandonment, and decommissioning of the Wells and Platform Holly because Defendants contractually required Venoco and all Lessees to maintain a bond in favor of the State to cover that cost, among others. In 1997, Defendants anticipated that Venoco might not be able to meet its obligations under the Leases, and therefore did not release Mobil from its obligations when the Commission approved the transfer of the Leases from Mobil to Venoco. Defendants anticipated that Venoco may not be able to meet its obligations under the Leases during and after Venoco's first bankruptcy filing in 2016 because the Commission at that time renegotiated and increased the amount of the Bond. Defendants also anticipated Venoco's quitclaim of the Leases in the three to four months leading up to the quitclaim because Mr. Wracher was in contact with them about the fact that Venoco did not have a viable path forward. The fact that the Bond amount was ultimately insufficient does not negate the fact that Defendants specifically anticipated and planned for the circumstance that Venoco would quitclaim its Leases and the Defendants would be responsible for the Wells and Platform Holly and would have to find a way to handle the hydrogen sulfide gas produced from the Wells.

xi.        **The Trustee Established The Existence Of Alternatives To Using The EOF.**

127.    The Trustee presented evidence that alternatives to using the EOF existed and were viable: building a 9.6-mile onshore pipeline to transport production from Platform Holly to an existing oil and gas processing facility (ExxonMobil's Las Flores Canyon facility) and the renting or leasing of a floating production storage and offloading platform ("FPSO").

128.    As evidence of the viability of the first alternative, the Trustee presented the Commission's Environmental Impact Report ("EIR") prepared in connection with a different undertaking—the Commission's 2014 analysis of recommissioning PRC 421. *See* Ex. P38. Kathy Spletter, an expert designated by the Trustee, reviewed that EIR in connection with her work on this case.[12] She explained that the EIR process requires consideration of a "reasonable range of potentially feasible options or alternatives." Mar. 9 Trial Tr. 87:16–22. The Commission identified Las Flores Canyon in the 2014 EIR as an alternative to the EOF for processing production from PRC 421. *See* Ex. P38 at P38.0006–8. According to the Commission's EIR, use of the Las Flores Canyon Facility for that purpose would have required the construction of a 10.2-mile pipeline. *See id*. at P38.0033; *see also* Mar. 9 Trial Tr. 87:16–22.

129.    Ms. Spletter further explained that in January 2015, the City of Goleta adopted an ordinance that made it easier to terminate the EOF's nonconforming use status. Mar. 9 Trial Tr. 72:24–73:3. At that time, Venoco engaged InterAct to analyze alternatives to use of the EOF. *Id*. at 73:4–19. After conducting its analysis, InterAct prepared a report dated March 2015 (the "InterAct Report"). *See* Ex. P7. Venoco personnel (including Mr. Huskins), the permitting group, and the engineering group, participated in the creation of the InterAct Report and had an opportunity to provide input on the report. Mar. 7 Trial Tr. 185:1–24. Mr. Huskins had an

---

[12] Ms. Spletter's qualifications are discussed below.

opportunity to review a draft of the report, and he provided his comments on the report before it was finalized. *Id.* at 186:3–8.

130.    Ms. Spletter analyzed the alternative scenarios identified in the InterAct Report and determined that Scenario 2 in the InterAct report, which involves construction of a 9.6-mile onshore pipeline that would transport oil and natural gas produced at Platform Holly to the Las Flores Canyon processing facility, thereby enabling the hydrogen sulfide in the natural gas to be treated and the oil and natural gas to be sold, was a reasonable alternative to the EOF because it provides the same utility as the EOF as of September 15, 2017 and October 15, 2018 (the "Valuation Dates"). Mar. 9 Trial Tr. 85:23–86:1. Specifically, Ms. Spletter testified that it is reasonable to conclude that the 9.6-mile onshore pipeline contemplated in Scenario 2 could be built and permitted. *Id.* at 86:4–12. Ms. Spletter considered the other scenarios in the InterAct report, but determined that Scenario 2 was the scenario that replaced the utility of the EOF at the lowest cost. *Id.* at 81:12–18.

131.    Ms. Spletter also testified that another alternative to using the EOF is the renting or leasing of a floating production storage and offloading platform ("FPSO"). *Id.* at 106:1–107:14. Ms. Spletter explained that the FPSO would provide the same functions as the EOF via a vessel pulled up alongside Platform Holly. *Id.* at 107:15–108:6. The FPSO would take the fluids and gas from Platform Holly that is produced during the P&A activity, treat it, process it, and store it until those products could be brought back to shore using existing pipeline infrastructure. *Id.* Although ultimately Ms. Spletter concluded for purposes of her appraisal opinion that the cost of the FPSO is substantially greater than the cost of building a pipeline to Las Flores Canyon under Scenario 2, she testified that the FPSO was an alternative to use of the EOF that would replicate the utility of the EOF. *Id.* at 107:17–108:6, 110:2–20.

132. In connection with the EIR prepared in 2014, Ms. Lucchesi testified that the Commission "directed staff, pursuant to public testimony, to build out the analysis of the Las Flores Canyon alternative." Mar. 9 Trial Tr. 231:5–10. Ms. Lucchesi testified that from an engineering and technical perspective, the pipeline to Las Flores Canyon could be built. *Id*. at 231:16–20. Ms. Lucchesi testified that the Las Flores Canyon alternative was "determined to be infeasible" for the PRC 421 resumption project in 2014 "because of the significant impacts to the marine and coastal environment as well as the regulatory -- the insurmountable regulatory requirements associated with that." *Id*. at 232:7–13.

133. With respect to the Commission's consideration of alternatives to use of the EOF in response to Venoco's quitclaim of the Leases, Ms. Lucchesi testified that the Commission did not hire a consultant or contractor to analyze alternatives to use of the EOF in response to Venoco's quitclaim. *Id*. at 230:25–231:4. The Commission performed no independent assessment of using Las Flores Canyon as an alternative to the EOF after Venoco's quitclaim; instead, it relied on prior studies like the InterAct report and "evaluated it internally." Mar. 10 Trial Tr. 61:7–15. Ms. Lucchesi testified that the Commission determined the Las Flores Canyon was not a feasible alternative to using the EOF because of the time associated with building out the project, the "significant permitting hurdles, and also the various land ownership options that you'd have to get agreement for to build that, and then the actual construction, was prohibited by the time associated with moving through that entire life cycle." Mar. 9 Trial Tr. 231:21–232:13. Ms. Lucchesi further testified that the EOF, by contrast to the Las Flores Canyon facility, was fully permitted and ready to go such that the Commission could start work right away. *Id*. at 232:14–23.

134. Defendants, who bear the burden of proof as to the emergency exception, offered no expert testimony as to the feasibility of the scenarios discussed in the InterAct report. As for

the "internal analysis" referenced by Ms. Lucchesi, the Court was presented with no documentary evidence reflecting any such internal analysis performed by the Commission. Mar. 10 Trial Tr. 61:16, 61:23–62:3. Therefore, the Court is left with Ms. Lucchesi's testimony as to the conclusion reached by the Commission but no analysis to support that conclusion. The Court is not persuaded by this conclusory testimony, especially when considering the testimony offered by Ms. Spletter and the InterAct Report. The Court also finds, however, that given the testimony on the feasibility of the Las Flores Canyon facility, which is owned by ExxonMobil, Defendants could have looked to ExxonMobil to fulfill its obligations under the Leases under California law.

### xii.    Defendants Chose Not To Seek Fulfillment Of All Obligations In The Leases From ExxonMobil And Instead Chose To Take Private Property.

135.    The Court was presented evidence that ExxonMobil remained responsible for the obligations in the Leases. *See, e.g.*, Ex. P44 at P44.0004 ("CSLC contends that Mobil, as the predecessor lessee to Venoco, was the previous operator of all thirty-two (32) Wells and reserves its right to seek fulfillment of all obligations in the Leases."). Defendants offered no explanation as to why DOGGR did not order ExxonMobil to plug and abandon the Wells. The Court finds as a matter of California law that the State may pursue prior operators seriatim, that is, from the most to the least recent. Cal. Pub. Res. Code 3237(c)(2). The Court was presented with evidence that the Commission entered into a settlement agreement compromising its claims against ExxonMobil, and therefore the Commission contractually limited its pursuit of prior operators. *See generally* Ex. P44; *see also* Mar. 9 Trial Tr. At 233:5–8 Thus, the law provides an alternative that the Commission should have considered before taking the Trust's private property.

136.    The Court therefore finds that there was no emergency because Defendants had statutory authority to hold a private party—with ample resources and experience—to deal with the decommissioning, plugging, and abandoning of the Wells and Platform Holly. Instead, the

Commission chose to take private property and assume responsibility for operations at the EOF and Platform Holly itself. That choice was not "under pressure of public necessity to avert impending peril," because Defendants could have instead sought fulfillment of Mobil's obligations under the Leases. *See, e.g.*, *Holtz*, 475 P.2d at 446 (quoting *House v. L.A. Flood Control Dist.*, 153 P.2d 950, 953 (1944)).

**D.    The Trust Is Entitled To Damages For Defendants' Use And Occupancy Of The EOF From September 15, 2017 Until Defendants Vacate The EOF.**

137.    The Court finds that Defendants' temporary taking of the EOF began on September 15, 2017. On that date, the Commission entered into the Gap Agreement with Venoco, under which Venoco "agree[d] to allow the Commission and its designated contractor to continue non-exclusive use of the EOF, EOF-related machinery or equipment . . . so long as the Commission agree[d]" to certain conditions, including that the Commission would "continue[] to negotiate in good faith with Venoco regarding a reasonable payment amount for the Commission's continued non-exclusive of EOF and the EOF-related equipment and machinery." Ex. P26 at P26.0001–2. The Commission and Venoco never agreed upon the final amount. Although the Commission ultimately made some payments under the Gap Agreement, the Commission did not make full payments and later refused to make *any* further payment when it first asserted "police power."

138.    Defendants argued in pre-trial briefing that the thirteen-month period covered by the Gap Agreement is only actionable as a claim for breach of contract. The mere existence of a contract is not fatal to a takings claim. *Integrated Logistics Support Sys. Int'l v. United States*, 42 Fed. Cl. 30, 34 (Fed. Cl. 1998) ("[T]aking claims are not presumed to be foreclosed by claims for breach of express contract merely because the claims share the same factual background."); *see United States v. General Motors Corp.*, 323 U.S. 373 (1945) (proposing the Fifth Amendment takings clause as an alternative means for relief in an action involving an alleged breach of a lease

agreement). "[A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2170 (2019).

139.    Federal courts have expressly rejected the argument "that a takings claim can never arise out of a contract." *Henry Hous. Ltd. P'ship v. United States*, 95 Fed. Cl. 250, 255–56 (Fed. Cl. 2010) (citing *Lynch v. United States*, 292 U.S. 571, 579 (1934)). The existence of a contract does not bar a takings claim when the property right at issue was not created by the contract with the government. *See Century Expl. New Orleans v. United States*, 103 Fed. Cl. 70, 78 (Fed. Cl. 2012) ("[T]he capacity in which the government acts is an important consideration in suits alleging an uncompensated taking of property rights *created by contract*.") (emphasis added).

140.    It is undisputed that the Trust's rights in the EOF were not created by a contract with Defendants. When the property rights at issue exist independently of a contract, a plaintiff can bring a takings claim arising from governmental action infringing on those rights. *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 302 (Fed. Cl. 2003) ("The Court of Federal Claims has recognized that vindication of rights existing independently of the contract at issue cannot be restricted to contractual remedies.").

141.    The Court therefore finds that the Trust's claim for inverse condemnation arose as of September 15, 2017. On that date the Commission began its use and occupancy of the EOF. The Commission later refused to pay more than the $100,000 per month minimum payment that was agreed upon between Venoco and the Commission as *partial* compensation to be contributed toward a final, agreed upon "reasonable" payment amount. The Commission later asserted it had no obligation to pay whatsoever. As explained below, the amounts paid under the Gap Agreement are deducted from the Court's finding of just compensation, but the Court finds that just

compensation is owed for the period from September 15, 2017 until the Defendants vacate the EOF.

**E.    The Trustee Is Entitled To The Fair Market Value Of What Defendants Took.**

142.    California law entitles a successful inverse condemnation plaintiff to damages. "Compensation shall be awarded for the property taken. The measure of this compensation is the fair market value of the property taken." Cal. Code Civ. Proc. § 1263.310. California law defines fair market value as follows:

> (a)    The fair market value of the property taken is the **<u>highest price</u>** on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with each other with full knowledge of the uses and purposes for which the property is reasonably adaptable and available."

> (b) The fair market value of property taken for which there is no relevant, comparable market is its value on the date of valuation as determined **<u>by any method of valuation that is just and equitable</u>**.

Cal. Code Civ. Proc. § 1263.320 (emphasis added).

143.    In general, just compensation is measured by the fair market value of the property at the time of the taking. *Rose v. State*, 19 Cal. 2d 713, 737 (1942). For this reason, "it is a firmly established principle that the compensation payable is to be based upon the loss to the owner rather than upon the benefit received by the taker." *Pacific Gas & Elec. Co. v. Zuckerman*, 189 Cal. App. 3d 1113, 1127 (Cal. Ct. App. 1987). This rule, however, does not mean that evidence of the highest and best use of the property must be excluded simply because that is the use that the condemnor intends to make of the property. *Id*.

144.    California law recognizes that "an inverse condemnation action may be maintained for mere damage to property, for temporary invasions, and even when the public entity does not physically possess the property. *City of Los Angeles v. Superior Court*, 194 Cal. App. 4th 210, 220

(2011). "Unlike an eminent domain proceeding, an inverse condemnation action does not always result in the public entity acquiring the property." *Id.* Furthermore, "[t]he yardstick used to ascertain the amount of compensation due in an 'inverse condemnation' action is precisely the same as that used in the normal condemnation action," which is "the market value of the land at the time it is taken . . . ." *Federal Oil Co. v. Culver City*, 179 Cal. App. 2d 93, 97 (1960).

145.    The "just compensation" required by the U.S. Constitution is that which constitutes "a full and perfect equivalent for the property taken." *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326 (1893). Just compensation under the U.S. Constitution is measured by the owner's loss, not the government's gain. *Brown v. Legal Found. of Washington*, 538 U.S. 216, 236 (2003). The value of the property to the government for its particular use is not a relevant criterion. *United States v. Chandler-Dunbar Co.*, 229 U.S. 53, 80–81 (1913).

146.    Just compensation is measured "by reference to the uses for which the property is suitable, having regard to the existing business and wants of the community, or such as may reasonably be expected in the immediate future, . . . [but] 'mere possible or imaginary uses or the speculative schemes of its proprietor are to be excluded.'" *Chicago B. & Q. R.R. Co. v. Chicago*, 166 U.S. 226, 250 (1987); *McGovern v. City of New York*, 229 U.S. 363, 372 (1913). The general standard thus is the market value of the property, *i.e.*, what a willing buyer would pay a willing seller. *United States v. Miller*, 317 U.S. 369, 374 (1943); *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 275 (1943).

147.    The Court finds that the Trust is entitled to the fair market value of the property taken. The property taken in this case is the temporary possession, use, and occupancy of the EOF, not ownership. Defendants' taking is temporary, not permanent. *See* Mar. 9 Trial Tr. 239:1–4, 5–8. "[T]he proper measure of compensation in a temporary takings case is the rental that probably

could have been obtained . . . ." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7 (1949) (emphasis added); *see also Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed. Cir. 2012) ("The usual measure of just compensation for a temporary taking is the fair rental value of the property for the period of the taking."); *Sacramento & San Joaquin Drainage Dist. v. Goehring*, 13 Cal. App. 3d 58, 66 (Cal. Ct. App. 1970) (just compensation for a temporary taking includes the rental value for the period of the taking).

148.     The Court heard testimony from several expert witnesses regarding the fair market value and fair rental value of the EOF, including testimony regarding the real property, the equipment, the Title V air permit, and the assemblage of all tangible and intangible assets at the EOF. The experts' testimony and the Court's calculation of damages are summarized below.

    **i.**        **Fair Rental Value Of The EOF Real Property.**

        **a.**        **Mr. Michael Arnold's Testimony.**

149.     The Trustee designated a certified real estate appraiser, Mr. Michael Neal Arnold, to testify regarding the fair market value and the fair rental value of the EOF real property, the office building on the property, the chain link fence, and the concrete slab, as of September 15, 2017, and October 15, 2018.[13] Mar. 8 Trial Tr. 39:22–23, 46:1–21. Mr. Arnold began working as an appraiser in 1974, was certified over thirty years ago, and the geographic focus of his appraisal practice has been Santa Barbara County and the immediately adjacent counties. *Id.* at 43:14–45:1. Mr. Arnold is certified by the State of California and holds the MAI designation which is granted by the Appraisal Institute. *Id.* at 40:3–8. Mr. Arnold was tendered by the Trustee, the Defendants made no objection to his qualifications, and the Court recognized Mr. Arnold as an expert in the field of real estate appraisal. *Id.* at 53:21–54:4.

---

[13] Mr. Arnold did not appraise the equipment or intangible assets at the EOF.

150.    Mr. Arnold used the data comparison approach to value the land, the cost approach to determine the contributing value of the improvements, and he determined rent on an annual basis to be the equivalent to an appropriate rate of return on the underlying value. *Id*. at 50:19–51:5.

151.    In performing the data comparison approach, Mr. Arnold performed a survey to find evidence of sales of light industrial properties. *Id*. at 54:24–55:3. He identified those properties by considering elements of comparison such as location, size, date of sale, and zoning. *Id*. at 55:11–57:1. Using the purchase prices for the properties identified by his survey, Mr. Arnold calculated a price per square foot for each of the sales. Mr. Arnold then considered the quality of the properties that were sold, including the quality of the finishes, and he developed a range of prices per square foot. *Id*. at 57:12–58:15. Mr. Arnold determined that the EOF was likely valued at the lower end of the range, and he used a range of $20.00 to $22.50 per square foot to calculate a fair market value of the EOF real property of $3,885,560.00 to $4,371,255.00. *Id*. at 57:16–58:5, 58:16–59:15. He ultimately concluded that the fair market value of the EOF real property as of September 15, 2017, was $4,000,000.00. *Id*. at 59:16–60:12.

152.    Mr. Arnold then determined the value of the office building, the chain link fence, and the concrete slab by calculating the cost to replace those assets and depreciating for the age of the building, which he thought was an appropriate allowance from the perspective of a typical market participant. *Id*. at 61:15–62:16. For this analysis, he used the cost approach. *Id*. at 61:13–62:16. He determined that the replacement cost per square foot of the 4,914 square foot office building would be $300. *Id*. Mr. Arnold arrived at that cost by first forming the opinion that to build the building new would cost $400 per square foot, and that an appropriate allowance for the diminished utility of the building would be 25% based upon his ongoing dialogue with commercial

brokers and familiarity with the market.[14] *Id*. at 62:17–63:22. Mr. Arnold similarly determined the replacement cost of the fencing and paving. *Id*. He concluded that the fair market value of those improvements was $1,750,000.00. Mar. 8 Trial Tr. 62:13–16.

153.    Mr. Arnold testified that annual rent for leases of similar properties is a range of 5%–7% of fair market value. *Id*. at 64:19–25. He determined that 6% was the appropriate percentage to apply to determine the annual rent of the EOF real property and the improvements that he valued. *Id*. at 64:14–25. Mr. Arnold determined that the annual rent for the land and specific improvements identified was $345,000, which translates to a monthly rent of $28,750.00. *Id*. at 64:23–65:18.

154.    He performed essentially the same process for the October 15, 2018 valuation. He conducted a limited survey for more recent sales, closer in time to the October 15, 2018 valuation date, to calculate fair market value of the EOF real property. *Id*. at 65:19–66:1. His survey indicated that the market had changed slightly, and therefore he determined the EOF's fair market value would be calculated as of October 15, 2018 at $21 to $23 per square foot, yielding a fair market value of $4,250,000.00. *Id*. at 66:2–9, 66:12–24. Mr. Arnold's analysis of the value of the improvements did not change, and therefore he concluded that the fair market value of the EOF real property and identified improvements was $6,000,000.00 as of October 15, 2018. Mr. Arnold again used the 6% figure to determine market annual rent for the subject property was $360,000.00, which translates to $30,000.00 per month. *Id*. at 67:1–15.

155.    Mr. Arnold testified that he also considered contemporaneous rental rates for lease of land owned by the City of Santa Barbara Airport Commission. *Id*. at 86:2–9. He explained that

---

[14] Mr. Arnold also consulted a publication of national averages of building costs, using adjustment factors for Santa Barbara County. Mar. 8 Trial Tr. 63:4–64:9. Mr. Arnold testified, however, that the publication even when accounting for adjustment factors for areas like Santa Barbara County has "very questionable" application in the Santa Barbara market. *Id*.

while those rates are not directly comparable to the EOF, they generally bracket the rent he derived, which provided support for his opinion. *Id.*

156.    Mr. Arnold did not consider the cost of any alleged contamination as part of his valuation. He testified that contamination was not considered to be a factor because (1) the tenant's use of the property would have a high degree of possibility of generating contamination, and so operations like those occurring at the EOF are frequently on contaminated sites; (2) he had "never seen a situation where the tenant was responsible for the site cleanup;" and (3) the testimony of the Beacon West witnesses indicated that contamination had no impact on operation of the site. *Id.* at 67:23–68:19.

### b.    Mr. Bradley Lofgren's Testimony.

157.    The Court also heard testimony from an expert designated by the Defendants, Mr. Bradley Lofgren, a real estate appraiser and investor. Mar. 10 Trial Tr. 201:3–4. Mr. Lofgren is certified as an appraiser in the states of California and Hawaii, and he also holds the MAI designation. *Id* at 201:8–25. Mr. Lofgren has worked as an appraiser since 1992, and he described himself as a "generalist" whose practice focuses on commercial assets. *Id.* at 203:9–18. Counsel for Defendants tendered Mr. Lofgren as an expert in the field of real estate appraiser, the Trustee did not object to Mr. Lofgren's qualifications, and the Court so recognized Mr. Lofgren. *Id.* at 205:16–206:2.

158.    Mr. Lofgren's scope of assignment was to determine the fair market value for the EOF as of September 15, 2017, and October 20, 2021. *Id.* at 203:21–23, 204:4–11. Mr. Lofgren did not offer an opinion as of October 15, 2018. Mar. 11 Trial Tr. 8:11–13. He used the definition of fair market found in the California Civil Code, which is the highest price on the date of valuation that would be agreed to by a seller being willing to sell but under no particular or urgent necessity for so doing, and a buyer ready, willing, and able to buy but under no particular necessity for so

doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available. Mar. 10 Trial Tr. 208:14–209:2. Mr. Lofgren was not asked to develop a rental value opinion. *Id*. at 204:2–3.

159.    Mr. Lofgren's appraisal of the EOF was limited to the real property, which he explained also included the buildings that are affixed to the land. *Id*. at 204:6–11. Mr. Lofgren found that the building on the property was not considered to add value to the site and would likely have to be removed. Mar. 11 Trial Tr. 11:1–11. Mr. Lofgren concluded that the highest and best use of the EOF was as open space, which is consistent with the EOF's zoning. Mar. 10 Trial Tr. at 205:7–10. He testified that he considered the possibility that the highest and best use of the EOF could be its current configuration, but because Mr. Lofgren assessed the EOF as a "processing facility" without "any linkages," with "no way to get materials to the property to be treated," and once treated, no way to bring the materials "to the market for sale," he rejected the possibility that the EOF's highest and best use could be an industrial facility. *Id*. at 217:19–218:9.

160.    Mr. Lofgren used the sales comparison approach to identify data related to sales of comparable properties, including transactions involving acquisitions for open space as well as industrial-zoned properties. *Id*. at 218:17–220:13. From those data points, Mr. Lofgren calculated a price per square foot for each transaction yielding a range from $7 to $31 per square foot. *Id*. at 221:18–222:17. As of September 15, 2017, Mr. Lofgren determined a final reconciled value of the EOF per square foot of $20.00, which yielded an indicated value of $3,885,560.00 for the EOF real property. *Id*. at 222:18–21, 231:25–232:14. As of October 20, 2021, Mr. Lofgren determined that the price per square foot of land for the EOF was $25.00, yielding an indicated value of $4,856,950 for the EOF real property. *Id*. at 222:22–223:4, 233:4–10.

161.    Mr. Lofgren's valuation included "very significant deductions" from his appraisal for removal of the EOF equipment, as well as a credit for the value of the scrap of the removed equipment. *Id*. at 206:21–207:4. Mr. Lofgren deducted $7,060,000.00 from the determined market value for the cost of removal of the EOF equipment, and added a credit of $800,000.00 for the value of the scrap. *Id*. at 224:3–15. After deducting those values from the indicated value of the EOF real property on both valuation dates, Mr. Lofgren concluded that the reconciled final value of the EOF real property was $0.00. *Id*. at 232:6–233:3.[15]

162.    During cross-examination, Mr. Lofgren explained that he was asked to determine the fair market value of the EOF real property "under the guise of condemnation." Mar. 11 Trial Tr. 6:2–5. He explained that he determined that fair market value was appropriate for the scope of work, and the underlying premise of market value is the sale of the property. *Id*. at 6:10–20. But at the time Mr. Lofgren formed his opinions and wrote his report, he did not know that the Commission was only temporarily using the property. *Id*. at 7:2–11. Mr. Lofgren confirmed that at the time he wrote his report, he had not considered whether market rent would be more appropriate for the appraisal problem because that was not part of his assignment. *Id*. at 7:12–24. At the time of trial, Mr. Lofgren still had not considered whether market rent would be a more appropriate appraisal analysis for this case. *Id*. at 7:25–8:2.

163.    Because the Court has found that the proper measure of damages is fair rental value for Defendants' temporary use and occupancy of the EOF, the Court is not persuaded by Mr.

---

[15] Despite Defendants' unpaid use and occupancy of the property, the Trust received two unsolicited indications of interest from potential purchasers of the EOF. Ex. P62, P65. Mr. Davis described these as "over-the-transom offers," which he said are very common when a property comes out of bankruptcy and is held in a trust or a successor corporation. Mar. 7 Trial Tr. 52:4–20. Although unaccepted offers are not evidence of market value, the unsolicited offers that the Trust received refute the notion that the property is worthless as Mr. Lofgren opined. *See Fourth Inv. LP v. U.S.*, 2011 WL 227564 at *4 (S.D. Cal. Jan. 21, 2011) ("It is long and well-settled that an unaccepted offer to buy is inadmissible to establish market value.") (citing *Sharp v. U.S.*, 191 U.S. 341, 348–49 (1903)).

Lofgren's valuation of the EOF real property after removal of the equipment so that it is available for open space. Mr. Lofgren provided no opinion as to the fair rental value of the EOF. The Court finds no basis to deduct the cost of removal of the EOF equipment because the Commission's contractor has been using the EOF equipment since September 15, 2017, and Ms. Lucchesi testified that the Commission does not intend to remove the equipment before vacating the premises. Mar. 9 Trial Tr. 239:12–14. Furthermore, Mr. Lofgren found that the office building used by the Commission's contractor as of September 15, 2017 was considered to add no value to the site. Mar. 11 Trial Tr. 11:2–11:17.

164.    The Court finds that Mr. Lofgren's opinion of the fair market value as of October 21, 2021 is not relevant to the question before the Court, which is the value of the property taken as of the date of the taking. *See, e.g.*, *County of Ventura v. Channel Islands Marina, Inc.*, 159 Cal. App. 4th 615, 628 (2008) (explaining that under California inverse condemnation law, "[a] property owner is entitled to recover just compensation measured by the fair market value of the property at *the time of the taking*.") (emphasis added); *U.S. v. 50 Acres of Land*, 469 U.S. 24, 29 (1984) ("The Court has repeatedly held that just compensation normally is to be measured by 'the market value of the property *at the time of the taking* contemporaneously paid in money.'") (emphasis added) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)). The Court also notes that Mr. Lofgren's conclusion as to the indicated value of the real property for the EOF as of September 15, 2017, is not substantially different than the value of the real property derived by Mr. Arnold. The Court is persuaded that the more appropriate valuation was offered by Mr. Arnold, which is the fair rental value of the EOF, including the real property, office building, chain link fence, and concrete slab.

ii.        **Fair Rental Value Of The EOF Equipment.**

165.    The Trustee designated David Goesling, a machinery and equipment appraiser, to testify regarding the value of the EOF equipment. Mar. 8 Trial Tr. 93:17–23. Mr. Goesling has worked as an appraiser since 1981, and for the entirety of his appraisal career his focus has been the discipline of machinery and equipment appraisal. *Id*. at 94:8–95:13. Throughout his forty-one-year career, Mr. Goesling has been asked to value equipment at several of oil and gas facilities, including refineries, tank farms, pipelines, and others. *Id*. at 96:3–15. The Trustee tendered Mr. Goesling as an expert in the field of equipment appraisal with a particular emphasis on appraising oil and gas processing equipment, the Defendants made no objection to his qualifications, and the Court so recognized Mr. Goesling. *Id*. at 100:24–101:7.

166.    Mr. Goesling's assignment in this case was to estimate the fair rental rate of the machinery and equipment, sometimes referred to as personal property, at the EOF. *Id*. at 97:7–13, 112:20–113:1. Mr. Goesling explained that "fair rental rate" means the amount of rent expected for personal property for a given period of time and considering market expectations for the lessor and lessee at that time. *Id*. at 112:20–113:1. Excluded from Mr. Goesling's valuation was the EOF real estate and any intangible assets of the EOF. *Id*. at 97:20–98:6, 110:14–17. Mr. Goesling considered the value of the EOF equipment as of September 15, 2017, and October 15, 2018. *Id*. at 98:7–22. For the 2017 valuation date, Mr. Goesling looked at rental periods of four years and five years. *Id*. at 99:15–22. For the 2018 valuation date, the rental periods were assumed to last 3.42 years and 4.42 years. *Id*. at 99:20–22.

167.    Mr. Goesling testified that his valuation opinions reflect fair rental value based upon his training, experience, and expertise as an appraiser, and that he adhered to the Uniform Standards of Professional Appraisal Practice ("USPAP"). *Id*. at 100:13–23, 101:10–15. Because his appraisal was prepared in 2021, several years after the valuation dates, Mr. Goesling's appraisal

is considered a retrospective appraisal, meaning that the appraiser must consider information that was known or knowable as of the valuation dates unless that information could be anticipated by a trend that was occurring as of the valuation date. *Id*. at 111:6–112:7.

168.    At trial, Mr. Goesling provided the Court with an overview of the oil and gas processing equipment at the EOF that is the subject of his appraisal. *Id*. at 102:14–110:10. Mr. Goesling personally inspected the EOF on September 15, 2017, which is the first valuation date. *Id*. at 110:22–111:2. In 2017, Mr. Goesling was provided with equipment lists, and an extensive set of drawings of the facility showing the equipment in place, along with all piping and wiring diagrams. *Id*. at 121:3–12. He also considered the equipment list contained in the InterAct report, and another from a proposed expansion of the Ellwood Facilities. *Id*. at 121:11–121:17. In total, Mr. Goesling was provided four different lists of equipment, which he then compiled into a single asset list that was the basis for his valuation. *Id*. at 121:18–20. Mr. Goesling confirmed that the sources he reviewed and relied upon were available prior to or as of the valuation dates. *Id*. 121:21–25.

169.    Mr. Goesling explained that his analysis began with an assessment of fair market value assuming that the assets are going to continue to be used with assumed earnings. *Id*. at 113:7–14. Mr. Goesling testified that he assumed continued use and continued earnings based upon his analysis of the highest and best use of the EOF. *Id*. at 113:15–115:1. Mr. Goesling determined that the highest and best use of the EOF equipment was continuing use, as installed, where located, at the EOF for use in processing oil and gas. *Id*. at 124:8–13. Mr. Goesling then considered all three approaches to value (the cost approach, the sales comparison approach, and the income approach), but he ultimately concluded the value of the EOF equipment based upon the cost approach. *Id*. at 117:1–4. Mr. Goesling determined that neither the sales comparison approach nor the income

approach was appropriate because of the lack of data regarding the sales of facilities like the EOF and the income generated by rental of facilities like the EOF. *Id*. at 117:5–118:14.

170.    Next, Mr. Goesling calculated the replacement cost for the EOF equipment, then accounted for depreciation and the effective age of the EOF equipment, which Mr. Goesling determined to be 30 years. *Id*. at 125:3–13, 126:9–127:25. Ultimately, Mr. Goesling concluded that the fair market value of the EOF as of September 15, 2017 was $8,144,116.00 for a four-year term, and $9,889,286.00 for a five year term. *Id*. at 129:1–15. Mr. Goesling then determined the residual value of the property at the end of the rental period to determine how much value would have been lost and would need to be recovered by the application of rent. *Id*. at 129:17–23. Mr. Goesling testified that under the continued use concept, there is no remaining value at the end of the rental period other than scrap value. *Id*. at 130:3–17. Mr. Goesling used the scrap value identified in a February 2018 report authored by MatthewsDaniel , a firm hired by the Commission, which estimated the EOF equipment was worth $800,665.00 as of February 2018. *Id*. 130:18–131:4. Mr. Goesling adjusted that figure to account for the difference in scrap prices as of September 2017, which yielded a scrap value of $703,000.00 as of September 2017. *Id*. at 130:18–131:4. Mr. Goesling subtracted the scrap value from the fair market value to determine that the loss in value of the EOF equipment over a four-year period was $7,441,052.00, and was $9,186,222.00 over a five year period. *Id*. at 134:11–16.

171.    To determine the rental rate, Mr. Goesling relied on an approach used by leasing companies, which is to look at a risk-free rate for the same period as the lease and add a premium of 300 basis points to that figure. *Id*. at 132:25–133:15. In calculating the rent, he assumed that the periodic payments would be made on a monthly basis and made in advance, which Mr. Goesling testified is a typical assumption. *Id*. at 134:11–23. The result of that calculation was a periodic rent

payment beginning September 15, 2017 of $172,318.00 per month for a four-year period and $174,675.00 per month for a five-year period. *Id*.

172.    Mr. Goesling used the same methodology to determine the fair market value and fair rental rate for the October 15, 2018 valuation date. *Id*. at 136:7–13. As of October 2018, however, there was more publicly available information about the progress on the P&A program, including the difficulties the Commission seemed to be having in starting the P&A work. *Id*. at 136:14–137:6. This new information had the effect of changing his assumption as to the length of the P&A program (increasing it from a range of 4 to 5 years to a range of 4.5 to 5.5 years[16]), the useful life of the property, and on the amount of depreciation taken, and he also accounted for the changes in the replacement cost that would have occurred between 2017 and 2018. *Id*.

173.    As of October 15, 2018, Mr. Goesling determined that the fair market value of the EOF equipment, assuming a 3.42-year rental period, was $7,143,658.00. *Id*. at 137:19–138:2. For a 4.42 year rental period, the fair market value of the EOF equipment was $8,972,380.00. Mr. Goesling again looked at the difference in scrap values between February 8, 2018 (the date of the MatthewsDaniel report) and October 15, 2018 (the valuation date), and based on the slight differences in commodity prices, Mr. Goesling adjusted the value of scrap downward to $780,501.00. *Id*. at 138:10–20. Mr. Goesling also looked at the risk-free rates as of October 2018, which had gone up, so he added 300 basis points to the October 2018 treasury rate. *Id*. at 139:5–14. Based on his analysis and calculations, Mr. Goesling determined that the fair rental rate as of October 15, 2018 was $173,928.00 per month for a 3.42-year period, and $179,337.00 for a 4.42 year period. *Id*. at 140:5–15. Mr. Goesling testified that based upon his experience and expertise

---

[16] Because Mr. Goesling's October 2018 valuation date occurred thirteen months after the beginning of the rental period, he deducted thirteen months from the 4.5- and 5.5-year periods, resulting in rental terms starting October 2018 of 3.42 and 4.42 years.

as an appraiser, those monthly rate estimates were reasonable for the EOF equipment. *Id*. at 140:16–19.

174.    Mr. Goesling provided some testimony regarding anticipated testimony from Mr. Timothy Skillman, an expert designated by the Defendants, but Defendants did not call Mr. Skillman to testify. Defendants offered no expert testimony to rebut Mr. Goesling's opinions. Defendants did, however, challenge Mr. Goesling's testimony by way of a pre-trial *Daubert* motion, arguing that his opinions were unreliable because (1) he did not consider the zoning of the EOF; and (2) the Commission constitutes a "market of one" for the EOF. A.D.I. 196. The Court has considered Defendants' *Daubert* motion, the Trustee's opposition thereto, and Mr. Goesling's testimony. The Court finds Mr. Goesling's opinions were relevant, reliable, and fit the facts of this case.

175.    Further, contrary to Defendants' *Daubert* arguments, Mr. Goesling testified that he did, in fact, consider the zoning and specifically the memorandum of understanding between the Commission and the City of Goleta (the "Goleta MOU"). Mar. 8 Trial Tr. 143:24–144:21, 167:8–23. Mr. Goesling further testified that the Goleta MOU had no impact on his estimate of fair market value and fair market rent for the EOF equipment because the EOF is a legal non-conforming use. *Id*. at 180:10–20. Mr. Goesling further testified that the American Society of Appraisers ("ASA") has counseled against relying on single market comparable sales because the amount of data is inadequate to derive a conclusion. *Id*. at 141:2–12. Mr. Goesling testified that neither he nor anyone else at Stout could find a reference to the ASA discussing the concept of a "market of one." *Id*. The Court thus finds Defendants' arguments to the contrary unavailing. Accordingly, Defendants' *Daubert* motion is denied.

176.    The Court found Mr. Goesling's testimony to be relevant and reliable and to fit the facts of this case. The Court is persuaded by his testimony of the value of the EOF equipment, and therefore the Court finds that the fair rental rate of the EOF as of September 15, 2017 was $172,318.00 per month for a four-year term and $174,675.00 per month for a five-year term, paid in advance. The Court further finds that the fair rental rate of the EOF equipment as of October 15, 2018 was $173,928.00 per month for a 3.42-year term, and $179,337.00 per month for a 4.42-year term, paid in advance.

### iii.        Value Of The EOF Air Permit.

177.    The Trustee presented evidence from two experts regarding the value of the Title V air permit at the EOF (the "EOF Air Permit"). The EOF Air Permit allows the EOF to emit pollutants under the Title V program of the Clean Air Act. Mar. 8 Trial Tr. 188:20–24. Nicolas Serieys testified regarding the replacement value of the EOF Air Permit, and Mark Berkman explained the value of the EOF Air Permit if cancelled and converted to emission reduction credits ("ERCs").

### a.        The EOF Air Permit Valued According To The Cost Approach.

178.    The Trustee presented expert testimony from Mr. Serieys, a principal engineer with SLR International, whose work involves environmental and permitting consulting. *Id*. at 185:19–24. Mr. Serieys holds a bachelor's and master's degree in environmental engineering from the Nantes School of Mines in France and a master's degree in civil engineering from the Los Andes University in Colombia. *Id*. at 184:19–23. Mr. Serieys is licensed as a professional engineer by the State of California for mechanical engineering, and he is also certified by the South Coast Air Quality Management District as an air permitting professional. *Id*. at 185:5–10. The Trustee tendered Mr. Serieys as an expert in air permitting in California, Defendants made no objection to his qualification, and the Court accepted Mr. Serieys as an expert in his field. *Id*. at 190:18–191:5.

179.    Mr. Serieys was engaged to provide an opinion as to the cost to replace the EOF Air Permit. *Id*. at 187:15–19. Mr. Serieys did not offer an appraisal of the value of the air permit—that topic was covered by Ms. Spletter. *Id*. at 188:2–8. Mr. Serieys estimated the cost of obtaining a Title V air permit as of September 2017 and October 2018. *Id*. at 189:11–14. The costs to obtain a Title V air permit were broken into three main components: (1) consulting costs; (2) administrative processing fees charged by the air pollution control district; and (3) the cost of securing emission offsets. *Id*. at 192:10–22. Mr. Serieys reviewed the EOF Air Permit, compared the emissions from the site to the local and federal permitting thresholds, looked at the permitting fee rule from the air pollution control district, and evaluated the cost of emission offsets needed to secure this permit. *Id*. at 192:23–193:6. Mr. Serieys testified that this process reflects the methodology that he uses regularly at SLR and that it is a common methodology to estimate the cost of obtaining an air permit. *Id*. at 193:7–13.

180.    With respect to consulting costs, Mr. Serieys summarized the permitting steps from the consultant's perspective. *Id*. at 193:23–194:12. Mr. Serieys testified that he estimated a total of 3,090 consulting hours to complete those steps, which he multiplied by an average billing rate of $170 per hour for a team of three professionals to complete this effort. *Id*. at 194:20–195:18, 195:23–25. Mr. Serieys testified that the three-member team he described is typical for environmental permitting consulting work. *Id*. at 195:19–22. The average rate was derived from the normal billing rates SLR charged its clients in 2018, which Mr. Serieys testified are reasonable for the market. *Id*. at 196:1–16. The total consulting cost calculated using that method was $525,300.00, which Mr. Serieys explained would cover the preapplication phase, the preparation of the application, correspondence with the air district, review of the draft air permit, and finalizing the air permit. *Id*. at 196:25–197:6.

181.    Mr. Serieys further testified that for the EOF, an air quality impact analysis ("AQIA") would be required, as well as a health risk assessment ("HRA"). *Id*. at 199:14–201:10. Those analyses require additional expertise, require additional cost and time, and increase the risk of obtaining a Title V air permit. *Id*. at 201:11–21. Mr. Serieys also concluded that ambient air monitoring would be required for at least one year before beginning operations on site, which would cost $300,000.00 separate from the consulting cost. *Id*. at 201:11–202:25.

182.    Mr. Serieys testified that he would expect it to take six months to complete the pre-application phase and to prepare the application (Mar. 8 Trial Tr. 197:18–22), and another six months for the Santa Barbara County Air Pollution Control District ("SBCAPCD"), which is the permitting authority, to issue a determination that the permit application is complete. *Id*. at 203:23–204:1. Once the permit is deemed complete, the SBCAPCD will review the application in great detail checking the applicability of each state, federal, and local rule, among other things. That process often involves back-and-forth with the permit applicant, which is a process that takes 36 months. *Id*. at 204:5–15. At that point, a draft permit is issued, and the U.S. Environmental Protection Agency and the public each have period in which to comment (45 and 30 days, respectively). *Id*. at 204:16–20. Mr. Serieys testified that the public very often requests a hearing for Title V permit applications and that the EPA can object to an application, either of which increases the risk that the permit may not be granted and the length of time to obtain the permit if it is granted. *Id*. at 204:20–205:12. In total, Mr. Serieys testified that obtaining a Title V air permit for the EOF would take four to five years in 2015. *Id*. at 205:21–206:5. The total consulting costs to secure the permit would be $825,000.00 in 2018 (including the cost of ambient air monitoring) and $802,000.00 in 2017 (adjusted for inflation). *Id*. at 206:18–19.

183.    Mr. Serieys testified that it can be difficult to predict the application fee, so he conservatively estimated the fee using the amount the SBCAPCD assessed previously to renew the May 2018 permit: $176,000. *Id*. at 207:9–22, 208:9–11. Mr. Serieys testified that using the fees associated with a permit renewal is a conservative estimate of what the SBCAPCD may charge for a new air permit. *Id*. 207:22–208:6. For 2017, Mr. Serieys opined that the permit application fees would be approximately $172,000.00, which was derived by adjusting the 2018 number for inflation. *Id*. at 208:12–16.

184.    Finally, Mr. Serieys calculated the cost of obtaining emission offsets, which are meant to mitigate new emissions brought into ambient air by new sources. *Id*. at 209:13–15. Mr. Serieys testified that offsets are required when an applicant is going to emit a significant level of air pollutant for which the air basin is in nonattainment with federal or state ambient air standards. *Id*. at 209:16–20; *see also id.* at 200:5–9. In 2017 and 2018, the SBCAPCD was in nonattainment for ozone, which is caused by the reaction of nitrogen oxide and reactive organic compounds. *Id*. at 209:20–210:3. The EOF application would significantly increase the amount of organic compounds emitted into the atmosphere, and therefore offsets would be required. *Id*. The applicant would need to purchase those offsets from a third party. *Id*. at 210:9–18.

185.    The number of required offsets is calculated based on the facility potential to emit, which was approximately 89 tons of reactive organic compounds for the EOF, multiplied by 1.3 as required by SBCAPCD regulations, for a total of 116 tons per year of organic compounds. *Id*. at 210:19–211:5. Mr. Serieys testified that he considered whether some of the emissions could be controlled to reduce the volume of offsets that would need to be purchased, and he testified that approximately 93% of the organic compound emissions are from fugitive emissions, such as gaps in seals and connections and gaskets. *Id*. at 211:6–12. Because the EOF already has a leak detection

program in place to mitigate those fugitive emissions to the maximum extent possible, Mr. Serieys ultimately concluded that there are not significant opportunities to lower the emissions through controls. *Id*. at 211:6–15.

186.    Mr. Serieys determined the cost of obtaining offsets in 2018 by looking at the SBCAPCD's website, which publishes the transaction costs of ERCs. *Id*. at 211:23–212:17. Mr. Serieys looked at the reported cost of obtaining offsets for reactive organic compounds for transactions between 2014 and 2018; four transactions were identified, and Mr. Serieys determined the average cost per ton of reactive organic compounds was $107,500.00. *Id*. at 212:18–213:14. Using that figure, Mr. Serieys determined that in 2018, the necessary offsets would cost approximately $12.5 million. *Id*. at 213:15–22.

187.    For the year 2017, Mr. Serieys testified that Venoco was active in the market for ERCs. *Id*. at 213:23–25. Venoco was associated with a transaction that yielded a cost of $75,000.00 per ton. *Id*. at 213:25–214:1. Mr. Serieys therefore took the same number of required tons multiplied by $75,000.00 and determined that the required offsets would cost $8.7 million in 2017. *Id*. at 214:1–3.

188.    Based on his calculations of the consulting costs, application fees, and the cost of securing emission offsets, Mr. Serieys testified that the total cost to obtain a new Title V air permit for the EOF would be $13,526,570 in 2018 and $9,713,315 in 2017. *Id*. at 190:6–10.

189.    Mr. Serieys testified that an applicant might incur other costs that were not included in his calculation, such as in-house environmental counsel, in-house general counsel, in-house environmental health and safety personnel or outside counsel. *Id*. at 214:4–13. He further testified that there are significant risks in obtaining a Title V permit for a facility like the EOF and that a Title V permit is very hard to get. *Id*. at 216:6–217:2.

190.    The Court finds Mr. Serieys' testimony was credible and persuasive. Defendants filed a pretrial *Daubert* challenge regarding the reliability and fit of Mr. Serieys' opinions (A.D.I. 191), and the Court deferred ruling on the motion until after Mr. Serieys' testimony. The Court has now considered that motion, the response and reply thereto, and Mr. Serieys' testimony, and the Court finds that the motion should be denied.

191.    With respect to fit, Defendants complain that Mr. Serieys derived a value for the EOF Air Permit even though Venoco had no further need or use for that permit. *See* A.D.I. 191 at 13 of 17. Venoco's need for the EOF Air Permit is irrelevant; the EOF Air Permit is an asset that the Commission has been continuously using, and the testimony of Defendants' representatives confirms that the EOF Air Permit is necessary for Beacon West's operations at the EOF. Furthermore, the Court finds the arguments regarding the EOF Air Permit's "value to the Trust" to be similarly irrelevant. The relevant question is the market value of the property taken—in this case, the market value of Defendants' use of the EOF Air Permit since September 15, 2017. Finally, the Court is not persuaded by Defendants' arguments regarding Mr. Serieys' inclusion of the cost of obtaining emission reduction credits. Mr. Serieys testified that replacement of the EOF Air Permit would require the purchase of ERCs as offsets. It does not matter that those costs were "never incurred by the Trust" or were "not avoided by the SLC." The subject of Mr. Serieys' opinions was the replacement cost of the EOF Air Permit, and Mr. Serieys convincingly explained why ERCs are a required component of that cost.

192.    With respect to reliability, Defendants complain that Mr. Serieys' opinions rest on unsupported assumptions, namely (1) an alleged failure to consider best available control technologies; and (2) the assumption that the applicant for a new air permit would have to apply for ERCs at all. The Court finds no fault with Mr. Serieys' assumptions.

193.    Mr. Serieys considered best available control technologies as an alternative to buying emissions offsets, and he testified that most of the emissions at the EOF—93%—are from fugitive emissions that are already subject to mitigation efforts. Mar. 8 Trial Tr. 211:6–15. Mr. Serieys therefore concluded that there are no significant opportunities to lower these emissions further. *Id.*

194.    Mr. Serieys explained that emission offsets are meant to mitigate new emissions brought into ambient air by new sources, and offsets are required when an applicant is going to emit a significant level of air pollutant for which the air basin is in nonattainment.[17] *Id.* at 209:13– 20. He explained that an application to replace the EOF Air Permit would require offset by ERCs in 2017 and 2018 because Santa Barbara County was in nonattainment for ozone, which is caused by the reaction of nitrogen oxide (NOx) and reactive organic compounds (ROC). *Id.* at 209:16– 24.

195.    The Court finds Mr. Serieys' opinions relevant to the issues before the Court and resting on a reliable foundation. The Court therefore denies Defendants' *Daubert* motion (A.D.I. 191).

196.    Ms. Spletter testified regarding the appraisal methodology for an air permit. She explained that appraisal of an air permit requires consideration of the cost of actually securing the permit, including the hard costs incurred in consulting time, studies, and modeling. Mar. 9 Trial

---

[17] Defendants called David Harris, a division manager with the Santa Barbara County Air Pollution Control District, to testify regarding ERCs, among other things. Mr. Harris testified that in other instances, based upon section 43201.13(a) of the California Health and Safety Code, the Santa Barbara County Air Pollution Control District approved air permits in Santa Barbara County relating to the decommissioning of a source that did not require the purchase ERCs. Mar. 10 Trial Tr. 124:3–125:25. He gave several examples, including the issuance of permits for Platform Holly that did not require the purchase of ERCs as offsets. *Id.* Mr. Harris was also clear that he was not responsible for the emission reduction credit program in 2017 or 2018. *See id.* 126:17–127:3. Mr. Harris was not designated as an expert and offered no testimony regarding whether ERC offsets would be required to replace the EOF Air Permit. Therefore, there is no basis on which the Court could conclude, based upon the examples Mr. Harris provided, that section 43201.13(a) of the California Health and Safety Code would apply to the EOF or would eliminate the need for the purchase of ERCs as offsets as part of the cost of replacing the EOF Air Permit.

Tr. 113:4–14. Ms. Spletter explained that appraisal of an air permit also requires consideration of the opportunity cost, which is the years that it takes to get such permits in place and the lost profits and costs associated with that time delay. *Id.* 113:18–20. Ms. Spletter testified that the opportunity cost is a "much greater value." *Id.* Ms. Spletter explained the methodology to value an air permit by way of example included in an appraisal textbook. *Id.* at 115:10–116:5. She explained that permits such as environmental permits are sometimes valued using the cost approach, which is essentially the sum of all costs, including opportunity costs, associated with obtaining such a permit. *Id.*

197.    The Court also heard ample testimony regarding the necessity of the EOF Air Permit and the difficulty permitting can create. For example, Ms. Lucchesi testified that without a proper permit, the EOF cannot be operated and maintained consistent with local and regulatory requirements, which means that the EOF would not be able to treat gas from Platform Holly. Mar. 9 Trial Tr. 229:12–19. Both Ms. Lucchesi and Mr. Planck also testified about the difficulty to obtain a new permit. *See, e.g.*, *id.* at 231:21–232:13 (describing "significant permitting hurdles" and the "insurmountable regulatory requirements . . . ."); Mar. 10 Trial Tr. 36:2–18 (describing "various different and very, very significant permitting hurdles"). Ms. Lucchesi testified that Venoco needed the EOF Air Permit to treat the Platform Holly gas even after commercial production ceased, and the Commission needed the permits to treat Platform Holly gas as well. Mar. 9 Trial Tr. at 229:20–25. Ms. Lucchesi confirmed that Beacon West, on behalf of the Commission, has been operating at the EOF under the EOF Air Permit that Venoco had. *Id.* at 230:1–4.

198.    Therefore, the Court finds that the fair market value of the EOF Air Permit under the cost approach is $13,526,570 as of 2018 and $9,713,315 as of 2017. Mar. 8 Trial Tr. 190:6–10.

### b.    The Value Of The EOF Air Permit If Cancelled And Sold As Emission Reduction Credits.

199.    The Trustee designated Mark Berkman, an economist, to testify regarding the value of the EOF Air Permit if cancelled and sold as Emission Reduction Credits ("ERCs"). ERCs are credits that recognize reductions in emissions for particular pollutants below levels that are required by existing law and regulation, and they are treated as an asset that can be traded in the marketplace or held for future use. Mar. 9 Trial Tr. 14:19–15:8. ERCs are available for several different pollutants, and Mr. Berkman focused on reactive organic compounds ("ROC") and nitrogen oxide ("NOx"), which he testified have the greatest value in the marketplace. *Id*. at 15:9–16.

200.    Mr. Berkman has a bachelor's degree in economics and urban affairs, a master's in planning and policy analysis, and a Ph.D. in public policy in the applied economic and management program. *Id*. at 6:17–7:3. Mr. Berkman is employed by the Brattle Group, and he has worked as an economist for 30 years. *Id*. at 7:4–19. Mr. Berkman was tendered as an expert in environmental economics, the Defendants did not object, and the Court so recognized him. *Id*. at 13:12–17.

201.    Mr. Berkman was engaged to estimate the value of the ERCs that could be obtained for the EOF had the Air Permit been cancelled, converted to ERCs, and sold in the market. *Id*. at 10:25–12:21. In support of his analysis, Mr. Berkman relied on data collected and made public on the SBCAPCD website, as well as several studies that the SBCAPCD had published about the

forecast of emissions going forward, especially with respect to ROCs and NOx, and he also consulted brokers who trade in ERCs. *Id*. at 13:19–14:15.

202.    As for his methodology, Mr. Berkman testified that the SBCAPCD regulations provide that available ERCs are calculated based upon the prior three-year average of emissions, then reduced those numbers by 20% as required by SBCAPCD regulations. Mr. Berkman calculated that figure for both 2017 and 2018 as follows for NOx and ROC:

|      | NOx  | ROC   |
|------|------|-------|
| 2017 | 2.83 | 66.01 |
| 2018 | 1.88 | 63.49 |

*Id*. at 17:1–17, 18:4–7, 18:11–13. Mr. Berkman testified that these figures represent credits that could be applied for. *Id*. at 18:14–23.

203.    Mr. Berkman then explained the two methods he used to determine the value of those ERCs. Mar. 9 Trial Tr. 12:13–14. The first method involved reliance on ERC history— essentially a review of how many units were sold and at what prices for the two units in question (NOx and ROC). He also analyzed what could drive demand for ERCs in the future and establishing the value of those credits under the anticipated scenarios. *Id*. at 19:19–20:1. Mr. Berkman reviewed the historical data related to the number of credits sold in each year since 1999 including the price at which the credits were sold, the number of tons available in a given year, and the inventory of credits over time. *Id*. at 20:15–21, 21:2–7, 12–18. Using those data points, Mr. Berkman estimated the average number of tons sold per year, the total cost and average unit cost for NOx and ROC. *Id*. at 22:8–25.

204.    For NOx, Mr. Berkman concluded that the average number of ERCs sold in any given year from 1999 to 2020 was 11.18 tons, and in the years between 2015 and 2020, Mr. Berkman determined that the average number of credits sold was 14.22 tons. *Id*. at 23:1–22, 24:2–

5. The average price for ERC sales of NOx between 1999 and 2020 was $52,087, and (more recently), from 2015 through 2020, the average price was $107,752.00. *Id*. at 24:15–18.

205.    For ROC, Mr. Berkman concluded that the average number of units sold was 7.83 over the entire period from 1999-2020 and 3.55 in 2015-2020. The average unit price from 1999-2020 was $48,488.00, and the average price from 2015-2020 was $92,312.00. *Id*. at 27:5–9.

206.    To reach a reasonable estimate of the value of the ERCs that could be obtained for the EOF if the Air Permit cancelled, Mr. Berkman developed four scenarios. *See id*. at 29:17–31:10. The first two scenarios relied on historical average prices. *Id*. at 29:20–30:17. The first assumed a modest amount of ROC sales per year—limiting to 2 tons per year, then the second assumes the tonnage would be 7.83 tons per year. *Id*. With respect to NOx, he assumed that 2.83 tons would be sold in both scenarios. *Id*.

207.    Mr. Berkman then applied the averages he derived to create a range of amounts that could have been obtained if ERCs had been generated and sold: $758,790.00 to $4,264,520.00 in 2017 or $706,310.00 to $4,073,041.00 in 2018. *See Id*. at 31:11–32:2.

208.    As a second way to determine the value of ERCs, Mr. Berkman spoke to emissions brokers. *Id*. at 32:6–10. He identified those brokers as people who trade in ERCs in Santa Barbara County. *Id*. at 32:11–33:3. One broker indicated he would offer between $850,000 to $1 million for the total number of NOx and ROC credits combined, based on the three-year average emissions rates reported to him. *Id*. at 33:25–34:13. He indicated that a patient seller might be able to obtain much more—as much as $7 million depending upon market conditions. *Id*. His estimate accounted for transaction costs. *Id*. at 34:14–20.

209.    The second broker provided a written report. *Id*. at 34:21–35:4. For the 2017 start date, he estimated $7,968,120, and for the 2018 date he estimated $7,526,400. *Id*. at 35:5–9. He also offered a value as of 2020 of $3,252,533. *Id*.

210.    Mr. Berkman testified that the brokers' quotes "bounded" his scenario analysis, and he viewed them as "very much in the same ballpark." *Id*. at 36:19–37:14. The second broker's estimates were well above Mr. Berkman's estimates, and therefore Mr. Berkman considered his own values to be conservative. *Id*. Therefore, Mr. Berkman concluded that the average value of the EOF Air Permit if sold as ERCs in 2017 was $4.484 million, and the average value as of October 2018 was $4.073 million. *Id*. at 12:15–13:1.

### c.    Mr. Harris's Testimony.

211.    Defendants offered testimony from David Harris, the division manager of the engineering division of the SBCAPCD. Mar. 10 Trial Tr. 103:11–15. Though Mr. Harris currently has responsibility for administering the SBCAPCD's emission reduction credit program, he was not responsible for that program in 2017 or 2018. *Id*. at 104:17–24, 126:17–19. Michael Goldman was the division manager in 2017 and 2018, and Mr. Goldman would have made the final determination on any application for emission reduction credits at that time. *Id*. at 126:20–127:3.

212.    Mr. Harris testified that to receive ERCs, the SBCAPCD requires that five criteria be met: emissions must be (1) real, (2) surplus, (3) quantifiable, (4) permanent, and (5) enforceable. *Id*. at 105:11–16. He also stated that, before ERCs can be generated and sold, the air pollution control district must issue a decision of issuance which contains certain conditions. *Id*. at 113:11–114:2. Mr. Harris testified that an air permit has an owner and an operator, and that it is not uncommon to have different owners and operators. *Id*. at 109:19–110:2. Only an owner can cancel a permit. *Id*. at 110:10–12. Mr. Harris testified that in a situation where the equipment is being shut down, the condition typically imposed by the decision of issuance is that the equipment must

be removed or rendered inoperable, which must be demonstrated to the satisfaction of the SBCAPCD. *Id*. at 128:14–21. Mr. Harris agreed that if the owner does not have operational control of the facility, the owner cannot meet that requirement. *Id*. at 129:8–10.

213.     Mr. Wenal testified regarding two emails he sent in late 2017 and early 2018 regarding the application for ERCs. *See* Exs. D36, D40; *see also* Mar. 7 Trial Tr. 144:7–151:4. The emails suggested that the application for ERCs was in process as of December 2017. *See* Ex. D36. On January 17, 2018, Mr. Wenal emailed Mr. Wracher a copy of the application for ERCs, and he stated "this is in Venoco's court to decide on what to do. Jason's last comment was to hold off on submittal pending further negotiations between the State and Venoco." Ex. D40. Mr. Wenal testified that he did not know why the comment was to "hold off" on submitting the application, but he understood at the time there were ongoing negotiations between the State and Venoco. Mar. 7 Trial Tr. 150:10–16. Mr. Wenal then explained that he had personal or direct discussions with the SBCAPCD about ERCs, and that it was his understanding based upon those discussions that ERCs would not be issued until the uncertainty about who owned them was resolved. *Id*. at 158:4–12; *see also* Ex. D36. Mr. Serieys also testified that as it relates to the EOF specifically, the Commission's presence at the facility is an impediment for the Trust to receive ERCs because all sources must be removed in order to obtain ERCs, and the Trust cannot remove those sources without operational control. Mar. 8 Trial Tr. 218:18–24.

214.     To the extent that the Defendants suggest that the value of the EOF Air Permit as ERCs is diminished because of Venoco or the Trust's failure to submit an ERC application, the Court finds based upon Mr. Wenal's testimony and Mr. Serieys' testimony that the delay in submitting the application was a result of the dispute between Defendants and Venoco (then

Defendants and the Trust) regarding the ownership of the EOF and therefore the ownership of any ERCs.

*    *    *    *    *

215.    The Court finds that the Commission, through its contractor Beacon West, has used the EOF Air Permit as part of its continued use and occupancy of the EOF. Thus, the Court concludes that the Trust is entitled to the fair market value of the property taken. The Court finds that valuation of the EOF Air Permit according to the cost approach, as explained by Ms. Spletter and Mr. Serieys, is appropriate. The Court therefore finds that the fair market value of the EOF Air Permit under the cost approach, as explained by Ms. Spletter and Mr. Serieys, as of 2017 is $9,713,315.00. The Court further finds that the fair market value of the EOF Air Permit under the cost approach is $13,526,570.00 as of 2018.

### iv.    Fair Rental Value Of All Tangible And Intangible Assets At EOF.

216.    The Trustee presented expert testimony from Kathy Spletter, a consultant with Stancil & Co., who is an accredited senior appraiser with the American Society of Appraisers. Mar. 9 Trial Tr. 58:23–59:1; 59:14–25. Ms. Spletter received a Bachelor of Science in chemical engineering from Texas A&M University with highest honors and was a licensed professional engineer in the State of Texas. *Id*. at 59:8–19. Ms. Spletter is a member of the American Institute of Chemical Engineers, the International Association of Assessing Officers, and the American Society of Appraisers. *Id*. at 59:20–25. Since 1987, Ms. Spletter's professional work has been focused on appraising energy industry assets. *Id*. at 61:21–62:3.

217.    The Trustee tendered Ms. Spletter as an expert appraiser with a particular emphasis on appraising oil and gas processing equipment and energy industry assets. Defendants did not object to Ms. Spletter's qualifications, and the Court accepted Ms. Spletter as an expert in the field for which she was offered. *Id*. at 65:17–66:3.

80

218.    Ms. Spletter described her involvement in this case as providing an independent appraisal of the fair market value and fair rental value of the EOF as of September 15, 2017, and October 15, 2018. *Id*. at 59:2–7. As part of her appraisal analysis, Ms. Spletter considered all of the tangible and intangible assets that comprise the EOF. *Id*. at 63:24–64:7. The tangible assets considered included all process equipment, buildings, land, pavement, fencing associated with the operation of the EOF. *Id*. at 76:10–19. The intangible assets considered by Ms. Spletter included operating manuals and procedures, engineering drawings, software, permits, easements, rights of way, and other rights relating to the operation and license to operate the EOF. *Id*. at 76:20–77:3.

219.    Ms. Spletter performed her appraisal analysis in accordance with USPAP and the American Society of Appraisers' code of ethics. *Id*. at 66:6–13. She considered all three approaches to appraisal, but ultimately used the cost approach and the income approach. *Id*. at 77:5–15. Ms. Spletter's appraisal is a retrospective appraisal because her analysis occurred in the fall and winter of 2021, but the valuation dates used are in 2017 and 2018. *Id*. at 68:23–69:4.

220.    Ms. Spletter explained that the logic behind the cost approach is the principle of substitution, which holds that a prudent buyer will not pay more for a property than the cost of acquiring a substitute property of equivalent utility. *Id*. at 77:16–78:12. Ms. Spletter further explained that the cost approach begins with the establishment of a replacement cost new for the property, then consider physical differences between the existing property and the replacement property such as depreciation and economic or functional obsolescence. *Id*. at 78:16–79:1.

221.    Because the EOF is a non-conforming use property, Ms. Spletter testified that her analysis required replacement of the utility of the EOF on an alternative site. *Id*. at 79:2–11. The alternative site Ms. Spletter considered is Las Flores Canyon, which was identified in the InterAct report as one of four scenarios that would be alternatives to use of the EOF. *Id*. at 79:2–13, 80:6–

81:18; *see also* Ex. P7. Ms. Spletter relied on Scenario 2 of the InterAct Report because that was the scenario that replaced the utility of the EOF as of the valuation dates at the lowest cost. Mar. 9 Trial Tr. at 79:2–13, 80:6–81:18

222.   InterAct estimated that the cost to implement Scenario 2 was $109 million as of December 2014. *Id*. at 95:25–96:7. Ms. Spletter accepted that cost as reasonable for the scenario and adjusted it for timing by referring to the Chemical Engineering Index, which tracks the cost of process equipment and facilities, and used that to adjust to her valuation date. *Id*. at 96:12–18. Ms. Spletter considered the salvage value for the processing facilities at the end of the P&A program to be 50% of the initial investment, resulting in a credit of $6 million in year 9. *Id*. at 99:21–100:2. Then, Ms. Spletter applied a 5.75% discount rate, which she determined to be representative of the rate available to an industry participant on the valuation dates. *Id*. at 100:6–22.

223.   The methodology Ms. Spletter employed yielded a fair market value of the EOF as of the valuation dates. *Id*. at 102:14–22. Ms. Spletter's analysis yielded a fair market value of the EOF of $140,000,000.00 as of September 15, 2017, and $145,000,000.00 as of October 15, 2018. She explained that the values were substantial because they reflect the value of having the fully permitted EOF available as of the valuation dates for immediate use as compared to the value of a substitute value that a buyer or seller would be able to acquire to perform the same utility as the EOF. *Id*. at 103:1–11.

224.   Ms. Spletter also considered the income approach as part of her appraisal analysis. *Id*. at 103:12–104:5. The income approach considers cash flow or earnings, but in this situation, Ms. Spletter testified that the alternative cash flow would be associated with renting or leasing an FPSO, which is a floating vessel. *Id*. That negative cash flow reflects the value of the EOF because, by owning or leasing the EOF, the owner or lessee can avoid the cost of renting or leasing the

FPSO. *Id*. at 106:1–108:17. Ms. Spletter explained that FPSOs are unique, and data on the mobilization charges and day rates for rental of the FPSO are not readily available. *Id*. at 106:10–107:14. Ms. Spletter used pricing for a pipelay vessel, as the InterAct report did, in order to determine the cost of leasing the FPSO to replace the utility of the EOF, then she confirmed that figure with other data. *Id*. Ultimately, Ms. Spletter calculated the cost of the FPSO as $290,000,000.00. *Id*. at 108:18–109:1.

225.    Because of the uncertainty associated with the income approach, Ms. Spletter's ultimate conclusion of value was based upon the cost approach. *Id*. at 110:2–17. From her fair market value conclusion, Ms. Spletter derived a range of fair market rental value for the 4-year and 5-year rental periods, which varied from a low of $2.7 million per month (as of September 15, 2017) to a high of $4.5 million per month (as of October 15, 2018). *Id*. at 118:11–120:8.

226.    Defendants challenged Ms. Spletter's testimony in a pre-trial *Daubert* motion arguing that Ms. Spletter's analysis (a) fails the "fit" prong because it is not connected to the facts of the case; and (b) rests on unsupported assumptions. *See generally*, A.D.I. 193. Having considered the Defendants' motion and the response and reply thereto, the Court denies the Defendants' *Daubert* Motion. The Court finds that Ms. Spletter's opinions did not reflect "costs avoided by the [Commission]," but rather reflected a fair market value and fair rental value analysis. The Court further finds that Ms. Spletter properly considered, in performing her cost approach analysis, the cost of replicating the utility of the entire EOF as of the valuation dates. Ms. Spletter identified six different sources available at or around the valuation dates reflecting that all of the equipment at the EOF was deemed by the Commission as useful and necessary for ongoing operations. Among them were Commission reports that all of the equipment at the EOF was being maintained and repaired, a 2018 draft of the EOF Air Permit including all functions of the EOF

and attaching an equipment list of all EOF equipment, and the Commission's claim in the bankruptcy stating that the Commission is incurring considerable expense to repair, inspect, and certify all of the equipment at the EOF. *See* Mar. 9 Trial Tr. 127:2–131:9. The Court therefore finds this "fit" criticism unpersuasive.

227.    Defendants also asserted a challenge to Ms. Spletter's assumptions—specifically, her rejection of Scenario 1 of the InterAct report which contemplated reinjection of the gas. The Court finds, however, that Ms. Spletter's rejection of Scenario 1 was reasonable. Ms. Spletter noted that the gas is not currently being reinjected offshore, and she explained that the contemporaneous statements from the Commission indicated that they intended to maintain and repair all equipment at the EOF. Ms. Spletter testified that she saw no suggestion that injecting gas would provide a total solution for handling the fluids from the plugging and abandonment activities, and that reinjecting gas would not replicate the full utility of the EOF. The Court finds Ms. Spletter's analysis and conclusions to be sound and persuasive. The Court therefore denies Defendants' *Daubert* challenge to Ms. Spletter (A.D.I. 193).

228.    The Court finds that the Trust is owed the fair market value of the property taken under both California law and the Fifth Amendment. The Court finds that through their use and occupancy of the EOF, Defendants took all tangible and intangible assets at the EOF starting September 15, 2017.[18] Therefore, the Court finds that Defendants are liable to the Trust for the fair rental value of all tangible and intangible assets at the EOF, in the amount of $2,677,518.00 per month until Defendants vacate the EOF.

229.    Because the Trustee has prevailed on his claims for inverse condemnation under California law, the Court finds that the Trustee is entitled to reimbursement for reasonable costs,

---

[18] *See supra* Section IV.D.

disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees actually incurred in this proceeding and in the appellate proceedings in which the Trustee prevailed. *See* Cal. Code Civ. Proc. § 1036. The Court further finds that the Trustee is entitled to prejudgment interest accruing starting September 15, 2017. *See Customer Co. v. City of Sacramento*, 10 Cal. 4th 368, 290 (Cal. 1995) (citing *Holtz v. San Francisco Bay Area Rapid Transit Dist.*, 17 Cal.3d 648, 657 (1976)). The Trustee shall submit an application for recovery of such fees and interest, as set forth below.

**F.   Defendants Are Not Entitled To Deduct The Cost Of Potential Future Remediation At The EOF.**

230.   Defendants ask the Court to deduct from any payments for fair rental value the potential future cost of remediating soil and groundwater contamination at the EOF as well as the cost of removing the EOF equipment from the property. Because Defendants' use and occupancy of the EOF is temporary and not permanent, the Court does not find that any deductions from the fair rental value are appropriate for several reasons.

231.   First, three Beacon West employees testified that the existence of any soil and groundwater contamination at the EOF did not affect the use of the EOF to support the plugging and abandonment activities. Mar. 7 Trial Tr. 111:13–112:8 (Wenal testimony); A.D.I. 242-1 at Ex. B (Wracher Dep.) at 66:8–12 (Wracher testimony); Mar. 7 Trial Tr. at 187:5–9 (Huskins testimony).

232.   Second, Ms. Lucchesi testified that the Commission did not intend to perform any soil or groundwater remediation before leaving the premises. Mar. 9 Trial Tr. 239:15–18.

233.   Third, the extent of any soil or groundwater contamination was unclear from the testimony presented at trial. Mr. Davis testified that during his tenure as a Venoco board member and during his tenure as Trustee, he received no notifications of any claims with respect to

environmental damage at the EOF. Mar. 7 Trial Tr. 49:7–16. Mr. Davis testified that no governmental or regulatory agency notified the Trust of any contamination at the EOF, the Trust had not received any order or request to remediate any contamination at the EOF, and no one from the Santa Barbara County Water Board or the Santa Barbara County Public Health Department notified him of any issue related to contamination. *Id.* at 49:17–50:6. Mr. Davis further testified that he had not received notifications or complaints from anyone in the vicinity of the EOF, and in all of the time that the Commission through its contractor has been present at the EOF, no one from the Commission notified him of any contamination in need of remediation nor requested that the Trust take any remedial action to address contamination at the EOF. *Id.* at 50:7–22.

234.    Defendants' expert Ryan Zukor similarly testified that no soil or groundwater remediation activities are presently required at the EOF, and no regulatory authority has ordered remediation of the soil or groundwater at the EOF at this time. Mar. 11 Trial Tr. 61:24–62:1. Mr. Zukor further testified that there is also no present requirement for additional assessment for remediation at the EOF. *Id.* at 53:19–25. Nevertheless, Mr. Zukor opined as to the cost of remediation that may be required in the future but is not required now.

235.    The Trustee designated Rory Johnston as a rebuttal expert. Both Mr. Zukor and Mr. Johnston relied upon the same set of data. *Id.* at 107:6–18. That data included periodic groundwater monitoring reports through December 2021, and soil data from 1997, 2001, 2009, 2010, and 2011. *See* Demonstrative Ex. DD17. Both experts agreed that further work, including a risk assessment and negotiation with regulators, would be needed to determine the required remediation goals and costs of remediation. *See* Mar. 11 Trial Tr. 56:3–58:1; *id.* at 114:25–115:8.

236.    Additionally, both Mr. Zukor and Mr. Johnston relied on the 2017 AECOM Report commissioned by Venoco. (the "AECOM Report") *Id*. at 64:22–65:4. The AECOM Report concluded:

> In summary, the available site assessment data indicate intermittent hydrocarbon impacts in soil and groundwater; however, there are significant data gaps that would need to be addressed to accurately estimate the volume of impacted soils or groundwater. Consequently, the estimates are based on assumptions and professional judgment. Additional site condition data collection is recommended in order to further understand the environmental liability associated with the EOF property.

Ex. DD16.

237.    Thus, the evidence presented by both Parties consistently confirmed that (1) no remediation is presently required at the EOF; (2) no assessment of remediation is presently required at the EOF; and (3) more information would be needed to determine whether remediation is necessary as well as the extent and cost of such remediation. Defendants did not assert any counterclaim against the Trust for the costs of remediation, and the evidence presented at trial— including the admissions of Defendants' own 30(b)(6) representative—demonstrates that Defendants will not perform any remediation or incur any remediation costs as part of their temporary use and occupancy of the EOF. Therefore, as a matter of law and fact, the Court finds no basis upon which a deduction for the cost of remediation would be proper. Assuming for the sake of argument that such a deduction was proper, the evidence establishes that no remediation is necessary at this time and the Parties' experts agree that the extent and cost of any remediation required in the future is presently unknown.

238.    On the issue of contamination, the Court's Final Pretrial Order included a list of issues of law that were agreed between the parties to be decided by the Court. *See* A.D.I. 242-1 at 23–24. The Final Pretrial Order also includes one issue over which there was disagreement:

Whether the Liquidating Trustee took title [to] the EOF subject to environmental laws and regulations pertaining to remediation of any environmental contamination existing on the EOF as of the Effective Date of the Plan, such that the need for an estimated cost of environmental remediation is appropriately considered in determining the fair market value of the EOF.

A.D.I. 242-1 at 24.

239.    The Defendants submit that this issue is proper for the Court's determination. The Trustee asserts that the issue is not before the Court under any asserted theory. A.D.I. 242-1 at 24. The Court agrees with the Trustee. Defendants have not asserted any counterclaim against the Trustee in this case, nor is this issue relevant to any pleaded claim or defense. To the extent that the Defendants seek a prospective ruling that any remediation required in the future will be the responsibility of the Trust, such a ruling would be improper and premature. Based upon the evidence presented at trial, the only operators of the EOF are Mobil, Venoco, and Beacon West on behalf of the Defendants. The Trust has not operated at the EOF. Furthermore, Mr. Davis testified that an investigation would be required to determine whether any existing contamination is the result of Venoco's use, Mobil's use, or the Commission's use. To the extent that Defendants seek an interpretation of the Liquidating Trust agreement, that is not before the Court in this adversary proceeding. Therefore, the Court makes no finding on this issue.

**G.    Defendants Are Not Entitled To Deduct The Cost Of Future Removal Of The EOF Equipment.**

240.    Defendants' real property appraiser, Bradley Lofgren, included a deduction from his calculation of fair market value for the future cost to remove the "facilities"—i.e., the EOF equipment—from the EOF.

241.    As previously explained, Mr. Lofgren testified only as to the fair market value of the EOF, which assumes a sale or change of ownership of the property. Because this case involves a temporary taking, the Court has concluded that fair rental value of the EOF is the appropriate

measure of just compensation. Ms. Lucchesi testified that the Commission does not intend to remove the EOF equipment before vacating the property. Mar. 9 Trial Tr. 239:9–11. Defendants have offered the Court no reason why the cost of removal of the facilities should be considered as a deduction from the fair rental value owed to the Trust, therefore the Court finds that Defendants are not entitled to any deduction of the cost of removal of the EOF equipment.

## V.    CONCLUSION

242.    Based the foregoing, the Court finds as follows:

    a.    Beginning September 15, 2017, Defendants effectuated a taking of the EOF, which is the Trust's private property;

    b.    Defendants are liable to the Trust for the fair market value of the property taken from September 15, 2017 until they vacate the EOF;

    c.    Defendants took the use and occupancy of the EOF, including all tangible and intangible assets at the EOF;

    d.    Defendants' taking is temporary;

    e.    Among the tangible and intangible assets at the EOF is the real property, the office building, the chain link fence, the concrete slab, the equipment, and the EOF Air Permit, among other things;

        i.    The fair rental value for the EOF real property, the office building, the chain link fence, and the concrete slab as of September 15, 2017 for a five-year rental period is $28,750.00 per month;

        ii.    The fair rental value for the equipment at the EOF as of September 15, 2017 for a five-year rental period is $174,675.00 per month, paid in advance;

        iii.    The fair market value for the EOF Air Permit as of 2017 is $9,713,315.00;

        iv.    The fair rental value for all tangible and intangible assets at the EOF as of September 15, 2017 for a five-year rental period is $2,677,518.00 per month.

    f.    The Court finds that a reasonable range of payment for fair market rent for a five-year period of the EOF is $21,918,815.00 to $160,651,080.00.

g. The Court finds that Defendants are liable to the Trust in the amount of

$_____.

h. The Court finds that the Trust is entitled to recover reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of this proceeding in the trial court or in any appellate proceeding in which the Trust prevailed.

i. The Court therefore ORDERS the Trust to submit an application for such costs, disbursements, and expenses within twenty one (21) days of the filing of this Opinion and Order.

j. The Court will issue a separate Final Judgment consistent with this Opinion and Order.

Dated: May 9, 2022

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Matthew O. Talmo*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Matthew O. Talmo (No. 6333)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@morrisnichols.com
aremming@morrisnichols.com
mtalmo@morrisnichols.com

-and-
**BRACEWELL LLP**
Bryan S. Dumesnil (admitted *pro hac vice*)
Nancy McEvily Davis (admitted *pro hac vice*)
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713)-221-1520
Facsimile: (800) 404-3970
Bryan.Dumesnil@bracewell.com
Nancy.Davis@bracewell.com
-and-
Robert G. Burns (admitted *pro hac vice*)

Mark E. Dendinger (admitted *pro hac vice*)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (212) 508-6101
Robert.Burns@bracewell.com
Mark.Dendinger@bracewell.com
   -and-
Jason B. Hutt (admitted *pro hac vice*)
Brittany Pemberton (admitted *pro hac vice* )
2001 M Street, NW
Washington, District of Columbia 20036
Telephone: (202) 828-5800
Facsimile: (202) 857-2114
Jason.Hutt@bracewell.com
Brittany.Pemberton@bracewell.com

*Counsel for the Liquidating Trustee*