## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| VENOCO, LLC, | ) | Case No. 17-10828 (JTD) |
| | ) | |
| Liquidating Debtor. | ) | |
| | ) | |
| EUGENE DAVIS, in his capacity as Liquidating | ) | |
| Trustee of the Venoco Liquidating Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 18-50908 (JTD) |
| | ) | |
| STATE OF CALIFORNIA and CALIFORNIA | ) | |
| STATE LANDS COMMISSION, | ) | |
| | ) | |
| Defendants. | ) | **Re:  Adv. D.I. 117** |

### OPINION[1]

Eugene Davis, the Liquidating Trustee (the "**Trustee**") filed this adversary proceeding

asserting a claim for inverse condemnation against the State of California (the "**State**") and the

California State Lands Commission (the "**SLC**" or "**Commission**") (together the "**Defendants**").

The Trustee asserts he is entitled to compensation of up to $161 million for the alleged unlawful

taking of his property by Defendants, who have occupied it for the past five years, for the

purpose of decommissioning connected oil and gas wells previously operated by the liquidating

debtor, Venoco, LLC ("**Venoco**" or "**Debtor**").  Trial was held from March 7-11, 2022, and

post-trial briefing and proposed findings of fact and conclusions of law were submitted.  For the

reasons discussed below, I find that the Commission's occupation of the Trustee's property is a

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal
Rule of Bankruptcy Procedure 7052, made applicable to contested matters by Federal Rule of Bankruptcy
Procedure 9014.

proper exercise of its police power and is not a taking in violation of the Fifth Amendment to the United States Constitution or the Constitution of the State of California.

## BACKGROUND

### I.    The Parties

Plaintiff is the Trustee, acting on behalf of the Venoco Liquidating Trust (the "**Trust**"), owner of the property that is the subject of this suit.

Defendants are public entities.  The Commission is a land resource management agency that acts on behalf of the State to manage over four million acres of public lands both onshore and offshore.[2]  It is tasked with preventing injury to the resources and the lands underlying the submerged waters within its jurisdiction, as set forth in the California Public Resources Code.[3]

### II.    The Property

The State owns an offshore oil and gas field located in State waters off the coast of Santa Barbara, California.  This field (the "**South Ellwood Field**" or "**Field**") consists of 32 offshore wells (the "**Wells**") and an offshore platform ("**Platform Holly**") used to conduct operations in the Field.[4]

In 1964, the State, acting by and through the Commission, entered into certain oil and gas leases (the "**Leases**")[5] with Richfield Oil Corporation and Socony Mobil Oil Company, the predecessor in interest to ExxonMobil Corporation ("**ExxonMobil**"), giving ExxonMobil rights to prospect for, drill for, produce, and take oil, gas, and other hydrocarbon substances from the Field.  In 1997, the Commission approved the transfer of the Leases from ExxonMobil to

---

[2] 3/9/22 Tr. at 187-88.
[3] 3/9/22 Tr. at 241-42; California State Land Commission Regulation: Article 3.4, Oil and Gas Drilling and Production Operations: Pollution Control – 2 CCR § 2135.
[4] Adv. D.I. 242-1
[5] *Id.*

Venoco.[6]  The Leases gave Venoco the exclusive right to conduct operations at the Field in exchange for rent and royalties paid to the State.

At the same time that Venoco acquired the Leases, it also acquired from ExxonMobil the property that is at the heart of this dispute, the Ellwood Onshore Facility (the "**EOF**").[7]  The EOF is an integrated onshore oil and gas processing facility utilized by Platform Holly.  Unlike Platform Holly and the Field, the State has no property rights in the EOF.[8]

The EOF sits on a triangular shaped, 4.46-acre coastal site in Goleta, California, between a resort and a golf course, and near residential communities and open space areas, including a public beach.[9]  While it has been operating as an oil and gas processing facility since the mid-1970s, it is currently zoned by the City of Goleta as "REC (Recreation), Open Space / Active Recreation (General Plan)" and is not zoned for any other use, including for residential or commercial use.[10] The EOF's current use as an oil and gas processing facility is legally permitted as a "non-conforming use."[11]

The EOF is equipped with processing equipment, utilities systems, electrical gear, storage tanks, custody transfer units, a building that houses switchgear, a control room, laboratory, offices, and thousands of feet of interconnecting pipes, among other things.[12]  It also

---

[6] 3/9/22 Tr. at 193-94; Adv. D.I. 242-1 at 8.
[7] Adv. D.I. 242-1 at 8; Adv. D.I. 247 (Pretrial Order), Stipulated Fact 3, 5, 8, 9; First Amended Complaint ("**Complaint**") ¶ 24.  Since the effective date of Venoco's confirmed chapter 11 plan, title to the EOF has been held by the Venoco Liquidating Trust.
[8] Adv. D.I. 242-1 at 8.
[9] 3/10/22 Tr. at 61, 68; Ex. D113, D114 (aerial photos).
[10] Adv. D.I. 242-1 at 8.
[11] *Id.* at 9.
[12] *Id.* at 8.

has a Title V air permit issued by Santa Barbara County the ("**Air Permit**"), without which the EOF processing equipment cannot be operated in compliance with applicable law.[13]

The EOF is physically connected to Platform Holly via pipelines that carry oil and gas from Platform Holly to the EOF, and by undersea power and communications lines that supply electricity, communications, and monitoring connectivity to the platform.[14]  Platform Holly has no pipeline capable of transporting oil or gas to any facility other than the EOF.  Similarly, the EOF has no pipeline transporting oil or gas from any facility other than Platform Holly.[15]

Of particular importance here is the fact that Platform Holly relies on the EOF to manage the potentially lethal hydrogen sulfide gas ("**H₂S**" or "**annular gas**") that emanates from the annular casings of the Wells.  I will discuss more about the nature of $H_2S$ below, but for now suffice it to say that Platform Holly itself does not contain the equipment, or even the space for equipment, to treat the $H_2S$ gas that comes from the Wells.[16]  The equipment to process $H_2S$ is all located at the EOF.[17]

To prevent the $H_2S$ from accumulating to dangerous levels, all of the $H_2S$ that originates from the Wells is transferred from Platform Holly to the EOF and sent through an iron sponge tower, where it reacts with iron chips to create harmless iron sulfide, which can then be burned off safely in the flare at the EOF.[18]  Because exposure to $H_2S$ is highly toxic, the EOF is equipped with 29 detectors within the facility and 6 more on the exterior fence line of the

---

[13] 3/9/22 Tr. at 115, 229.  The Air Permit is regulated by an agency called the Santa Barbara County Air Pollution Control District.  3/7/22 Tr. at 141.

[14] Adv. D.I. 247, Stipulated Fact 17-18; Complaint ¶ 25.

[15] Adv. D.I. 247, Stipulated Fact 26.

[16] 3/10/22 Tr. at 39-40; *see also* Exhibit P7 (Opportune Report) at P7.0019 ("There is no deck space or structural capacity on Platform Holly to construct a full offshore gas processing plant.").

[17] Adv. D.I. 247, Pretrial Order Stipulated Fact 17-18; 3/7/22 Tr. at 142-43, 161-62.

[18] 3/7/22 Tr. at 161-62; 3/11/22 Tr. at 74-75, 82-83.  This procedure is required by the air permit regulating the EOF as well as Santa Barbara County Air Pollution Control District Rule 310, which prohibits the discharge of odorous organic sulfides over a certain quantity.  3/7/22 Tr. at 161; 3/11/22 Tr. at 74-75, 82-83; Rule 310, available at https://www.ourair.org/wp-content/uploads/rule310.pdf.

facility, that will notify personnel in the event of a release of $H_2S$.[19]  Because the release of $H_2S$

into the air can quickly become fatal, both Platform Holly and the EOF are monitored around the

clock by trained personnel and all personnel and visitors must wear personal protective

equipment ("**PPE**") in certain locations.[20]  The Wells will continue to discharge $H_2S$ until the

wellbore is permanently sealed with concrete and reinforced (a process referred to as "**plug and

abandon**" or "**P&A**").[21]

### III.    The Problem Leading to the Parties' Dispute

Prior to May 2015, Venoco used Platform Holly to operate its 100% working interest in

the Leases in the South Ellwood Field.  Produced gas, hydrocarbon liquids, and water were

separated on Platform Holly, and the produced gas could either be recompressed for gas-lift or

sent to the EOF for processing.  Oil and natural gas from Platform Holly were transported

through pipelines to the EOF, where they were then processed and carried to market via the

Plains All American Pipeline Company's Line 901 (the "**Plains Pipeline**").[22]

However, in May 2015, the Plains Pipeline, which was the only route by which

hydrocarbons were brought to market, ruptured.  Absent use of the Plains Pipeline, Venoco could

not commercially sell the oil and gas produced from the South Ellwood Field.[23]  Accordingly,

since the Plains Pipeline rupture, there has been no commercial production from Platform Holly

to the EOF.[24]

---

[19] 3/7/22 Tr. at 109-10, 117.
[20] 3/10/22 Tr at 19, 141; 3/7/22 Tr. at 108, 116; 3/9/22 Tr. at 245-46.
[21] 3/10/22 Tr. at 31-32.
[22] Adv. D.I. 242-1 at 9.
[23] *Id.* at 9 and Ex. A at 94-95.
[24] Excepting a single sale of oil from the EOF by the Commission, which was necessary to clear holding tanks on the EOF, which were reaching capacity.  Adv. D.I. 242-1 at 9.

IV.    **The Bankruptcies and Negotiations**

Because Venoco was unable to get its product to market after the Plains Pipeline rupture, its finances quickly dwindled.  In March 2016, Venoco filed for bankruptcy (the "**First Bankruptcy**").[25]  During and after the First Bankruptcy, the parties renegotiated and increased the amount of financial assurance that the Leases required Venoco to provide to the Commission in the form of a bond (the "**Bond**").[26]  The Bond was intended to ensure that the State was protected if the leased premises were abandoned, and the State became responsible for them.[27] The Bond amount that was ultimately agreed upon was an amount that was acceptable to the Commission.[28]

Despite its best efforts following the First Bankruptcy, Venoco was still unable to get its product to market. Consequently, by the spring of 2017, Venoco began considering whether to exercise its right under the Leases to quitclaim its interests.   The Leases included a provision that enabled Venoco to quitclaim or relinquish all its rights under the Leases at any time, "subject to the continued obligation of [Venoco] . . . to place all wells . . . in condition for suspension or abandonment in accordance with the terms of [the] lease and the rules and regulations of the State. . . .".[29]

 At the end of March 2017, Venoco informed the Commission that it was having financial difficulties, that there was a possibility that it would be filing for bankruptcy again, and that it was actively marketing its assets.[30]

---

[25] Case No. 16-10655.
[26] 3/9/22 Tr. at 198-99; see also Ex. D1.
[27] 3/9/22 Tr. at 194.
[28] 3/9/22 Tr. at 199.
[29] Ex. D1 (Leases).
[30] 3/9/22 Tr. at 200-01; Ex P8.

On March 31, 2017, Venoco notified the Commission that it was considering quitclaiming the Leases.  Venoco's counsel, Jason Hutt emailed counsel for the Commission, Seth Blackmon providing "a timeline for each of the scenarios under consideration" which were: (1) Venoco executes a Temporary Services Agreement with the Commission and quitclaims the Leases; or (2) ExxonMobil agrees by April 10 to pay Venoco a monthly fee for Venoco's covenant not to quitclaim the Leases until the earlier of a court-approved sale, rejection, abandonment, or quitclaim.[31]  With respect to the first option, Mr. Hutt elaborated:

> The timeline below may be a helpful illustration of the scenarios.  These dates are not hardened (although they're probably quite close to reality"):
>
> April 6th – Venoco files a Notice of Intent to Quitclaim with the SLC.  The Notice provides that:
>
> - Venoco intends to quitclaim its South Ellwood facility leases on April 10th
>
> - Venoco will agree, at its expense, to holdover on the assets in order to maintain current operations until no later than April 25th.
>
> - Venoco remains willing to enter a TSA arrangement to maintain current operations at the South Ellwood field assets after April 25th, provided that an acceptable agreement can be finalized on or before that date.  Pursuant to the TSA, Venoco would commit to work cooperatively with SLC and other regulators to ensure that the assets remain prepared for the P&A process.
>
> - [ ] Subject to SLC's feedback re accessing the sureties, the notice may also contain language regarding Venoco's inability to continue paying for its obligations under the leases.[ ]
>
> April 10th -  Venoco quitclaims the South Ellwood facility leases and Venoco then files for bankruptcy
>
> - Venoco's initial bankruptcy pleadings are expected to inform the Court about the quitclaim, its commitment to maintain current operations until April 25th, and its expectation that its South Ellwood-related expenditures from the estate will discontinue on April 25th.

---

[31] Ex P8.

> April 25th - If no TSA has been finalized with the SLC or its designated
> operator by April 25, Venoco removes all personnel from the South Ellwood
> field assets. [32]

On April 12, 2017, Mr. Michael Wracher, Venoco's Chief Operating Officer, emailed

Ms. Jennifer Lucchesi, the Executive Officer of the Commission, stating:

> As we have discussed with you and your staff, Venoco sees no economically
> viable future or market value for these assets, and the Company will soon be
> unable to continue meeting its obligations under the South Ellwood Field Leases.
> We anticipate further direction from our Board of Directors at their April 13, 2017
> meeting, including a potential decision to surrender and quitclaim Venoco's
> rights, title and interests in the South Ellwood Field in the near future. As we have
> discussed, Venoco intends to work with the SLC to facilitate a safe and
> responsible transition for the South Ellwood Leases and to ensure that the assets
> remain prepared for the plug and abandonment process. With that commitment in
> mind, while Venoco remains the owner of the [EOF], the Company intends to
> allow for continued operational support from EOF recognizing that it is
> operationally necessary for the plugging and abandonment of the South Ellwood
> Field.
>
> In the event that Venoco exercises its rights to surrender and quitclaim the South
> Ellwood Field Leases, Venoco will commit, at its expense, to maintain current
> operations through April 30, 2017. Venoco would be willing to maintain current
> operations for a short transition period beyond April 30, 2017, provided that an
> acceptable reimbursement agreement can be finalized in the near future. . . . [33]

Mr. Wracher testified that prior to sending this email on April 12, 2017, he spoke with Ms.

Lucchesi and her staff about Venoco's impending inability to meet its obligations under the

Leases. [34] Specifically, Mr. Wracher testified that Venoco "stayed in fairly regular contact with

the [Commission] on our attempt to save the company," and that phone calls and in-person

meetings were "ongoing in the last, you know, three or four months as it became apparent that --

that we didn't have a way out, that those meetings occurred." [35] Mr. Wracher further testified

that the purpose of notifying the Commission was to make sure that there was an orderly

---

[32] Ex P8 (alterations in original).
[33] Ex. P10.
[34] Adv. D.I. 242-1 at Ex. B (Wracher Dep.) at 28.
[35] *Id*. at 28–29.

transition from Venoco to the Commission, and that oversight would continue.[36]  Mr. Wracher testified that Venoco coordinated with the SLC in quitclaiming the Leases because timing was important to ensure an orderly transition of the assets.[37]

Ms. Lucchesi offered a different perspective of these events, testifying that while the Commission had previously been made aware that Venoco was struggling financially and would potentially quitclaim the Leases, it was unaware that Venoco would be imposing a deadline on negotiations and intended to abandon the EOF if no agreement was reached before that deadline. Once it understood there was a possibility that Venoco could leave the EOF unmanned if it did not receive payment, the Commission switched gears and instead of continuing to attempt to negotiate a consensual resolution, turned its attention to obtaining emergency funding for the purpose of paying Venoco's staff to stay and continue to operate the EOF while the Commission began its search for contractors qualified to take over.[38]

Following its receipt of the April 12 email, the Commission worked with the California Governor's Office, the California Department of Finance, and others to obtain funding to enter into an agreement with Venoco that would ensure the necessary personnel would remain on site and safely operate the EOF and Platform Holly.[39]  It submitted an "Unanticipated Cost Funding Request" (the "**Funding Request**") to the Department of Finance, seeking $3 million by May 1, 2017, so that the Commission could maintain adequate staffing at the EOF while the Bond was processed.[40]  The Funding Request states:

> Venoco's quitclaims along with their financial inability to continue staffing and operating these leases, has created a significant safety concern for the State of California. Specifically, Platform Holly . . . is currently in a production ready

---

[36]  *Id*. at 30–31.
[37]  *Id*. at 39–40.
[38]  3/9/22 Tr. at 13-14; Ex. D8 (Unanticipated Cost Funding Request).
[39]  Ex D8 and 3/10/22 Tr. at 14, 15, 25.
[40]  *Id.*

status and without adequate staffing any emergency, up to an oil spill, would not
have persons capable of initiating a response in a timely fashion.  More
immediately, Platform Holly is still producing natural gas with very high
concentrations of Hydrogen Sulfide ($H_2S$) to control well pressures in accordance
with various permit requirements. . . .  Sufficient staffing of Platform Holly and
the related processing center onshore (the Ellwood Onshore Facility) is necessary
to draw the gas off the platform and to incinerate it so that the $H_2S$ levels do not
reach lethal concentrations. While the Commission will eventually have access to
funding from Venoco's required surety bonds, the Commission is unsure as to the
timeframe for said access and needs interim funding in case the release of the
bonds is delayed.

The Funding Request was granted, and on April 14, 2017, Venoco and the Commission entered

into the Agreement for Reimbursement of Temporary Services (the "**TSA**" or "**Reimbursement**

**Agreement**"), the first of several agreements regarding continued operations at the EOF

following the quitclaim.  The TSA was intended to operate until September 15, 2017.[41]  The

Trustee testified that the agreement was part of an overall process to effectuate an orderly

transition of the operation of the EOF and Platform Holly.  He further testified that the purpose

was to effectuate that transition in three stages—(i) Venoco would pay for a period of weeks to

keep its employees on site; (ii) it would make those employees available to run the facility on

behalf of the Commission but would be reimbursed by the Commission for those costs; and (iii)

the transition agreement would be replaced with a longer term lease for the facility when the

Commission determined who it wanted to operate the facility.[42]

The TSA provided that Venoco would maintain operations at the EOF and Platform

Holly at its expense through April 30, 2017.  Thereafter, Venoco would continue to work at the

EOF and Platform Holly and the actual costs of that work would be reimbursed by the

---

[41] Adv. D.I. 247, Stipulated Fact 38; Ex. P12.
[42] 3/7/22 Tr. 41-42.

Commission.[43]  The Commission agreed to pay an initial deposit of $1.12 million which would be applied to the costs incurred by Venoco in connection with Venoco's continued work, including overhead, general and administrative costs, and out-of-pocket costs and expenses such as the cost to acquire, renew, or maintain licenses, permits or approvals and employee salary or wages, among other things.

On April 17, 2017, Venoco quitclaimed the Leases (the "**Quitclaim**"), after which Venoco had no possessory or ownership interest in the Leases, the Wells, or the real property underlying the Leases; all such interests reverting to the Commission by operation of the Leases and applicable law.[44]  That same day, following the Quitclaim, Venoco and the other Debtors filed for bankruptcy for the second time.[45]

Also on April 17, the Commission sent a letter to Mr. Wracher informing Venoco that it was in receipt of the Quitclaim and that: (1) the Commission considered Venoco to be in material breach of its obligations under the Leases; and (2) the law still required Venoco to comply with its obligation to plug, abandon, and decommission the wells and the infrastructure associated with the Leases.  The letter further notified Venoco that it would be calling upon Venoco's surety to "commit the total amount of its performance bond to reimburse the state for as much of Venoco's continuing liability as it will cover."[46]  The amount of the Bond at the time of Venoco's quitclaim was $22 million.

---

[43] Ex P12.
[44] Adv. D.I. 242-1 at 10; *see also* Ex. P11.
[45] *See* D.I. 1.
[46] Ex. P13; 3/10/22 Tr. at 16-17.

On April 19, 2017, the Commission served the surety with a formal request to release Venoco's $22 million bond, in favor of the Commission, so that work to secure the facilities could be undertaken.[47]

In the following weeks the Commission's executive officer held multiple meetings for the purpose of updating the relevant constituencies on the decommissioning plan and to respond to questions.  These included a presentation to the Ocean Protection Council, a presentation to the California Coastal Commission, an open discussion hosted by the Environmental Defense Center, and a town hall meeting in the City of Goleta.[48]

On May 15, 2017, the State of California's Department of Conservation, Division of Oil, Gas, and Geothermal Resources ("**CalGEM**")[49] issued an order to Venoco to plug and abandon wells, decommission attendant facilities, and restore the well sites (the "**CalGEM Order**").[50]  It stated:

> The Supervisor has determined that Operator's April 13, 2017[,] Consent in Lieu of Meeting of Board of Directors, quitclaim deeds for state oil and gas leases "PRC" 3120, "PRC" 3242, and "PRC" 421, and subsequent related default are credible evidence that Operator has deserted, or will soon desert, the Wells and Facilities. . . .  Moreover, the evidence indicates that Operator intends to leave the Wells and Facilities without plugging and abandoning, decommissioning, or otherwise restoring the well sites.
>
> For the reasons stated above, the Division has determined that the Wells and Facilities are deserted. Therefore, IT IS HEREBY ORDERED,  that Operator plug and abandon the Wells and decommission the Facilities according to PRC sections 3208, 3228, 3229, and 3230 Regulations sections 1722 through 1724.1, 1760, 1775, and 1776, and the conditions included in any permit the Division may issue pursuant to PRC section 3229 for the Wells.[51]

---

[47] Ex. D27.  The Commission ultimately received the full amount of the Bond.  See 3/9/22 Tr. at 199-200.

[48] Ex D27.

[49] CalGEM was previously known as the Department of Conservation's Division of Oil, Gas and Geothermal Resources, or "DOGGR" and is referred to as such in some testimony and documents.

[50] Ex. D25.

[51] *Id.*  The CalGEM Order further states that "[i]f the Division determines that the current operator does not have the financial resources to fully cover the cost of plugging and abandoning the well, the

Venoco disputes that it is liable for plugging and abandoning the wells and it appealed the order, but that appeal was never ruled on because Venoco was in bankruptcy.  Consequently, the order did not become final.[52]

On May 17, 2017, the Commission issued a Solicitation for Statements of Interest (the "**Solicitation**") to hire an engineering consultant to operate the EOF.  It announced the Commission's "need to retain an Offshore Oil & Gas Facilities Engineering Consultant to conduct the continued safe operation of Venoco's Ellwood Facilities, and to Plug & Abandon 30 wells on Platform Holly and two 'onshore' wells in the surf zone accessible from the Ellwood Onshore Facility."[53]

On June 22, 2017, the Commission presented a staff report at a public Commission meeting and briefing (the "**Staff Report**").[54]  The Staff Report was issued for the purpose of providing information sufficient to enable the Commission[55] to formally authorize its executive officer to take all necessary actions in connection with Platform Holly and related facilities.  It gives a complete report of the background of the events leading to the Quitclaim as well as outlines "the Commission's actions to ensure the health and safety of the people of California as

---

immediately preceding operator shall be responsible for the cost of plugging and abandoning the well." The immediately preceding operator in this case was ExxonMobil.  When the Commission approved the assignment of the Leases from ExxonMobil to Venoco in 1997, the Commission did not release ExxonMobil from its obligations under the Leases.  3/9/22 Tr. at 233- 36 (Lucchesi testifying that it was the Commission's position that ExxonMobil had the responsibility to plug and abandon the Wells if Venoco could not).  Following the Quitclaim, the Commission entered into a settlement with ExxonMobil pursuant to which ExxonMobil agreed to assist with plugging and abandoning the Wells.  See Ex P44 (Phase 1 Agreement) ("Given Venoco's inability to fulfill its lease, regulatory and statutory obligations to properly plug and abandon its wells and to decommission all associated infrastructure or to comply with DOGGR Order 1116, the Parties have voluntarily engaged in a cooperative agreement, contained herein, to facilitate the timely plugging and abandonment of the thirty-two (32) Wells listed below.").

[52] A.D.I. 242-1 at 11 ¶ 33; 3/9/22 Tr. at 234.
[53] Ex P20.
[54] Ex. D27; 3/10/22 Tr. at 29.
[55] The "Commission" is both an office and a committee comprised of California's lieutenant governor, California's state controller, and California's director of finance.  3/7/22 Tr. at 240.

well as the integrity and health of California's offshore ecosystems relating to the

decommissioning of Platform Holly and the Ellwood Beach Piers."[56]   The Staff Report sets forth

the following plan:

> There are three general phases to the decommissioning process of
> Platform Holly and the Ellwood Beach Piers, including:
>
> · **Phase 1:** Ensure continuous staffing at Platform Holly and the EOF
>   to provide Commission staff with time to seek qualified
>   engineering firms to P&A the wells on Platform Holly and the
>   Ellwood Beach Piers. This phase should be concluded by July 31,
>   2017.
>
> · **Phase 2:** Once a contractor is selected, begin the P&A process on
>   the 30 wells on Platform Holly and the 2 wells at the Ellwood
>   Beach Piers. This phase is expected to require roughly 20-36
>   months, depending on conditions. Once complete Platform Holly
>   and the Ellwood Beach Piers will be rendered largely safe.
>
> · **Phase 3:** The final decommissioning and removal of offshore
>   infrastructure. The specifics for this phase have not yet been
>   developed and is highly dependent on funding, but Commission
>   staff anticipates beginning the development of the
>   decommissioning plan in approximately 18 months from the
>   beginning of the P&A process. [57]

It also describes the Commission's intent in entering into the Reimbursement Agreement:

> Based on Venoco's precarious financial situation and prior to the quitclaim,
> Commission staff worked to negotiate an agreement with Venoco (Temporary
> Services Agreement), to ensure that certified operators remain onsite at Platform
> Holly, Ellwood Beach Piers, and the EOF to ensure the safety of the facilities and
> the maintenance of Venoco's permit obligations. The agreement effectively began
> on May 1, 2017. Through the Temporary Services Agreement the Commission has
> agreed to provide the funds Venoco needs in order to retain staff on the facilities
> and keep them safe. The original term of the Temporary Services Agreement is
> until Venoco is transitioned out or June 30, 2017, whichever occurs first. This
> termination date has since been revised to July 31, 2017 in order for the
> Commission to solicit and acquire an engineering firm to take over the operations
> as detailed below. The Temporary Services Agreement provides Commission staff

---

[56] Ex D27.
[57] *Id.*

the opportunity to seek a third-party contract to maintain Platform Holly and the time to assess whether any need exists to continue the use of facilities ancillary to the platform.[58]

The Staff Report goes on to describe the need for continuous monitoring at both the Platform and

the EOF:

> The wells produce hydrogen sulfide gas ($H_2S$) within the oil and natural gas. Sufficient staffing of Platform Holly and the EOF, with certified $H_2S$ operators, is necessary to draw the gas off the platform and to incinerate it so that the $H_2S$ levels do not reach lethal concentrations. Failure to properly handle $H_2S$ gas can be lethal and operations in and around the platform and the EOF could result in significant harms to public health, including death. Even though the platform production equipment is not operational, the operating systems and safety equipment must be continually manned, serviced, and maintained in a safe and secure condition. Venoco operating personnel are currently performing these functions continually (24 hours a day/7 days a week) through the Temporary Services Agreement with the Commission, described above.[59]

On September 1, 2017, the Commission entered a contract with Beacon West Energy

Group LLC ("**Beacon West**"), a company formed by former Venoco executives, to take over

operation of the EOF and perform the P&A work.[60]

The scope of Beacon West's work is defined in the agreement between the Commission

and Beacon West (the "**Beacon West Agreement**") as "perform[ing] the engineering,

operations, and administrative services, under the oversight of the CSLC Project Coordinator . . .

and other required duties in order to continue the safe daily operations of Platform Holly (Holly)

and the Ellwood Onshore Facility (EOF) at the Current Baseline Conditions . . . .".[61] "Current

Baseline Conditions" is defined to mean "those conditions pertaining to the scope, type, and

intensity of activities and projects necessary for the operation and maintenance of Holly and the

EOF in a safe and non-producing state, as they have generally existed during the period of May

---

[58] *Id.*
[59] *Id.*; see also 3/10/22 Tr. at 29.
[60] Adv. D.I. 247, Pretrial Order Stipulated Fact No. 39; see also Ex. P25.
[61] Ex. P25.

1, 2017 and August 31, 2017." It is further explained in the Beacon West Agreement that "activities not identified as primary tasks below or activities in response to emergency or extraordinary events are not considered Current Baseline Conditions."

On September 14, 2017, in anticipation of the expiration of the TSA, the Commission and Venoco entered into a letter agreement regarding the Commission's continued use of the EOF while the parties continued negotiations (the "**Gap Agreement**").[62] Mr. Davis testified that the Gap Agreement was part of a process to establish a longer-term solution for the Commission's use of the EOF, which anticipated that rent would be paid during the period of the Commission's use until a more definitive agreement could be prepared.[63] The Gap Agreement provides for the Commission's continued use of the EOF with Venoco's consent, as long as the Commission agrees to certain conditions, including:

> (a) The Commission continues to negotiate in good faith with Venoco regarding a reasonable payment amount for the Commission's continued non-exclusive use of EOF and the EOF-related equipment and machinery.
>
> (b) Any periodic payment amount that the Commission agrees to pay Venoco shall be payable retroactive to the Transition Date (the "Catch-Up Payment") […]
>
> (c) In addition to the payment contemplated in (a) and (b) above, the Commission agrees to reimburse Venoco for any actual expenses incurred after the Transition Date in relation to ownership of the EOF. . . ; provided however, that any amounts paid by the Commission to Venoco pursuant to this clause shall be credited against the Catch-Up Payment.[64]

On September 15, 2017, when the Reimbursement Agreement expired, operations were transitioned from Venoco to Beacon West.

---

[62] Ex. P26.
[63] 3/7/22 Trial Tr. 42–43.
[64] Ex. P26.

On October 13, 2017, the Commission filed a proof of claim in Venoco's bankruptcy in the amount of $130 million for recovery of any amounts that it may later determine Debtor owes in connection with the Leases.[65]

Over the next few months, the Gap Agreement was amended four times.[66]  The First and Second Amendments to the Gap Agreement simply extended its term.[67]  On December 15, 2017, the parties entered into the third amendment to the Gap Agreement (the "**Third Amendment**") which, in addition to extending the term again also provided that the Commission would "pay Venoco, within 21 calendar days, a nonrefundable sum of $250,000 in cash (the "Payment") for the Commission's use of the EOF from December 15, 2017, to February 28, 2018[,]" and that such payment "may be contributed toward any final settlement the Parties may reach." [68]

On February 27, 2018, the parties executed the fourth amendment to the Gap Agreement (the "**Fourth Amendment**").[69]  The Fourth Amendment extended the term from February 18 to May 31, 2018, and also provided that beginning in March 2018, the Commission would pay "a nonrefundable monthly sum of $100,000 in cash (the "Monthly Payment") for the Commission's continued non-exclusive use of the EOF and EOF-related machinery and equipment.".[70], and that amount would be contributed toward any catch-up payment owed by the Commission to Venoco for its use of the EOF and EOF-related machinery and equipment.[71]  The Fourth Amendment goes on to state that "the Monthly Payment may contribute to any Catch-Up Payment (as defined in the Gap Agreement) owed by the Commission to Venoco . . . for the period of September 14,

---

[65] Ex. P27 (Proof of Claim No. 106).
[66] A.D.I. 242-1 at 12 ¶ 43.
[67] Exs. P28, P29; P31; 3/9/22 Tr. at 220.
[68] Ex. P31; 3/9/22 Tr. 220–21.
[69] Ex. P35.
[70] *Id.*
[71] *Id.*; 3/9/22 Tr. at 74, 221-22.

2017 until any final disposition of the EOF and the EOF-related machinery." It further provides

that after May 31, 2018, the Gap Agreement would remain in effect "on a month-to-month basis

(including the Monthly Payment) provided that either party may unilaterally terminate any

further month-to-month use of the EOF . . . upon prior written notice of 45 days."[72]

 In connection with its plans to decommission the Wells, the Commission entered into a

Memorandum of Understanding (the "**MOU**") with the City of Goleta, to ensure there would be

no conflict arising from the overlap in city and state jurisdiction and regulatory requirements.[73]

The MOU relieved the Commission of any obligation to comply with City regulations in

connection with its P&A work, including permitting requirements, and relieved the City of

certain responsibilities related to the facilities during this same time.

 In the meantime, while the Commission was operating the EOF with Venoco's consent

but at its own expense, Venoco was working its way through its Second Bankruptcy. On May

23, 2018, Venoco's chapter 11 plan was confirmed.[74]

 On August 22, 2018, Venoco's counsel sent a letter to the Commission informing it of

Venoco's intention to terminate the Gap Agreement effective October 15, 2018, because the

Commission had not made all of the payments contemplated by the Gap Agreement and its

amendments.[75] The termination letter notified the Commission that the Gap Agreement would

terminate on October 15, 2018 "if (i) the past due payments . . . are not made, and (ii) the parties

are unable to make substantial progress towards settlement beforehand."[76]

---

[72] Ex. P35 (Fourth Amendment).

[73] Ex. D52.

[74] Ex. D47 (Confirmation Order); The Plan became effective on October 1, 2018, at which time the Liquidating Trust was formed.

[75] Ex. P45; Adv. D.I. 242-1 at 11–12 ¶ 41; 3/7/22 Tr. 46–47.

[76] Adv. D.I. 242-1 at 11–12 ¶ 41.

On October 15, 2018, the Gap Agreement terminated, but the Commission continued its use and occupancy of the EOF.[77]  Following the stalling of negotiations, the Commission ceased making payments to Venoco and asserted it had the right to use the property without payment by virtue of its police power in response to an emergency.[78]  The Commission did, however, continue to pay all operating and ownership costs of the EOF, including insurance, taxes and maintenance costs, as well the cost of employing Beacon West to monitor the facility.[79]  These costs ran approximately $500,000 per month.[80]  As of December 31, 2021, the Commission had spent more than $25 million.[81]

The Commission testified at trial that it expected to remain on the site until completion of the P&A process, which is projected to be done by the end of 2022.  At that time, the Commission will return the property to the Trustee, who will sell it as part of the liquidation of the Venoco estate assets.

On October 16, 2018, the Trustee filed this adversary proceeding asserting an inverse condemnation claim on the grounds that the Commission's occupation of the EOF constitutes a taking of property for public use without just compensation, in violation of the Takings Clause of the Fifth Amendment and the Constitution of the State of California.[82]

---

[77] Adv. D.I. 242-1 at 12; 3/7/22 Tr. 44.

[78] 3/7/22 Tr. 44.

[79] 3/7/22 Tr. at 46 (Trustee testifying that the Trustee periodically invoices the Commission for insurance, utilities, and taxes); 3/8/22 Tr. at 7-8 (Huskins testifying that the Commission pays the Trust for operating expenses, including salaries, insurance, taxes, and utilities).

[80] 3/8/22 Tr. at 9 (Huskins testifying).

[81] 3/10/22 Tr. at 53-55.  $22 million of this is from the Bond.

[82] Adv. D.I. 1.  The Trustee was appointed the day before, on October 15, 2018.  He previously served as a director on Venoco's board from the close of Venoco's First Bankruptcy in 206 until he was appointed as Trustee in 2018. 3/7/22 Tr. at 45, 57.

## V.    **The Parties' Arguments**

In defense of this claim, the Commission argues that its occupation is not a taking but an exercise of its police powers, because use of the Trustee's property is necessary to protect public health and welfare.  Specifically, the Commission argues that having been informed that Venoco would no longer be able to operate and maintain the EOF, and that Venoco planned to desert Platform Holly without completing its plugging and abandoning obligations, it took the necessary action of operating the facilities itself in order to avert potential public peril posed by unmanaged oil and gas wells and facilities.  Because the Commission temporarily entered Venoco's property to protect human health, safety, and the environment, and not with the intent to convert it for public use, it asserts that its actions were an exercise of police power, not eminent domain.

In support of this position, the Commission cites to deeply rooted Supreme Court precedent, beginning with *Mugler v. Kansas*, 123 U.S. 623 (1887), in which the Court held that where the State acts to preserve the "safety of the public," the State "is not, and, consistent with the existence and safety of organized society, cannot be burdened with the condition that the society must compensate such individual owners for pecuniary losses they may sustain . . ." *Id.* at 668-69.  In *Mugler*, the Court held that the taking of plaintiff's brewery and related property for the manufacture of alcoholic beverages was a valid exercise of the State's police power and did not require compensation under the Fifth Amendment.  It observed that the principles behind the Taking Clause "have no application to the case under consideration" where the actions taken were "exerted for the protection of the health, morals, and safety of the people." *Id.*

More recent cases, the Commission argues, continue to recognize the breadth of police powers a state possesses in a variety of circumstances.  *See, e.g., Lech v. Jackson*, 791 Fed.

App'x 711 (10th Cir. 2019), *cert. denied*, 141 S. Ct. 160 (2020) ("[W]hen the state acts pursuant

to its police power, rather than the power of eminent domain, its actions do not constitute a

taking for purposes of the Takings Clause . . . [T]his distinction remains dispositive in cases that,

like this one, involve the direct physical appropriation or invasion of private property.");

*AmeriSource Corp. v. United States*, 525 F.3d 1149, 1154 (Fed. Cir. 2008) ("So long as the

government's exercise of power was pursuant to some power other than eminent domain, then

the plaintiff has failed to state a claim for compensation under the Fifth Amendment."); *Zitter*

*v. Pertucelli*, 744 F. App'x 90 (3d Cir. 2018) ("'The government may not be required to

compensate an owner for property which it has already lawfully acquired under the exercise of

governmental authority other than the power of eminent domain.'") (quoting *Bennis v. Michigan*,

516 U.S. 442, 452 (1996)).[83]  Applying this line of case law, the Commission argues that its

operation of the EOF was a proper exercise of its police powers and the Trustee is not entitled to

compensation.

The Trustee disagrees with the Commission's characterization of the law and the facts,

arguing that the government's police power is much narrower than the Commission suggests and

does not allow the State to physically occupy private property without payment except in very

rare circumstances not present here.  The Trustee argues that the Commission's actions were not

a valid exercise of its police powers because: 1) there was no ongoing emergency; 2) if there was

an emergency, it was foreseeable; and 3) there were feasible alternatives to use of the EOF.

Specifically, the Trustee contends that the Commission knew for years about the presence of $H_2S$

gas and the potential for buildup, was aware for several months that Venoco's finances were

---

[83] See also Defendant's Brief in Support of Summary Judgment Motion, Adv. D.I. 135 at 21 and Reply
Brief, Adv. D.I. 185 at 26.

dwindling and that it would not be able to afford to continue operating the EOF, and that it only took possession of the EOF because it was the most convenient way to complete the P&A work.

In support of his position, the Trustee distinguishes the Commission's cases as factually inapplicable and cites to several cases where the police power was held to be an insufficient defense to a takings claim. *See, e.g., Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States."); *Chi. Burlington, & Quincy Ry. Co. v. Illinois*, 200 U.S. 561, 592-93 (1906) ("Private property cannot be taken without compensation for public use under a police regulation relating strictly to the public health, the public morals, or the public safety, any more than under a police regulation having no relation to such matters, but only to the general welfare."); *In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 263-64 (Fed. Cl. 2019) (finding the government made a calculated decision to allow for flooding when it designed the dams and cannot now claim that the harm was unavoidable); *Patty v. United States*, 136 Fed. Cl. 211, 215-16 (Fed. Cl. 2018) (finding plaintiffs had stated a claim under the Takings Clause where it seized plaintiff's truck not to prevent a harm, but because it was convenient to use in connection with a drug seizure operation).[84] Applying this line of cases, the Trustee argues that the Commission could not have been acting pursuant to its police powers and compensation is required.

---

[84] The Trustee suggests at various points in his briefing that California courts interpreting the Takings Clause in the California Constitution apply a narrower definition of "emergency" than courts interpreting the U.S. Constitution. My review of the case law, however, leads me to conclude that there is no material difference between the two as they apply to this case, and that the Commission's actions here constitute a valid exercise of its police power under either one. Accordingly, I refer throughout this Opinion to cases interpreting either Constitution interchangeably.

## JURISDICTION

This matter is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and is a core proceeding pursuant to 28 U.S.C s 157(b).[85] This Court has jurisdiction over this proceeding pursuant to 28 U.S.C § 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. Venue is proper pursuant to 28 U.S.C §§ 1408 and 1409.

## DISCUSSION

I.    **Governing Law**

A. **Eminent Domain**

The "Takings Clause" of the Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides, in pertinent part, that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). When the government takes property for public use without the owner's consent, it is exercising its power of eminent domain. See 1 *Nichols on Eminent Domain* § 1.11 (2022).

"The question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty." *Penn Cent. Transp. Co. v. New York City*,

---

[85] The Defendants dispute whether the Bankruptcy Court has core jurisdiction to enter final orders in this case. The Court previously ruled, however, that core jurisdiction exists, D.I. 34 and 35, and the District Court for the District of Delaware denied the Defendants' Motion for Interlocutory Review, D.I. 86. That ruling, therefore, remains the law of the case.

438 U.S. 104, 123 (1978). The Supreme Court recently reiterated the principles that guide a

takings analysis in *Cedar Point Nursery v. Hassid*, stating:

> When the government physically acquires private property for a public use, the
> Takings Clause imposes a clear and categorical obligation to provide the owner
> with just compensation. The Court's physical takings jurisprudence is as old as
> the Republic. The government commits a physical taking when it uses its power
> of eminent domain to formally condemn property. The same is true when the
> government physically takes possession of property without acquiring title to it.
> And the government likewise effects a physical taking when it occupies
> property—say, by recurring flooding as a result of building a dam. These sorts of
> physical appropriations constitute the "clearest sort of taking, and we assess them
> using a simple, *per se* rule: The government must pay for what it takes.

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (internal quotation marks and

citations omitted).

In *Cedar Point*, the Court considered whether a regulation granting union organizers a

right of access to growers' property for up to three hours a day, 120 days per year, constituted a

taking. Having found that "the regulation appropriates a right to physically invade the growers'

property – to literally 'take access,' as the regulation provides[,]" the Court concluded it was

therefore a *per se* physical taking. *Id.* at 2074.

However, in addressing the dissent's concern that this holding would "endanger a host of

state and federal government activities involving entry onto private property" the Court

explained that there are multiple exceptions to the rule that a physical invasion constitutes a *per*

*se* taking. *Id.* at 2078. First, there are "[i]solated physical invasions, not undertaken pursuant to

a granted right of access, [that] are properly assessed as individual torts rather than

appropriations of a property right." *Id.* (citing 1 P. Nichols, *The Law of Eminent Domain* §112,

at 311 (1917) ("[A] mere occasional trespass would not constitute a taking.")). Second, there are

physical invasions that are for the purpose of enforcing "longstanding background restrictions on

property rights." *Id.* "For example, the government owes a landowner no compensation for

24

requiring him to abate a nuisance on his property, because he never had a right to engage in the

nuisance in the first place." *Id.* "*Third*, the government may require property owners to cede a

right of access as a condition of receiving certain benefits, without causing a taking." *Id.* An

example of this is the way in which a restaurant is given a permit to sell food on the condition

that the department of health is granted access to inspect the premises at will. Concluding that

none of these exceptions applied to the case before it, the Court held "the access regulation

amounts to simple appropriation of private property." *Id.* But the facts here require a different

result.

### B.  Intersection of Police Powers and Eminent Domain

While a physical invasion of private property will usually amount to a *per se* taking, no

taking will be found where the government is acting to enforce pre-existing background

restrictions on property rights:

> These background limitations [ ] encompass traditional common law privileges to
> access private property. One such privilege allowed individuals to enter property
> in the event of public or private necessity. *See Restatement (Second) of Torts* §196
> (1964) (entry to avert an imminent public disaster); §197 (entry to avert serious
> harm to a person, land, or chattels) []. The common law also recognized a
> privilege to enter property to effect an arrest or enforce the criminal law under
> certain circumstances. *Restatement (Second) of Torts* §§204-205.

*Cedar Point*, 141 S. Ct. 2063, 2079 (2021) (internal citation omitted); *Thousand Trails, Inc. v.*

*Cal. Reclamation Dist. No. 17*, 21 Cal. Rptr. 3d 196, 204-05 (Cal. Ct. App. 2004) ("The proper

exercise of a public entity's police power is an exception to the just compensation requirement in

inverse condemnation cases. This emergency exception' arises when damage to private property

is inflicted by government under the pressure of public necessity and to avert impending

peril. Courts narrowly circumscribe the type of emergency that shields an entity from inverse

condemnation liability.) (quoting *Odello Bros. v. County of Monterey*, 73 Cal. Rptr. 2d 903 (Cal.

Ct. App. 1998)) (internal quotation marks omitted).  The government's right to regulate private property in this manner is often referred to as its police power.  See 1 *Nichols on Eminent Domain*, § 1.42 (defining police power as the government's inherent power to "prevent persons under its jurisdiction from conducting themselves or using their property to the detriment of the general welfare.").

"The distinction between an exercise of the police power and a constitutional taking has been characterized since *Mugler* as 'whether the governmental action operates to secure a benefit for or to prevent a harm to the public.'" *Patty v. United States*, 136 Fed. Cl. 211, 214 (Fed. Cl. 2018) (quoting *Morton Thiokol, Inc. v. United States*, 4 Cl. Ct. 625, 630 (Cl. Ct. 1984)).  The Tenth Circuit aptly described the differences between the two doctrines, stating "[p]olice power should not be confused with eminent domain, in that the former controls the use of property by the owner for the public good, authorizing its regulation and destruction without compensation, whereas the latter takes property for public use and compensation is given for property taken, damaged or destroyed." *Lamm v. Volpe*, 449 F.2d 1202, 1203 (10th Cir. 1971).

While the government must pay for property taken by eminent domain, it has no such obligation when acting pursuant to its police power.  As the Supreme Court has explained, "'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,' and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it." *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491-92 (1987) (quoting *Mugler*, 123 U.S. at 664).

An attempt to define the reach or outer limits of the police power has been said to be "fruitless, for each case must turn on its own facts." *Berman v. Parker*, 348 U.S. 26, 32 (1954).

"Public safety, public health, morality, peace and quiet, law and order -- these are some of the

more conspicuous examples of the traditional application of the police power to municipal

affairs.  Yet they merely illustrate the scope of the power and do not delimit it."  *Id.*

Nevertheless, the police power is not absolute:

> Private property cannot be taken without compensation for public use under a
> police regulation relating strictly to the public health, the public morals or the
> public safety, any more than under a police regulation having no relation to such
> matters, but only to the general welfare. . . . The constitutional requirement of due
> process of law, which embraces compensation for private property taken for
> public use, applies in every case of the exertion of governmental power. If in the
> execution of any power, no matter what it is, the Government, Federal or state,
> finds it necessary to take private property for public use, it must obey the
> constitutional injunction to make or secure just compensation to the owner. If the
> means employed have no real, substantial relation to public objects which
> government may legally accomplish; if they are arbitrary and unreasonable,
> beyond the necessities of the case, the judiciary will disregard mere forms and
> interfere for the protection of rights injuriously affected by such illegal action. . . .
> If the injury complained of is only incidental to the legitimate exercise of
> governmental powers for the public good, then there is no taking of property for
> the public use, and a right to compensation, on account of such injury, does not
> attach under the Constitution. . . .  There are, unquestionably, limitations upon the
> exercise of the police power which cannot, under any circumstances, be ignored.
> But the clause prohibiting the taking of private property without compensation "is
> not intended as a limitation of the exercise of those police powers which are
> necessary to the tranquility of every well-ordered community, nor of that general
> power over private property which is necessary for the orderly existence of all
> governments.

*Chi., B. & Q. R. Co. v. Illinois*, 200 U.S. 561, 592-94 (1906) (internal citations omitted); *see also*

*Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922) ("As long recognized, some values are

enjoyed under an implied limitation and must yield to the police power.  But obviously the

implied limitation must have its limits, or the contract and due process clauses are gone.").

Determining whether a particular government action constitutes a compensable "Taking"

or a noncompensable exercise of police powers is therefore highly dependent on the facts and

circumstances of each case.  Here, the facts support the conclusion that in assuming operations of

the EOF, the Commission was acting to avert harm to both the public and the environment.

## II.    **Analysis**

When Venoco informed the Commission that it could no longer afford to operate the

EOF – which operations are necessary to ensure that $H_2S$ gas does not build up and leak into the

atmosphere – it created the need for the Commission to step in and operate the facility itself.

The Commission's use of the EOF to assist in the plugging and abandoning of the Wells was and

is the most reasonable way to permanently eliminate the risk of an $H_2S$ leak, or other

environmental catastrophes originating from the Wells.  As the Trustee had no right in the first

place to allow the property to sit idle while potentially lethal $H_2S$ gas seeps into the atmosphere,

the Commission's operation of the property takes nothing from him.  Accordingly, its actions fall

within the exception to the *per se* takings rule and no taking has occurred.  There is ample

evidence in the record to support this conclusion.

First, there was extensive evidence presented at trial regarding the toxic nature of $H_2S$

gas, its presence at Platform Holly, and the need for the around-the-clock operation of the EOF

to manage it.

$H_2S$ is a toxic gas that is odorless at poisonous concentrations.  It produces a visible

cloud, but smell should not be relied on to detect it.  There is no significant warning to the human

body in the presence of $H_2S$.  Accordingly, persons entering an area where $H_2S$ may be present

must have proper training and wear PPE, including a self-contained breathing apparatus. [86]

The greater the level of $H_2S$ that a person is exposed to, the more dangerous it becomes.

Even at low levels, $H_2S$ can have deleterious effects on human health.  At a level of 10 to 15

---

[86] 3/8/22 Trial Tr. at 122, 136, 137; Ex. D118 (Emergency Action Plan); 3/10/22 Tr. at 79-80; 3/11/22 Tr. 73.

parts per million ("**ppm**"), a person exposed may start to lose olfactory nerve sensations and can become overcome by H2S unknowingly.[87]  At a high ppm, H2S can be lethal.   H2S has been assigned an "immediately dangerous to life and health" ("**IDLH**") rating when it reaches a level of 100 ppm.[88]

The H2S gas that originates in the Wells is continuously pumped off to the EOF where it is effectively neutralized.[89]  The concentration of H2S coming from Platform Holly and processed at the EOF ranges from 1,500 ppm to 20,000 ppm—and therefore fall within the "immediately lethal" range.[90]

Jeff Planck, retired production engineer and project coordinator for the Commission, testified that, on a weekly basis, the H2S treated at the EOF is about 5,000 parts per million.  He warned that "anything over 800[,] that's a death warrant, so you have to be careful."[91]  Mr. Planck explained:

> [Y]ou're immediately taken over by the hydrogen sulfide, and if you're not immediately removed from an environment with that much in it, within a matter of, I'm not even sure, seconds, minutes.[92]

In addition to the risk to human life and health, unmanaged H2S also increases the risk of an equipment failure that could result in contamination to the surrounding environment and wildlife:

> Q:      [A]re there other risks associated with H2S gas in terms of why it needs to be processed at the EOF?

> A:      It isn't like you can just kind of let it lay around even if it didn't build pressure. What H2S does is -- well, one thing, it eats rubber, so all of your gaskets have to be made out of nitrile or some other form of a synthetic rubber. And the

---

[87] 3/8/22 Tr. at 121.
[88] This rating was assigned by the NIOSH (National Institute of Occupational Health and Safety), ACGIH (American Society of Industrial Hygienists, and OSHA (Occupational Health and Safety Organization); see also 3/7/22 Tr. at 124.
[89] 3/10/22 Tr. at 141; 3/7/22 Tr. at 108-09, 116-18; 3/10/22 Tr. at 19-20.
[90] 3/8/22 Tr. at 123-24.
[91] 3/10/22 Tr. at 164-65.
[92] *Id*. at 165.

other -- the really serious problem with it besides its pitting on steel is that what happens when hydrogen sulfide comes in contact with steel that isn't hardened, I won't go into explaining that, but if it hasn't been treated, what happens is the hydrogen gets into the lattice of the pipe and it causes what's called hydrogen embrittlement, which means given enough time you could probably take -- I mean a nice steel piece of pipe, take a hammer, and it will shatter it. So you can't let the hydrogen sulfides sit too long without moving from where it's sitting in pipes and equipment.

The Wells will continue to either actively produce $H_2S$ or be at risk of producing $H_2S$ until the plugging and abandoning process is complete.[93]

Because the release of $H_2S$ gas can quickly become hazardous, the EOF and Platform Holly are staffed around the clock. Nothing in the evidence would support the conclusion that this 24-hour a day monitoring was unnecessary. In fact, as even the Trustee admits, the facilities have been able to operate safely for decades in spite of the presence of high levels of $H_2S$ because of the constant monitoring and maintenance of the facilities by skilled personnel.[94]

While continuous staffing of the EOF is necessary even in the best of conditions, the Commission learned when it assumed operation of the facilities after the Quitclaim that the Wells were in such poor condition that leaving the facilities unmanned would not have been a rational option. Mr. Planck testified that although the Commission had previously been under the impression that Venoco was maintaining the Wells while they were out of production, it learned after it began work at the site that the majority of the Wells were in bad shape. Some of

---

[93] 3/7/22 Tr. at 161 (Wenal testifying) ("Q: [ ] As long as plug and abandonment have not been concluded hydrogen sulfide, highly concentrated hydrogen sulfide would still be pushed through to be treated at the EOF until that last well is plugged and abandoned, correct? A: That is correct.").

[94] 3/7/22 Tr. at 82 (Trustee testifying that "there's been $H_2S$ present in these wells for the entire 40 or 50 years they've been under production, and it's been part of the equipment that's on the platform and the EOF to deal with it and treat with it, and there's been no -- thank God, no deaths, no damages, no illness because of this."); 3/7/22 Tr. at 161 (Wenal testifying) ("Q: [ ] S]taff is still needed on site 24/7 to insure there isn't a future emergency, isn't that correct? A: Correct."); 3/7/22 Tr. at 136-37 (Wenal testifying) ("Q: [I]t's your view that the EOF could not be maintained safely if there were no staff on the job? A: That's correct."); see also Adv. D.I. 242-1, Ex. B (Wracher Dep.) at 33-34 (describing the state of the Wells at the time of the Quitclaim as "a state whereby which if you continued the operation of the gas plant, i.e., pulling the gas off the wellheads, you—you—as long as you kept doing that, they'd be okay).

the Wells were repressurizing and annular gas was present in most of the wellbores.[95]  Mr.

Planck further testified that given the state of the Wells at the time, doing nothing in response

Venoco's termination of the Gap Agreement was out of the question:

> Q:      So, what kind of risk is associated with even just those five wells based
> on what you understood at the time in August of 2018?
>
> A:      I'm not sure what my understanding was in 2018 to be honest with you. I
> know right now, I mean now that I've been working with the stuff for five years,
> that I was probably a bit naive back then maybe. . . . The pressure buildup on
> those five wells, three of them this past April we had to stop the pressure buildup
> because it was starting to (indiscernible) allowing it on the well head. It built up
> to 200 PSI rather quickly. I can't tell you where it would go after a weeks, days or
> months, but we just couldn't afford that to happen.  That's not only my opinion,
> but it was Exxon's opinion and Beacon West's opinion, and I'm sure it was
> Venoco's opinion before they left.
>
> Q:      So, allowing that pressure to build up is not an option?
>
> A:      No.[96]

In addition to demonstrating that continuous monitoring was necessary, the uncontroverted

evidence also demonstrated that the EOF was and is the only way to ensure that the $H_2S$ gas did

not build up to dangerous levels and pose a risk to human life:

> And without a constant operation and maintenance and presence by qualified staff
> and personnel, we were facing a catastrophic emergency with wells that were re-
> pressurizing and could create an oil spill, and then also $H_2S$ gas that was
> constantly being produced and, without transfer and treatment at the EOF, would
> have created a significant health risk and potentially fatalities[.][97]

---

[95]  *See* 3/10/22 Tr. at 143-44 (Planck testifying that "[m]y understanding was, you know, although we
knew there was some annular gas and oil that the wells were in some kind of a reasonable condition. I
didn't understand, or didn't realize until then, I was under the impression that there was only a few wells
that had that problem. I was a little shocked to find out in my discussions with Larry Huskins and others
that it was the majority of wells. I've since found out that not only was it the majority of wells, but as far
as we could tell from some of the pressure tests that we've done, there's only three wells that aren't a
problem."); 3/10/22 Tr. at 159 (Plank testifying that oil and gas coming up through the annuli to the
surface of the Wells affected whether or not they had to use the EOF to treat the $H_2S$  and that "we found
out that the majority of the wells actually had this problem."); 3/10/22 Tr. at 19 (Luchessi noting that the
Wells had been re-pressurizing).
[96] 3/10/22 Tr. at 162-63.
[97]  *Id*. at 19.  While the Trustee makes much of an email Mr. Planck sent immediately following the
termination of the Gap Agreement, in which he stated that he believed as many as 25 of the Wells could

While the Trustee presented evidence that a new facility could have been constructed to permanently seal the Wells through the P&A process (discussed more below), there was no evidence demonstrating that there were any alternatives to manage the $H_2S$ gas produced by the Wells in the meantime.[98] Accordingly, the weight of evidence supports the conclusion that it was necessary to public health and safety for the EOF and Platform Holly to be staffed at all times.

Second, the evidence presented at trial also demonstrated that by mid-April of 2017, the Commission believed there was a real risk that Venoco would leave the EOF and Platform Holly unmanned and acted with the sole intent of protecting public health and safety.

On March 31, 2017, Venoco first informed the Commission that one of the scenarios it was considering following a quitclaim of the Leases was that it would remove its personnel from the facilities by April 25 if a satisfactory agreement had not been reached.[99] Discussions between the parties continued in early April, during which time the Commission proceeded on the assumption that a deal regarding the consensual use of the EOF would eventually be reached, but by mid-April, things appeared to change quite suddenly.

---

be plugged and abandoned without the use of the EOF, *see* Ex. P46, as Mr. Planck's testimony at trial made clear, that opinion was based on his mistaken assumption that the Wells had been kept in good condition. As noted above, the Commission later learned that this was not the case. See 3/10/22 Tr. at 143-44; *id.* at 162 (Planck stating that based on the information he has now, "I don't know that we could have abandoned most of [the Wells] without having some way of treating the hydrogen sulfide and that being the [EOF], not only at that time, but at this time.").

[98] As discussed below, any available alternative would likely take a minimum of several years to be built. During this time, while the Commission worked to obtain permits and construct an alternative to the EOF, it would still need to keep the EOF running to ensure that any buildup of annular gas at the Wells was pumped off to the EOF and treated.

[99] Ex. P8 ("If no TSA has been finalized with the SLC or its designated operator by April 25, Venoco [would] remove[] all personnel from the South Ellwood field assets."). The Trustee likewise testified that Venoco was financially unable to pay its employees to remain on the EOF after this time. 3/7/22 Tr. at 41-42 ("Venoco would pay for some period of weeks to keep its own employees present" but would then "make those same employees available to run the facility on behalf of the [Commission], but would be reimbursed for those costs because, as I said, the company was bankrupt. They didn't have the wherewithal.").

By the time Venoco notified the Commission in its April 12, 2017, email that following its anticipated quitclaim of the Leases it would only maintain current operations through April 30 unless an "acceptable" agreement could be finalized "in the near future," [100] it became apparent to the Commission that it needed to treat the situation with greater urgency.  As Ms. Lucchesi testified at trial, while the Commission was previously aware that Venoco was financially unable to continue to staff the EOF, it was unaware that Venoco would be imposing a deadline on negotiations, after which time it would abandon the EOF. [101]  By April 12, the Commission began operating on the assumption that after April 30 it would need to staff the EOF itself. [102]

For example, with the knowledge that it would be unable to locate qualified replacements for Venoco's staff before April 30, the Commission first took steps to obtain emergency funding for the purpose of paying Venoco to keep its existing staff on until new contractors could be retained. [103]  The Funding Request submitted by the Commission to the Department of Finance states corroborates the Commission's testimony about the emergency nature of the situation. The Funding Request form contains a section titled "Emergency Notification" that asks if the request is an emergency for funding unanticipated costs.  It defines an emergency request as one "for expenses incurred in response to conditions of disaster or extreme peril that threaten the immediate health or safety of persons or property in this state" and requires the applicant to provide the basis for determining this is an emergency.  The Commission wrote:

> The [Commission] was only recently made aware that Venoco can no longer provide staffing for the Commission's leases. The Commission believes that funding is necessary to ensure that staffing on Platform Holly and the Ellwood Onshore Facility can be maintained to allow the Commission the time it may need

---

[100] Ex. P10.

[101] *See* 3/9/22 Tr. at 205 (Lucchesi testifying that the Commision was "not surprised by [Venoco's] financial condition.  We were surprised that they were planning to abandon the facilities within two weeks of notice of this email, or receipt of this email.").

[102] 3/10/22 Tr. at 15 (Lucchesi testifying that following the April 12 email the Commission "jumped into action right away"); *see generally*, Lucchesi testimony, 3/10/22 Tr. and 3/11/22 Tr.

[103] 3/10/22 Tr. at 14.

to access Venoco's surety bonds and to undertake efforts to plug and abandon the wells. Once the wells on Platform Holly are plugged, ongoing concerns about oil spills and H2S laden gas will be largely ameliorated.[104]

At the same time that it submitted its Funding Request, the Commission also notified state and local representatives of the situation and created a website for purposes of continually updating the public on its status.[105]  The Commission also prepared a Staff Report for presentation at a public meeting of the Commission, which outlined the actions taken by the Commission since the quitclaim and why they were necessary:

> Based on Venoco's precarious financial situation and prior to the quitclaim, Commission staff worked to negotiate an agreement with Venoco (Temporary Services Agreement), to ensure that certified operators remain onsite at Platform Holly, Ellwood Beach Piers, and the EOF to ensure the safety of the facilities and the maintenance of Venoco's permit obligations. The agreement effectively began on May 1, 2017. Through the Temporary Services Agreement the Commission has agreed to provide the funds Venoco needs in order to retain staff on the facilities and keep them safe. . . .
>
>        *         *         *         *
>
> The wells produce hydrogen sulfide gas (H2S) within the oil and natural gas. Sufficient staffing of Platform Holly and the EOF, with certified H2S operators, is necessary to draw the gas off the platform and to incinerate it so that the H2S levels do not reach lethal concentrations. Failure to properly handle H2S gas can be lethal and operations in and around the platform and the EOF could result in significant harms to public health, including death. Even though the platform production equipment is not operational, the operating systems and safety equipment must be continually manned, serviced, and maintained in a safe and secure condition. Venoco operating personnel are currently performing these functions continually (24 hours a day/7 days a week) through the Temporary Services Agreement with the Commission, described above.[106]

This evidence of the Commission's intent and purpose in taking over operation of the EOF was uncontroverted and establishes both that the Commission believed there was a real risk that

---

[104] Ex D8 (Funding Request).
[105] Ex D20; 3/10/22 Tr. at 31-32.
[106]  Ex. D27.

Venoco would cease operating the EOF and that it was motivated only by a need to protect public health and safety.[107]

Faced with an emergent situation that had the potential to jeopardize the health and safety of its citizens, the Commission was well within its rights to remain on the property to continue its decommissioning work. While the immediate need was simply to protect the public from exposure to toxic $H_2S$ gas by keeping the EOF up and running, the only permanent solution to that problem was to plug and abandon the Wells.[108] As Venoco indicated it had no intention of doing so, the Commission had no choice but to do so itself.

This type of action by a government entity – action taken to manage a potentially hazardous situation on private property that is not being sufficiently managed by the property owner – is an exemplary illustration of its police power. For example, in *Nassr v. Commonwealth*, 477 N.E. 2d 987 (Mass. 1985), plaintiffs who had been disposing of toxic waste without a license on their property sued the Commonwealth for trespass and sought compensation for a taking, after state and local officials entered the property to conduct the necessary cleanup. *Id.* at 989-90. The Court found the Commonwealth's actions to constitute

---

[107] This conclusion is further supported by the actions of another state agency, CalGEM, which also confirm the emergency nature of the circumstances. *See* Ex D25 (Citing its mandate to "order such tests or remedial work . . . necessary to prevent damage to life, health, property, and natural resources. . . ," and pointing to the quitclaim deeds as "credible evidence of desertion," CalGEM issued an order on May 15, 2017, directing Venoco to plug and abandon the Wells, decommission the attendant facilities, and restore the Well sites).

[108] Although the parties' arguments frequently refer to the two things interchangeably, there are two separate processes taking place here. While the P&A process is not necessary to manage the $H_2S$ gas in the short term, it is the only way to permanently stop the gas from escaping the Wells. Accordingly, while much of the visible work being done at Platform Holly and the EOF on a daily basis may be for the P&A of the Wells and not the management of $H_2S$, that is only because the management of the $H_2S$ is a more passive undertaking, largely occurring automatically as long as the equipment is working properly. 3/7/22 Tr. at 173 (Huskins testifying that P&A is different than management of annular gas: "Plugging and abandonment is taking the well and permanently abandoning the well. Managing annular gases is controlling the pressures and the fluids that are in the annular spaces."). As there is no possibility that Venoco will be in the position to complete the plugging and abandoning work itself, it is necessary for the Commission to do so to permanently eliminate the risk to public health and safety.

"classic exercises of the State's police power to maintain the public health" and found that the fact that it had to temporarily occupy plaintiffs' land to conduct the cleanup "hardly transforms this exercise of police power into an exercise of the eminent domain power." *Id.* at 990.  The Court continued, reciting the Supreme Court's observation that "'where the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property.'" *Id.* (quoting *Miller* v. *Schoene*, 276 U.S. 272, 279-280 (1928)). This distinguishing characteristic is present here and makes clear that the Commission was operating under its police power, not its power of eminent domain, when it took over operation of the EOF.

While not cited by either party, a case with analogous facts is *Commonwealth v. Barnes & Tucker Co.*, 371 A.2d 461 (Pa. 1977).  Appellant Barnes & Tucker Company owned a coal mine that it ceased operating, but which was discharging acid mine water that was draining into a nearby river.  The Commonwealth obtained an order declaring the condition at the mine to be a public nuisance requiring abatement.  Barnes and Tucker constructed a pumping and treatment facility but ceased operating it and its operation was assumed by the Commonwealth.  *Id.* at 462-64.  The Commonwealth obtained an order requiring the company to operate the pumping facility and pay the expense incurred by the Commonwealth for its operation of the facility.  The company appealed the order, arguing that the order was "both an unreasonable exercise of the state's police power and a 'taking' of private property in violation of the Fourteenth Amendment[.]"  *Id.* at 464.  The Court disagreed, observing that "[t]he police power of the state is as comprehensive as the demands of society require under the circumstances," and holding that "[w]e cannot say that, in light of the severity of harm which may occur from the continued

discharge . . . of the acid mine water . . . the remedy ordered by the Commonwealth Court is an unreasonable exercise of police power." *Id.* at 465-67.

The same is true here. Given the severity of the harm that could have occurred from the continuing buildup of the $H_2S$ gas at the Wells the Commission's assumption of operations at the EOF and the commencement of work to permanently seal the Wells was both necessary and appropriate. I therefore find such actions were a reasonable exercise of its police power.

### III.    The Trustee's Arguments

The Trustee argues that I should reach a different conclusion for three reasons: 1) no urgent situation requiring an immediate response ever arose; 2) even if there was an urgent situation, it was foreseeable; and 3) the Commission could have used available alternatives to P&A the Wells instead of the EOF. I will address them each in turn.

### A.  The Urgency of the Situation

In support of his position that no actual emergency ever arose here the Trustee points to the testimony of the former Venoco employees who now make up Beacon West -- Mr. Keith Wenal, Mr. Michael Wracher, and Mr. Larry Huskins – who each testified that at all relevant times the EOF, Platform Holly, and the Wells were continuously monitored and maintained in a safe and stable manner and that no leak of $H_2S$ gas ever occurred.[109] He argues that the entire purpose of the parties' continued negotiations and the Agreements was to ensure that the safe operation of the EOF would not be interrupted, and it was not. The Trustee points out that neither the parties' Agreements nor the Commission's Solicitation for an engineering consultant refer to an emergency situation, and the Commission's contract with Beacon West indicates the engagement was to continue normal operations, not respond to an emergency.[110] The Trustee

---

[109] Adv. D.I. 281 at 31 (Trustee's Proposed FFCL).
[110] Adv. D.I. 281 at 41; Ex. P12, Ex. P20, Ex. P25, Ex. P26.

contends that the police powers exception is interpreted narrowly and does not apply unless there is an actual, not just potential, emergency.  I disagree with the Trustee's characterization of both the facts and the law.

The Trustee seems convinced that the government may only rely on its police powers to <u>respond</u> to an active and ongoing emergency, but not to <u>prevent</u> one, essentially arguing that the government must wait until catastrophe strikes before it can assert its police powers.  This is not the law and the Trustee cites to nothing in support of such a proposition.

That the EOF never actually ceased operating is beside the point.  Venoco informed the Commission of the possibility that it would walk off the job, which was enough under the circumstances to justify the Commission's decision to begin treating the situation as an active emergency.  The Trustee's suggestion that the Commission did not have the right to assert its police powers until Venoco packed up its employees and left the EOF unmanned is not well taken.  Given the quick acting nature of the threat at hand, it would have been the height of negligence for the Commission to not take Venoco's threats seriously and respond accordingly.  Had it waited until Venoco abandoned the premises, any number of things could have occurred that might have prevented the Commission from being able to get the facilities up and running properly in enough time to prevent a release of toxic gas.  One can envision many scenarios that could have occurred if the Commission had waited for the actual alarm bells to start ringing before acting – all of which would have put the health and safety of the surrounding community at unnecessary risk.  Considering it was dealing with gas that has the potential to be fatal in a matter of seconds, as well as equipment that requires specially trained and highly skilled personnel to operate it properly, it would simply have been irresponsible to take a "wait and see"

approach here.  Under the facts and circumstances presented, the Commission was justified in taking action to prevent an emergency.  It need not have waited until the potential actualized.

Still, the Trustee points to more facts that he says prove there was never any emergency requiring a response.  For example, he notes that the plugging and abandoning work was paused for nearly eighteen months during the pandemic.  But this supports the Commission's argument rather than refutes it.  While the plugging and abandoning efforts were put on hold due to social distancing mandates in effect during the pandemic, both Platform Holly and the EOF were still continuously staffed for monitoring purposes.[111]  Given that only "essential" services were permitted to continue under the government orders issued during the pandemic, this fact further demonstrates that a disruption of EOF operations had the potential to be catastrophic. Continuous monitoring of the EOF to prevent the release of $H_2S$ gas was essential, while permanently plugging and abandoning the wells was, at that time, not essential.[112]

Likewise, the fact that the parties were negotiating the terms of an agreement with the intent of keeping the EOF operating is also not suggestive of the lack of an emergency, as the Trustee suggests.  The Trustee argues that the Commission knew that Venoco was financially unable to continue operating the EOF and entered into the Agreements for the precise purpose of ensuring that no emergency ever occurred.  Accordingly, he asserts, having avoided an emergency through their successful diplomacy, the Commission cannot now argue for purposes of this litigation, that its past actions were really an exercise of police power all along.  I disagree.  The Trustee cites to no authority, and I am aware of none, indicating that an exercise of police powers is not proper where the use of the property is the subject of a previous

---

[111] 3/10/22 Tr. at 175-76.
[112] 3/8/22 Tr. at 6 (Huskins testifying that under state and federal "stay-at-home" mandates issued during the pandemic, EOF personnel were considered essential workers and were permitted to continue staffing the EOF around-the-clock).

agreement between the parties, or that it is only proper if the government formally announces its intent to rely on its police powers at the time it acts.  That the Commission attempted to reach a consensual resolution with a property owner before exercising its police powers is suggestive only of a desire to avoid the protracted and contentious litigation that has now taken place. [113] Those attempts proved to be unsuccessful, requiring the Commission to take additional action.

The cases cited by the Trustee in support of his position that the situation the Commission faced did not qualify as an emergency are not persuasive.  Each is distinguishable on its facts.  For example, the Trustee cites to *Los Osos Valley Associates v. City of San Luis Obispo*, 36 Cal. Rptr. 2d 758 (Cal. Ct. App. 1994), in support of his assertion that the term "emergency" is restricted to a very narrow circumstances that he alleges are not present here.  The *Los Osos* decision, however, is much more limited and rested on the fact that the defendant failed to establish that its actions were motivated by a need to protect the public.

Facing a water shortage, the City in *Los Osos* chose to resolve the problem by pumping groundwater, which caused subsidence to plaintiff's property.  In rejecting the police powers defense to plaintiff's inverse condemnation claim, the Court found that the City's choices over a period of years were not suggestive of an emergency and were politically motivated rather than motivated by a need to protect public health or safety.  *Id.* at 1681-82 (finding the City's assertion of an emergency to be unsupported where it neither declared an emergency under the Emergency Services Act, nor raised the water conservation requirements of its citizens).  Here, by comparison, and as discussed above, the Commission's actions following its receipt of notice

---

[113] Particularly in light of the fact that the Commission has successfully avoid litigation in other cases by doing just that.  *See* 3/10/22 Tr. at 237 (Lucchesi describing the Commission's takeover of operations and decommissioning work arising out of leases with Rincon, which required the Commission to use facilities located on private property, which the landowner did not contest).

that Venoco could potentially walk off the job, suggest that it viewed its actions as necessary for public safety.

The Trustee cites to two more cases for this same proposition but again in both the Court's decision turned on the fact that the government action in question was not actually necessary to protect public health or safety. *See Smith v. County of L.A.*, 214 Cal. App. 3d 266, 287 (Cal. Ct. App. 1989) (rejecting argument that removal of landslide debris was an emergency because closing the road instead would have required residents to utilize longer alternate routes, stating "removal of such debris was not strictly necessary"); *Rose v. City of Coalinga*, 190 Cal. App. 3d 1627, 1635 (Cal. Ct. App. 1987) (finding issues of fact existed regarding whether demolition of plaintiff's building was necessitated by emergency where plaintiff had obtained opinion that the building was not a hazard, the property was fenced off, and the City had waited 57 days before demolishing it). [114]  As explained above, the facts here compel a different result.

The bottom line is that Venoco created an emergency when it threatened to leave unmanned a facility that required constant monitoring to ensure public safety.  It cannot now claim that it is owed payment when the State responded accordingly.

## B.  Foreseeability

The Trustee next argues that because the Commission knew for decades about the existence of $H_2S$ gas at the facilities and that the EOF was connected to Platform Holly, the

---

[114] Though the Trustee also cites to Supreme Court precedent, it is only to establish general propositions regarding the police powers exception.  *See, e.g., Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears.  But that cannot be accomplished in this way under the Constitution of the United States."); *Chi. Burlington, & Quincy Ry. Co. v. Illinois*, 200 U.S. 561, 592-93 (1906) ("Private property cannot be taken without compensation for public use under a police regulation relating strictly to the public health, the public morals, or the public safety, any more than under a police regulation having no relation to such matters, but only to the general welfare.").

Commission should have planned for its use as part of its liability protection and cannot assert the existence of an emergency when it realized it failed to do so.

In support of this position, the Trustee cites to several cases that he argues stand for the proposition that an emergency cannot be foreseeable or anticipated. But none of these cases stands for such a broad rule. Instead, in each, the police powers defense was denied on facts that simply are not present here.

For example, in *Odello Bros. v. County of Monterey*, 63 Cal. App. 4th 778 (Cal. Ct. App. 1998), while the Court did take into consideration "the County's prior knowledge of the threat," it was not, as the Trustee suggests, the deciding factor. In *Odello*, the Court was faced with an inverse condemnation claim that arose when the County intentionally breached a levee that protected appellant's property in order to minimize flooding to adjacent, commercial property. Both properties were protected by levees, but the levee protecting the commercial property was lower and did not provide as much protection as the one protecting appellants' property. The County was made aware of the flood hazard a decade before the incident at hand, and a flood control project recommended modifications be made to the levee protecting appellants' property. The County did not have the resources for that project, so nothing was done. Ten years later, in January of 1995, the river overflowed, causing the commercial property to flood, but not the appellants' property. During that flood, the County sought an assessment of the advisability of breaching the appellants' levee to protect the commercial area from future flooding but decided it would only be effective if it was "planned ahead of time and employed expeditiously." *Id.* at 784. The next month, a County report showed that it had considered lowering the levee as an emergency action following the January flood, but noted it would still need several approvals and would need funding from FEMA to do so. In March, heavy rains again raised the threat of

flooding and on March 10, 1995, the County declared a state of emergency and, without warning, breached the levee protecting appellants' property, which then flooded.

When appellants filed suit for inverse condemnation, the County defended by asserting it was acting pursuant to its police powers.  Relying on the emergency declaration, the trial court found in the County's favor.  But the Court of Appeals reversed, concluding that, given the facts, it was neither "fair [n]or reasonable to deny appellants compensation simply because County has established that it declared an emergency. . . ."  *Id.* at 791.  Troubled by the fact that "if County had in fact chosen to implement its existing flood plan, and had condemned part of appellants' property, then [it] would have been required to compensate appellants for the property taken[,]" the Court emphasized the importance in looking beyond the simple labeling of something as an "emergency":

> [T]he determination regarding County's liability cannot be based solely upon the situation which existed on March 10, 1995. The emergency action was necessary due to the inadequacy of the Mission Fields Levee, an inadequacy which was acknowledged by the County as early as 1989, and an inadequacy which had caused flooding during January 1995, just two months prior to County's March 1995 "emergency" action. In such circumstances, the emergency exception should not shield County from liability for inverse condemnation because the taking or damaging of private property . . . is not prompted by so great a necessity as to be justified without proper compensation to the owner.  In fact, it would be antithetical to the principles of our Constitution to permit a public entity to burden private property simply because the public entity's inadequate flood control measures threatened other, more populated property. If the emergency exception were applied in these circumstances, appellants would be required to contribute a disproportionate share of the public undertaking. Such a result would be neither fair nor just, regardless of County's March 10, 1995, declaration of an emergency.

*Id.* at 791-92 (internal quotations and citation omitted).  In essence, *Odello* simply instructs that the question of inverse condemnation versus police powers can only be resolved by considering all the facts, and not by assigning undue weight to emergency declarations of one kind or another.  My holding here is fully consistent with *Odello*.  My decision regarding the existence

of an emergency is not based on any single fact, but rather on the entirety of the facts and

circumstances, as discussed above. [115]

 The Trustee next cites to *In re Upstream Addicks and Barker (Texas) Flood Control*

*Reservoirs*, as supportive of his position that where a defendant can reasonably anticipate

conditions that may require a response, it cannot later claim they constitute an emergency. [116]

But in *Upstream Addicks*, the government did much more than simply anticipate the conditions

that allowed the plaintiffs' property to flood; they intentionally created them:

> Defendant asserts that in the situation at hand, the Corps had little to no choice on
> how to act when Harvey hit, and that in an effort to protect lives, the Corps
> operated the project in accordance with the 2012 Water Control Manual.  That is,
> the Corps could open the gates and risk more severe downstream flooding or keep
> the gates closed, as it did, flooding upstream properties. When Harvey struck, it
> was true that certainly the actions available to the government for dealing with the
> relevant emergency were constrained by the design of the dams and
> impoundments, the Corps' 2012 Water Control Manual, and the Corps' normal
> operating procedures.  But these constraints only existed because the Corps'
> design of the dams contemplated flooding beyond government-owned land onto
> private properties. Thus, it was not that the government had to respond to Tropical
> Storm Harvey as an emergency that necessitated the flooding of private land, but
> rather that the government had made a calculated decision to allow for flooding
> these lands years before Harvey, when it designed, modified, and maintained the
> dams in such a way that would flood private properties during severe storms.
> Defendant cannot now claim that this harm was unavoidable when it planned for
> years to impound floodwaters onto plaintiffs' properties.

*Upstream Addicks*, 146 Fed. Cl. 219, 263-64 (2019) (internal quotations and citations omitted).

The distinction between the cases relied upon by the Trustee and this case is striking.  In

both *Odello* and *Upstream Addicks* the government was making choices between which of two

landowners would bear the greater burden in the event of flooding in order to provide for "the

public undertaking."  The governments had planned for years and built infrastructure to deal with

---

[115] Notably, I have given no weight to the post-litigation memorandum prepared by the Commission
explaining why the conditions at the EOF constituted an emergency or to the California statute enacted
post-litigation expressly defining the Commission's activities on the EOF as an exercise of police power.
See Ex D54 and Cal. Pub. Res. Code § 6829.4(c).
[116] Opening Summary Judgment Brief, Adv. D.I. 158 at 31.

potential flooding.  Whatever action the government took one property would be burdened in order to prevent damage to another.  The situation in this case is starkly different.

The Trustee did not provide any evidence that the Defendants were involved in the design or construction of the infrastructure used by either ExxonMobil as the original lessee of the South Elwood Field or Venoco as the subsequent lessee. ExxonMobil built, owned and operated the EOF in order to comply with relevant federal and state regulations to prevent potentially deadly $H_2S$ gas from being released into the atmosphere while it exploited the oil and gas reserves in the Field. Venoco continued to own and operate the EOF after acquiring it from ExxonMobil for the same purpose.  The obligation to prevent the release of $H_2S$ was ExxonMobil's and subsequently Venoco's, not the Defendants'.

Notwithstanding this factual backdrop, the Trustee suggests that the Commission should have anticipated the situation that led to Venoco's abandonment of the EOF at the time the Leases were originally drafted more than 50 years ago and arranged for use of the EOF to complete the P&A of the Wells.  In other words, the Commission should have foreseen that at some point in the future the pipeline that allowed for the movement of oil and gas from the Field to market would suffer a catastrophic rupture making it economically impractical to continue to remove oil and gas from the Field; that the company then leasing the Field would not only quitclaim the Leases back to the Commission but would also advise the Commission that it was financially incapable of completing its obligations under the Leases to P&A the Wells; and would then ultimately threaten to walk off the EOF that was protecting the area and its residents from potentially deadly gas if the Commission did not cut a deal to pay for use of the EOF to complete what the lessee was obligated to do in the first instance. The Trustee's suggestion is not well taken.

While the Commission was certainly aware that the Wells emitted $H_2S$ gas and that the EOF was used to process that gas, the string of events that occurred thereafter and ultimately ended with Venoco being unable to fulfill its obligations was simply not reasonably foreseeable. There was no evidence presented that the Commission was aware that Venoco was unable to meet its obligations to P&A the Wells until just before Venoco's second bankruptcy filing when it notified the Commission it would not comply with its obligation.  As discussed above, by that point, the Commission was left with no choice other than to step in and take over operation of the EOF.  I am not, therefore, simply relying on the Commissions' description of the situation as an emergency as occurred in *Odello* and *Upstream Addicks*.  Instead, I am relying on the facts presented at trial supporting the conclusion that the Commission was exercising its police powers.

### C.  Available Alternatives

The Trustee next argues that the Commission's occupation of the EOF was not a proper exercise of police power because there were alternatives available.  Specifically, the Trustee points to two other options: building a 9.6-mile onshore pipeline to transport production from Platform Holly to an existing oil and gas facility owned by ExxonMobil (the "**Las Flores Canyon Facility**" or "**LFC**") and the renting or leasing of a floating production storage and offloading platform (an "**FTSO**" also referred to as a "**floating barge**").  In support of this conclusion, the Trustee points to the testimony of his expert, Kathy Spletter.

Ms. Spletter, a consultant with Stancil & Co., was engaged by the Trustee to provide an independent appraisal of the fair market value and fair rental value of the EOF.[117]  In connection with this work, Ms. Spletter considered two reports previously prepared for the parties (in matters unrelated to this litigation) regarding the availability of alternatives to the EOF.  The

---

[117] 3/9/22 Tr. at 59.

first, was an Environmental Impact Report ("**EIR**") prepared for Venoco by a company called

Opportune in 2014 in connection with the recommissioning of a previously shut-in well. [118]  The

second was a report prepared by a company called InterAct, retained by Venoco to analyze

alternatives to use of the EOF following the City of Goleta's adoption of an ordinance in 2015

that made it easier to terminate the EOF's nonconforming use status (the "**InterAct Report**,"

together with the EIR the "**Reports**"). [119] Ms. Spletter testified that, in her opinion, the InterAct

Report's "Scenario 2," which involves the construction of a 9.6-mile pipeline to transport oil and

natural gas produced at Platform Holly to the LFC, thereby enabling the $H_2S$ to be treated and

the oil and natural gas to be sold, was a reasonable alternative to the EOF because it would

provide the same utility as the EOF and could feasibly be built and permitted. [120]  Ms. Spletter

further testified that it would also be reasonable to rent or lease a floating barge to pull up

alongside Platform Holly, and take the fluids and gas from the Platform and treat it, process it,

and store it until those products could be brought back to shore using the existing pipeline

infrastructure. [121]

The Trustee argues that the Reports, along with Ms. Spletter's testimony, establish that

there were viable alternatives available to the Commission and thus its use of the EOF was not

necessary.  He asserts that, at the time of the Quitclaim, the Commission neither considered these

alternatives nor hired a consultant to determine if there were any other options, instead it took

over the EOF because it was convenient.

In response, the Commission offered the testimony of Ms. Lucchesi, who stated that

while the Commission did not retain anyone to evaluate the existence of new alternatives at the

---

[118] Ex. P38 (EIR).
[119] Ex. P7 (InterAct Report).
[120] 3/7/22 Tr. at 85-86.
[121] 3/7/22 Tr. at 106-110.

time of the quitclaim, it had considered the previously identified possibilities internally and determined that use of the EOF was the only option that made sense for several reasons.  First, connecting to the existing LFC site would require building ten miles of new pipeline, which would require both permits and agreements with private landowners, as well as building new tanks and infrastructure at the LFC site because the LFC processes federal oil and gas and there are strict rules about commingling state product with federal product.  Additionally, because the LFC may not be currently equipped to handle $H_2S$ gas (as the field that Platform Holly services produces significantly more $H_2S$ than anywhere else), there would likely need to be an additional build-out to manage and process the higher level of gas.  Since this plan would involve building out and constructing new facilities, the Commission would need to undertake environmental studies and prepare impact reports, as required by certain state and federal statutes.  All of this would take years to accomplish, without any promise of obtaining the necessary regulatory approvals required to start building.  The Commission therefore concluded this was not a feasible alternative to the EOF, which was already fully equipped and permitted. [122]

Ms. Lucchesi further explained that the idea of using a floating barge to manage the $H_2S$ was also a much more difficult undertaking than it seems at first glance.  Utilization of a floating barge would require construction of underwater pipelines connecting to Platform Holly. Obtaining the permits to construct an offshore marine facility is even more difficult than procuring similar permits on land, because offshore facilities are at higher risk of oil spills and other accidents that can have significant environmental and economic consequences.  As with the LFC option, substantial environmental studies would need to be done and then assuming permits

---

[122] 3/9/22 Tr. at 231-32; 3/10/22 Tr. at 35-37.

could be obtained (all of which would take several years), construction of the barge itself would take several more years. [123]  The Commission also considered this option to be unworkable.

Ms. Lucchesi also testified that the Commission considered constructing a facility directly on Platform Holly to manage the $H_2S$ gas and process the oil, but in addition to the fact that this also would have required extensive environmental studies and the same permitting process, it determined that the Platform simply was not large enough to accommodate another facility and the forty-plus people necessary to perform the P&A work at the same time. [124]  For these reasons, the Commission concluded that there were no realistic alternatives to using the EOF for the treatment of $H_2S$ gas and to P&A the Wells at Platform Holly. [125]  I agree.

Ms. Spletter's testimony established that the proposed alternatives were possible from an engineering and technical perspective, but not that they were appropriate under the circumstances.  Even if I were to agree with Ms. Spletter that one or both alternatives that she considered were feasible, I am not persuaded that it would have been rational to pursue either of them.  Setting aside the fact that creating any new structure to manage or process oil and gas is a highly speculative endeavor subject to the discretion of regulators who would be faced with "local antipathy to oil production," [126] even if one assumes the necessary approvals could have been obtained, [127] none of the alternatives presented were capable of being operational in less than several years.  Additionally, the construction of an alternative to the EOF would only replace the need to use the EOF for the P&A work.  None of the alternatives would do anything

---

[123] 3/10/22 Tr. at 37-39.

[124] 3/10/22 Tr. at 39-40.

[125] *See also* 3/8/22 Tr. at 22-26 (Huskins testifying about availability of practical alternatives).

[126] Ex. P7; 3/8/22 Tr. at 23-24 (Huskins testifying that "They have a very large contingency here in -- in -- especially in the Santa Barbara area that -- that are not friendly to oil production, stemming back from the environmental movement following the 1969 Santa Barbara Oil Spill.").

[127] 3/9/22 Tr. at 145-46 (Spletter acknowledging that she is not an expert on permitting risks and offered no opinion about whether permitting and construction could actually be accomplished in the time frames suggested).

to address the immediate need to manage the constant production of $H_2S$ gas coming off the Wells, for which the EOF was the only available option. Considering the fact that the EOF was already permitted and fully equipped to do the job, as well as unable to be used for any other purpose, it would have been illogical for the Commission to engage in the massive undertaking required to get either alternative up and running, all at the taxpayer's expense. The only one who would benefit from such an investment would be the Trustee who would presumably be demanding rent for the continuous operation of the EOF in the meantime. [128]

While the Trustee suggests that the Commission had several options to deal with the problem it faced and its decision to use the EOF was a choice, the other "choices" he presents are simply not reasonable considering the nature of the situation. [129] The Trustee attempts to equate this case to *Patty v. United States*, 136 Fed. Cl. 211 (Fed. Cl. 2018), but that case has no relevance here. The *Patty* Court found the defendants could not rely on their police power to defend against a taking claim arising out of the seizure and use of a truck used in a criminal investigation where the use of the truck was a matter of convenience not necessity:

> Using the dichotomy of whether the government action prevented harm to the public or secured a benefit to the public, the government's action falls within the latter category: it did not seize the truck to prevent a harm to the public caused by or related to the truck or anyone associated with it, but rather the agency chose to use the truck as a resource in ridding the area of controlled substances and criminal activity. It could just as easily have rented a truck and furnished it to Mr.

---

[128] 3/9/22 Tr. at 98 (Spletter testifying that "[w]e assume that it would take four years to permit the facilities at the LFC and then one year for constructions, and then three years for the P&A activity to be completed."); *Id*. at 143-44 (Spletter explaining that support from the EOF would be needed during the period that alternatives for P&A were being arranged).

[129] Further supporting the conclusion that in using the EOF the Commission did not simply choose the most convenient option is the fact that the Commission declined to exercise its police power over another property despite its usefulness to the P&A work. See 3/9/22 Tr. at 227 (Lucchesi explaining that although it was more convenient for the Commission to use the Ellwood Pier in connection with its work at the EOF, when negotiations with the owner of the Pier fell through it did not exercise its police power in order to use the property over the landowner's objection because another option was available, though it was less convenient).

> Chapa. Plaintiffs' truck was not evidence in a criminal prosecution, involved in a
> police investigation, seized pursuant to criminal laws, or subject to forfeiture
> proceedings.

*Patty*, 136 Fed. Cl. 211, 216 (2018).

But here, the operation of the EOF is not simply convenient. It is necessary. That there is even a question about the propriety of the Commission's actions is only because of the order in which the events took place. If, instead of allowing the Commission to take control of the EOF and then suing for payment the Trustee had instead denied access, shuttered the property, and precluded access to the Commission until he received payment – all while toxic gas built up and created a threat to neighboring communities – there would be no doubt that the Commission would have the right to access the property without ceding to the Trustee's demands for payment.

## CONCLUSION

For all the reasons discussed above, I find the record supports the conclusion that the Commission's actions were a reasonable exercise of its police power and not a taking in violation of the Fifth Amendment to the U.S. Constitution or the Constitution of the State of California. A separate Order entering Final Judgment will be issued contemporaneously with this Opinion.

Dated:  August 23, 2022

JOHN T. DORSEY, U.S.B.J.