IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE VENOCO, LLC, *et al.*, | : | Chapter 11 |
| | : | Bankr. No. 17-10828 (JTD) |
| Debtors. | : | (Jointly Administered) |

| | | |
|---|---|---|
| EUGENE DAVIS, in his capacity as Liquidating Trustee of the Venoco Liquidating Trust, | : : : | Adv. No. 18-50908 (JTD) |
| | : | |
| Appellant, | : | |
| v. | : | |
| | : | Civ. No. 22-1174 (CFC) |
| STATE OF CALIFORNIA and CALIFORNIA STATE LANDS COMMISSION, | : : : | |
| | : | |
| Appellees. | : | |

Robert J. Dehney, Andrew R. Remming, Matthew O. Talmo, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Warren W. Harris, Nancy McEvily Davis, Stephani A. Michel, BRACEWELL LLP, Houston, Texas

> *Counsel for Appellant*

Rob Bonta, Christina Bull Arndt, Office of the California Attorney General, Los Angeles, California; Edward K. Black, Delaware Department of Justice, Wilmington, Delaware; David M. Fournier, Kenneth A. Listwak, TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware; Steven S. Rosenthal, Marc S. Cohen, J.D. Taliaferro, Alicia M. Clough, LOEB & LOEB LLP, Los Angeles, California;

> *Counsel for Appellee*

**<u>OPINION</u>**

December 12, 2023
Wilmington, Delaware

_____

CONNOLLY, UNITED STATES DISTRICT JUDGE

The Liquidating Trustee of the Venoco Liquidating Trust (the Trustee) has appealed the Final Judgment (Adv. D.I. 287)[1] and Opinion, *In re Venoco, LLC v. State of California*, 2022 WL 3639414 (Bankr. D. Del. Aug. 23, 2022), issued by the Bankruptcy Court after trial in a post-confirmation adversary proceeding brought by the Trustee against the State of California and the California State Lands Commission (the Commission). The Trustee asserted at trial a so-called "inverse condemnation"[2] claim under the Takings Clauses of the United States[3] and California[4] Constitutions. Adv. D.I. 117 ¶¶ 38-44. The Trustee sought at trial compensation of up to $161 million for the alleged unlawful *de facto* taking by Defendants of the Ellwood Onshore Facility (the EOF). Defendants have occupied

_____

[1] The docket of the Chapter 11 cases, captioned *In re Venoco, LLC*, No. 17-10828-JTD, is cited herein as "B.D.I. __." The docket of the adversary proceeding, *Davis v. State of California*, Adv. No. 18-50908-JTD, is cited herein as "Adv. D.I. __." The appendix (D.I. 31-33) to the Trustee's brief is cited herein as "A__."

[2] Inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant." *United States v. Clarke*, 445 U.S. 253, 257 (1980) (quoting D. Hagman, Urban Planning and Land Development Control Law 328 (1971)). It "stands in contrast to direct condemnation, in which the government initiates proceedings to acquire title under its eminent domain authority." *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2168 (2019).

[3] The Takings Clause of the Fifth Amendment to the federal Constitution, applicable to the states through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.

[4] Article I, section 19, of the California Constitution provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

the EOF for the past five years for the purpose of decommissioning connected oil

and gas wells previously operated by the liquidating debtor, Venoco, LLC (Venoco).

## I. BACKGROUND

### A. Venoco and the EOF[5]

Venoco was an oil and gas company that operated the Platform Holly drilling

rig in area known as the South Ellwood Field located off the coast of Santa Barbara,

California. Venoco held rights, title, and interests to 32 offshore wells in the South

Ellwood Field by virtue of certain leases (the SEF leases) it obtained from Mobil Oil

Company in 1997. The SEF leases were issued by the State of California, acting by

and through the Commission. Venoco processed the oil and gas it obtained from

Platform Holly at the EOF, which sits three miles from the platform on a half-acre

lot on the California coast. The EOF is located between a resort and a golf course

and is near residential communities and a public beach. Venoco held title to the

EOF and the air permits necessary to use the EOF.

The gas produced by the South Ellwood Field wells contains hydrogen sulfide

($H_2S$), a toxic gas that even at low levels poses serious threats to human health.

A1455. Platform Holly lacks the equipment, or even the space for equipment, to

treat that $H_2S$. And, therefore, to prevent $H_2S$ from accumulating to dangerous

levels, the $H_2S$ that originates in the South Ellwood Field wells is transferred from

---

[5] There appears to be no dispute as to the events leading up to the occupation of the EOF.

2

Platform Holly by pipeline to the EOF, where it is sent through an iron sponge tower and ultimately burned off safely in a flare. Because of the toxicity of $H_2S$, the EOF is equipped with 29 interior detectors and six exterior fence line detectors to notify personnel of any $H_2S$ release. Sufficient staff, certified to work in an $H_2S$ environment, is required to be present on the EOF 24 hours per day for so long as $H_2S$ flows from Platform Holly.

Venoco's economic demise can be traced to 2015, when a ruptured pipeline cut off the only conduit for Platform Holly's oil to get to market. *In re Venoco*, 2022 WL 3639414, at *3. After filing a first bankruptcy in March 2016 and emerging from that bankruptcy, Venoco again found itself in financial distress by late March 2017. *See id.* On March 31, 2017, Venoco's legal counsel notified the Commission that Venoco was considering quitclaiming its Leases and outlined possible scenarios under consideration, including an April 10 bankruptcy filing:

> Venoco's initial bankruptcy pleadings are expected to inform the Court about the quitclaim, its commitment to maintain current operations until April 25th, and its expectation that its South Ellwood-related expenditures will discontinue on April 25th … If no [Temporary Services Agreement] has been finalized with the [Commission] or its designated operator by April 25, Venoco removes all personnel from the South Ellwood field assets.

*Id.* at *4. This was followed on April 12, 2017 by an email from Venoco's Chief Operating Officer to the Commission, stating that Venoco "will soon be unable to continue meeting its obligations under the [Leases]" and that it was awaiting a board

3

decision whether to quitclaim the Leases "in the near future." *Id.* The email asserted that Venoco intended to work with the SLC to facilitate a "safe and responsible transition" of the Leases, which included "continued operational support from EOF recognizing that it is operationally necessary for the plugging and abandonment of the [South Ellwood Field]." *Id.* The April 12 email concluded that Venoco would be "willing to maintain current operations for a short transition period beyond April 30, 2017, provided that an acceptable reimbursement agreement can be finalized in the near future … " *Id.* At trial, a Commission representative testified that the Commission had been unaware that Venoco was imposing a deadline on negotiations and that it intended to abandon the South Ellwood Field and EOF if no agreement were reached. *See id.* at *5. The Commission thus turned its attention to obtaining emergency funding to pay Venoco's staff to continue operating the EOF to safely treat the $H_2S$ emanating from the wells, and began searching for contractors qualified to take over the EOF. *Id.*

Upon approval of emergency funding, the Commission entered into an Agreement for Reimbursement of Temporary Services on April 14, 2017. Adv. D.I. 117-1. The reimbursement agreement provided that the EOF was "necessary for the continued operation and anticipated plugging and abandonment" under the SEF leases and that the Commission would pay Venoco approximately $1.1 million a month to operate Platform Holly, the wells, and the EOF in a safe manner until the new contractor designated by the Commission assumed operational control. *See id.*

4

On April 17, 2017, Venoco quitclaimed the Leases, including the wells and Platform Holly (D.I. 30 at 11, 13), and filed for bankruptcy the same day.  Adv. D.I. 117 ¶¶ 2, 26.  The wells will continue to discharge $H_2S$ until their wellbores are permanently sealed with concrete and reinforced (a process referred to as "plug and abandon").  Venoco did not plug and abandon the wells or decommission Platform Holly.  Also on April 17, the Commission sent a letter informing Venoco that it was in receipt of the quitclaim and that: (1) the Commission considered Venoco to be in material breach of its obligations under the Leases; and (2) the law still required Venoco to comply with its obligation to plug, abandon, and decommission the wells and the infrastructure associated with the Leases.  *See id.*

On September 15, 2017, a third-party contractor, Beacon West, took over the decommissioning and plugging operations, and the reimbursement agreement was terminated.  Adv. D.I. 117 ¶ 28.  At that point, Venoco and the Commission entered into a "Gap Agreement" pursuant to which the Commission agreed to pay Venoco $100,000 per month for the non-exclusive access and use of the EOF.  *Id.* ¶ 29; Adv. D.I. 117-2.  On October 13, 2017, the Commission filed a proof of claim with the Bankruptcy Court for an estimated $130 million contingent claim against Venoco for the recovery of amounts that the Commission incurred in plugging the wells and decommissioning Platform Holly.  Adv. D.I. 117 at 9 n.5.  The contingent claim included $29 million to $35 million for the cost to operate and maintain the EOF in connection with the plugging and decommissioning efforts.

The Commission also entered into a settlement agreement with ExxonMobil on June 29, 2018 (Phase 1 Agreement).  The Phase I Agreement required ExxonMobil to assist with plugging and abandoning the wells.  Adv. D.I. 117-5. But it expressly excluded the maintenance and operation of the EOF from its scope:

> This Phase I Agreement shall not cover any of the following:
>
> (i) The manning, servicing, operation and maintenance in a safe and secure condition of the EOF, including the operating systems and safety equipment at the EOF.
>
> (ii) The Decommissioning of the EOF, as may be required under any applicable Laws and Regulations, or agreements.

*Id.* at 7.  On May 23, 2018, the Bankruptcy Court entered an order confirming Debtor's Plan of Liquidation, effective as of October 1, 2018.  As part of the Plan and the Litigation Trust Agreement it incorporates, the Court created a Liquidating Trust and transferred to that Trust assets (the Liquidating Trust Assets) from the bankruptcy estate.  Those assets include the EOF and any claims Venoco had against the State Defendants.  The Bankruptcy Court appointed the Trustee and ordered him to "collect[ ], hold[ ], distribut[e] and liquidat[e] the Liquidating Trust Assets for the benefit" of Venoco's creditors that filed claims against the bankruptcy estate and "to otherwise administer[ ] the wind-down" of the estate.[6]

---

[6] B.D.I. 879-1, Liquidating Trust Agreement at 2; B.D.I. 893, Notice of Appointment of Liquidating Trustee; B.D.I. 922-1, Combined Disclosure Statement and Plan, Art. XI.C. (governing "Rights, Powers and Duties of the Debtors and

In the months leading up to plan confirmation, Venoco "sought to negotiate with the [Commission] for a purchase price and ultimate disposition of the EOF, its equipment, and [environmental] permits." Adv. D.I. 117 ¶ 30. Negotiations were unsuccessful and unpaid amounts owed to Venoco were accruing under the Gap Agreement. *Id.* ¶¶ 30-31. On August 22, 2018, Venoco notified the Commission that it intended to terminate the Gap Agreement on October 15, 2018 if certain conditions, including the payment of $950,000 in past due payments under the Gap Agreement and "substantial progress towards settlement" of the parties' outstanding claims against each other were not met. *Id.* ¶ 31.

On October 1, 2018, the Plan became effective and the EOF, its permits, and Venoco's potential claims against the State Defendants were transferred to the Liquidating Trust. On October 15, 2018, the Gap Agreement was terminated. Despite making the outstanding periodic payments due under the Gap Agreement, the State Defendants informed the Trustee that they intended to remain at the EOF without further compensation, alleging that they could lawfully do so under their police power. *Id.* ¶ 32. The State Defendants have used the EOF for the five years during their decommissioning and plugging and abandoning efforts. *Id.* ¶ 33. The plugging and abandoning work was paused for nearly eighteen months during the pandemic. The Commission testified at trial that it expected to remain on the site

_____

Liquidating Trustee"); *id.*, Art. XIII.D (governing "Payments and Distributions for Disputed Claims"); B.D.I. 922, Confirmation Order ¶¶ 10-11).

until completion of the P&A process. *In re Venoco*, 2022 WL 3639414, at *10. At that time, the Commission will return the property to the Trustee, who will sell it as part of the liquidation of the Venoco estate assets. *See id.*

### B. The Adversary Proceeding

On October 16, 2018, the Trustee filed a Complaint (as amended at Adv. D.I. 117) and thereby initiated this adversary proceeding. The Complaint alleges that the State Defendants' continued use of the EOF constitutes a taking under the United States and California Constitutions and that the Liquidating Trust is therefore entitled to "just compensation, including the fair market value and fair rental value, for [the State] Defendants' use and occupancy of the EOF, its equipment, its permits and [the State] Defendants' special use and operations thereon." Adv. D.I. 117 ¶ 40. By the Complaint, the Trustee seeks "to maximize [the] distributable value" of the EOF, as a Liquidating Trust Asset, "in accordance with" the Plan. *Id.* ¶ 44.

The State Defendants filed motions to dismiss to the Complaint, arguing that the claims were barred by the State Defendants' sovereign immunity. Adv. D.I. 9, 10. The Bankruptcy Court denied their motions to dismiss, basing its decision in part on its conclusion that "the *in rem* jurisdiction of the bankruptcy court defeats a claim of sovereign immunity." *In re Venoco, LLC*, 596 B.R. 480 (Bankr. D. Del. 2019). On appeal, this Court and the Third Circuit affirmed. *In re Venoco, LLC*, 610 B.R. 239 (D. Del. 2020), *aff'd* 998 F.3d 94 (3d Cir. 2021).

On December 23, 2021, the State Defendants filed a motion for summary

judgment as to both counts of the Complaint, and the Trustee filed a Cross-Motion.
Adv. D.I. 134, 157.  On March 7, 2022, the Bankruptcy Court granted summary
judgment in favor of State Defendants with respect to Count II of the Complaint,
which sought compensation for use of the EOF pursuant to § 105(a) of the
Bankruptcy Code.  Adv. D.I. 261.  On March 7-11, 2022, the Bankruptcy Court held
a trial with respect to the Count I inverse condemnation claims.  Adv. D.I. 270-274.

### C.    The Decision

On August 23, 2022 the Bankruptcy Court issued its Decision in favor of the
State Defendants.  The Bankruptcy Court found that "Venoco created an emergency
when it threatened to leave unmanned a facility that required constant monitoring to
ensure public safety" and that "in assuming operations of the EOF, the Commission
was acting to avert harm to both the public and the environment."  *In re Venoco*,
2022 WL 3639414, at *14, *22.  In the Court's words:

> When Venoco informed the Commission that it could no
> longer afford to operate the EOF – which operations are
> necessary to ensure that $H_2S$ gas does not build up and
> leak into the atmosphere – it created the need for the
> Commission to step in and operate the facility itself.  The
> Commission's use of the EOF to assist in the plugging
> and abandoning of the Wells was and is the most
> reasonable way to permanently eliminate the risk of an
> $H_2S$ leak, or other environmental catastrophes originating
> from the Wells.

*Id.* at *14.  Based on these fact findings, the Bankruptcy Court concluded that "the
Commission's assumption of operations at the EOF and the commencement of work

9

to permanently seal the Wells w[ere] both necessary and appropriate," and that,

therefore, those "actions were a reasonable exercise of [the Commission's] police

power" and not compensable under the Takings Clauses of the United States and

California Constitutions. *Id.* at \*20. On September 6, 2022, the Trustee filed a

timely notice of appeal of the Final Judgment. D.I. 1. The appeal is fully briefed.

D.I. 30, 34, 35, 40. On April 26, 2023, the Court held oral argument. D.I. 39.

## II. JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this appeal from the Bankruptcy Court under

28 U.S.C. § 158. On appeal from an order issued by the Bankruptcy Court, a district

court "review[s] the Bankruptcy Court's factual findings under a clearly erroneous

standard and exercise[s] plenary review over legal issues." *In re Trans World*

*Airlines, Inc.*, 145 F.3d 124, 130 (3d Cir. 1998) (noting that both the district court

and the Third Circuit "review the bankruptcy court's legal determinations *de novo*,

its factual findings for clear error and its exercise of discretion for abuse thereof.").

The Trustee's main argument on appeal is that the police power exception

applies only in an "emergency" and that the Bankruptcy Court erred in concluding

that such an emergency existed. D.I. 30 at 20. Notwithstanding the Trustee's

attempts to reframe this as an appeal of one of more erroneous legal determinations,

the existence of an emergency is a factual determination reviewed for clear error.

Under the clearly erroneous standard, the Court accepts the Bankruptcy

Court's findings of fact "unless that determination either is completely devoid of

10

minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Fellheimer, Eichen & Braverman v. Charter Tech..,* 57 F.3d 1215, 1223 (3d Cir. 1995). Findings may also be deemed clearly erroneous where there may be some evidence to support them, but the reviewing court is left with "the definite and firm conviction that a mistake has been made." *Haines v. Liggett Group, Inc.,* 975 F.2d 81, 92 (3d Cir. 1992) (quoting *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "The Bankruptcy Court is best positioned to assess the facts, particularly those related to credibility and purpose." *In re Myers*, 491 F.3d 120, 126 (3d Cir. 2007). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).

## III. ANALYSIS

### A. The Police Power Exception

As the Decision explains, "[w]hile a physical invasion of private property will usually amount to a *per se* taking, no taking will be found where the government is acting to enforce pre-existing background restrictions on property rights." *In re Venoco*, 2022 WL 3639414, at *13. Quoting the Supreme Court, the Bankruptcy Court explained:

> These background limitations [ ] encompass traditional
> common law privileges to access private property. One
> such privilege allowed individuals to enter property in the
> event of public or private necessity. *See Restatement
> (Second) of Torts* § 196 (1964) (entry to avert an imminent

11

public disaster); § 197 (entry to avert serious harm to a
person, land, or chattels) [ ].

*Id.* (quoting *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2079 (2021)). "The
government's right to regulate private property in this manner is often referred to as
its police power." *Id.* (citing 1 *Nichols on Eminent Domain*, § 1.42 (defining police
power as the government's inherent power to "prevent persons under its jurisdiction
from conducting themselves or using their property to the detriment of the general
welfare.")). And, as the Decision notes, "deeply rooted [in] Supreme Court
precedent, beginning with *Mugler v. Kansas,* 123 U.S. 623, 665 (1887)," is the
principle that "where the State acts to preserve the 'safety of the public' the State 'is
not, and consistent with the existence and safety of organized society, cannot be
burdened with the condition that the society must compensate such individual
owners for pecuniary losses they may sustain …' " *Id.* at *11 (quoting *Mugler*, 123
U.S. at 668-69).

This rule recognizes a distinction between the state's exercise of eminent
domain to acquire private property for public use and its exercise of the police
power to prevent injury to the public. In widely different contexts, the Supreme
Court since *Mugler* has held that the government's exercise of the police power with
respect to real property for the protection of the public does not give rise to a

12

compensable taking under the Fifth Amendment.[7]  "The distinction between an exercise of the police power and a constitutional taking has been characterized since *Mugler* as whether the governmental action operates to secure a benefit for or prevent a harm to the public." *Patty v. United States*, 136 Fed. Cl. 211, 214 (Fed. Cl. 2018) (internal quotes omitted).  The "[p]olice power should not be confused with eminent domain, in that the former controls the use of property ... for the public good, authorizing its regulation and destruction without compensation, whereas the latter takes property for public use and compensation is given for property taken, damaged and destroyed." *In re Venoco*, 2022 WL 3639414, at *13 (quoting *Lamm v. Volpe*, 449 F.2d 1202, 1203 (10th Cir. 1971)).

As the Bankruptcy Court further observed, "An attempt to define the reach or outer limits of the police power has been said to be 'fruitless, for each case must

---

[7] *Keystone Bituminous Coal Ass'n. v. DeBenedictis*, 480 U.S. 470, 485-86 (1987) (quoting *Mugler*) (no taking of property where the government prohibits mining of coal from portions of land due to risk of subsidence damage); *Nat'l Bd. of Y.M.C.A. v. U.S.*, 395 U.S. 85, 92 (1969) (no liability for damage caused by rioters to buildings occupied by troops acting primarily in defense of the buildings); *Goldblatt v. Hempstead*, 369 U.S. 590, 592-93 (1962) (quoting *Mugler*) (the "exercise of the town's police powers" to prohibit excavation on property as a safety measure, preventing all productive use of the property, did not confiscate property without compensation); *Miller v. Scheone*, 276 U.S. 272, 279-80 (1928) (citing *Mugler*) (permitting cutting cedar trees because of threat presented of spreading disease to apple orchards); *see also, Chi., B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 593-94 (1906) ("[T]he clause prohibiting the taking of private property without just compensation is not intended as a limitation of the exercise of the police powers which are necessary to the tranquility of every well-ordered community, nor of the general power over private property which is necessary for the orderly existence of all governments.") (internal citations and quotations omitted).

13

turn on its own facts.'" *Id.* at *14 (quoting *Berman v. Parker*, 348 U.S. 26, 32 (1954)). "Public safety, public health, morality, peace and quiet, law and order — these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it." *Id.* (quoting *Berman,* 348 U.S. at 32). "Determining whether a particular government action constitutes a compensable 'Taking' or a noncompensable exercise of police powers is therefore highly dependent on the facts and circumstances of each case." *Id.*

## B. The Record Supports the Bankruptcy Court's Factual Finding that an Emergency Existed

The Trustee argues that the police-powers exception "applies only where there is an 'imminent' threat of harm and 'unforeseen' circumstances calling for immediate action" and that "[n]o such imminent threat or unforeseen circumstances existed here." D.I. 30 at 2. According to the Trustee, "[t]he lack of an emergency is clearly demonstrated by the fact that when the alleged emergencies arose, Defendants decided not to seize the facility" but "[i]nstead . . . weighed their options, entered into contracts to pay for their use of the property, and then retroactively declared an emergency when they no longer wished to pay for that use." *Id.* at 2–3.

The record here, however, provides ample support for the Bankruptcy Court's finding that "Venoco created an emergency when it threatened to leave unmanned a

14

facility that required constant monitoring to ensure public safety," that the emergency would exist indefinitely until the wells were permanently plugged and abandoned, and that "in assuming operations of the EOF, the Commission was acting to avert harm to both the public and the environment" *In re Venoco,* 2022 WL 3639414 at *22. Specifically, the Bankruptcy Court found that "there was extensive evidence presented at trial regarding the toxic nature of $H_2S$ gas, its presence at Platform Holly, and the need for the around-the-clock operation of the EOF to manage it." *Id.* at *15. This finding was supported by testimony that the concentrations of $H_2S$ gas reaching the EOF "fall within the 'immediately lethal' range." *Id.* In addition to the risk to human life and health, unmanaged $H_2S$ at these concentrations "increases the risk of an equipment failure that could result in contamination to the surrounding environment and wildlife." *Id.*

Because the release of $H_2S$ gas is so hazardous, the Bankruptcy Court found, the EOF and Platform Holly are staffed 24 hours a day. *Id.* at *16. "In fact, as even the Trustee admits, the facilities have been able to operate safely for decades in spite of the presence of high levels of $H_2S$ <u>because</u> of the constant monitoring and maintenance of the facilities by skilled personnel." *Id.* It further found that, although the Commission had believed Venoco was maintaining the wells while they were out of production, when the Commission assumed possession of the wells, it learned "that the majority of the Wells were in bad shape." *Id.* at *17. The Commission's production engineer and project coordinator testified that given the

15

state of wells at the time, "doing nothing in response to Venoco's termination of the Gap Agreement was out of the question." *Id.* Thus, "the uncontroverted evidence ... demonstrated that the EOF was and is the only way to ensure that $H_2S$ gas did not build up to dangerous levels and pose a risk to human life." *Id.*

The Bankruptcy Court further found "that by mid-April of 2017, the Commission believed there was a real risk that Venoco would leave the EOF and Platform Holly unmanned and acted with the sole intent of protecting public health and safety," by assuming operation of both facilities. *Id.* The Decision details the facts underlying the Commission's belief that Venoco may be abandoning the EOF after April 30, 2017 and its concerns about the ongoing risk to the public health and safety from the potential release of $H_2S$ gas if the EOF was not continuously manned and operated, including contemporaneous funding requests and notifications to state and local representatives and the public. *Id.* at *18-19. "Th[at] evidence of the Commission's intent and purpose in taking over operation of the EOF was uncontroverted and establishes both that the Commission believed there was a real risk that Venoco would cease operating the EOF and that it was motivated only by a need to protect public health and safety." *Id.* at *19.

Lastly, the Bankruptcy Court found that "[w]hile the immediate need was simply to protect the public from exposure to toxic $H_2S$ gas by keeping the EOF up and running, the only permanent solution to that problem was to plug and abandon the Wells. *Id.* "As Venoco indicated it had no intention of doing so, the

Commission had no choice but to do so itself." *Id.* Based on the foregoing findings, the Bankruptcy Court concluded that, "Given the severity of the harm that could have occurred from the continuing buildup of the $H_2S$ gas at the Wells the Commission's assumption of operations at the EOF and the commencement of work to permanently seal the Wells was both necessary and appropriate. I therefore find such actions were a reasonable exercise of its police power." *Id.* at *20. The Bankruptcy Court's finding of the existence of an emergency is rationally related to the evidence presented by the entire record, and thus it is not clearly erroneous.

## C. The Emergency Presented an Imminent Threat

The Trustee attempts to reframe this appeal as one involving an erroneous legal determination rather than a factual finding, arguing that under both federal and California law, the police powers exception applies only in an emergency "that constitutes an ***imminent threat*** to the public's health and safety." D.I. 30 at 21 (emphasis added). The Trustee essentially argues that there can be an emergency which is not imminent.[8] The Trustee cites *U.S. v. Caltex*, which acknowledged that

---

[8] It is unclear how an "emergency" could involve anything other than an "imminent" risk or result. Black's Law Dictionary defines "emergency" as "[a] sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm" or "[a]n urgent need for relief or help." Black's Law Dictionary (11th ed. 2019); *see also* Merriam-Webster Online Dictionary, https://www.merriamwebster.com/dictionary/emergency (last visited Oct. 25, 2023) (defining "emergency" as "an unforeseen combination of circumstances or the resulting state that calls for immediate action"). Black's Law Dictionary defines "imminent" as "threatening to occur immediately," "dangerously impending" or "about to take place." Black's Law Dictionary (11th ed. 2019); *see*

"in times of ***imminent peril***—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved." D.I. 30 at 21 (quoting *U.S. v. Caltex*, 344 U.S. 149, 154 (1952) (emphasis added)). The Trustee further cites the applicable California legal standard, *House v. L.A. County Flood Control District*, which states that the police-powers exception applies "under the pressure of public necessity and to avert ***impending peril***." *Id.* (quoting *House v. L.A. Cnty. Flood Control Dist.*, 153 P.2d 950, 953 (Cal. 1944) (emphasis added)).

The Trustee does not dispute that the actions of the Commission were taken in furtherance of "public necessity." *See* D.I. 30 at 22-35 (challenging only whether the Commission was acting to address an "imminent threat"). Rather, the Trustee spends the entirety of his "emergency" argument on whether the State Defendants' actions addressed an "impending peril." In so doing, the Trustee ignores that the word "avert" modifies "impending peril" in the *House* decision. The record supports the Bankruptcy Court's conclusion that, in assuming operations of the EOF, the Commission was acting to avert public peril. *See* https://www.merriam-webster.com/dictionary/avert, last visited Oct. 25, 2023 (defining "avert" as "to see coming and ward off"); *see also* https://www.merriam-webster.com/thesaurus/

---

*also* Merriam-Webster Online Dictionary, https://www.merriamwebster. com/dictionary/imminent (last visited Oct. 25, 2023) (defining "imminent" as "ready to take place," "happening soon," or "near").

averting, last visited Oct. 25, 2023 (averting is "to keep from happening by taking action in advance"). Venoco notified the Commission that it may not be able to operate the EOF, and as a result would not be able to monitor and treat the "immediately lethal" $H_2S$ gas that existed at the EOF. *See In re Venoco*, 2022 WL 3639414, at *18. The "emergent situation [on the EOF and at Holly] … had the potential to jeopardize the health and safety of [California] citizens." *Id.* at *19. The Bankruptcy Court may not have used the terms "imminent" or "impending," but the record supports a finding that the emergency presented just such a peril.[9]

### D.    The Trustee Has Failed to Establish Clear Error

The Trustee has failed to demonstrate that the Bankruptcy Court's finding of an emergency was "completely devoid of minimum evidentiary support displaying some hue of credibility" or bears "no rational relationship to the supportive evidentiary data," as required to show clear error. According to the Trustee, several

---

[9] The Trustee further argues that an "emergency" justifying application of the police powers exception exists only where there are "unforeseen circumstances calling for immediate action." D.I. 30 at 2, 22-34. As the State Defendants point out, the factors added by Trustee, including "unforeseen situation" and "immediate action," are taken from inapplicable cases. *See* D.I. 34 at 41-44. As the Bankruptcy Court observed, "[t]he Trustee seems convinced that the government may only rely on its police powers to <u>respond</u> to an active and ongoing emergency, but not to <u>prevent</u> one, essentially arguing that the government must wait until catastrophe strikes before it can assert its police powers." *In re Venoco*, 2022 WL 3639414, at *22. The Court agrees that the "Trustee's suggestion that the Commission did not have the right to assert its police powers until Venoco packed up its employees and left the EOF unmanned is not well taken." *Id.*

facts controvert the Bankruptcy Court's finding that an emergency existed prior to the Commission's occupation of the EOF. The Trustee argues that, in response to the March and April 2017 emails, the Commission did not seize the EOF, but rather negotiated a reimbursement agreement obligating Venoco to maintain operations at the EOF until its agent could take over. D.I. 30 at 25. The Trustee further asserts available alternatives to occupation of the EOF, including requiring ExxonMobil, as Venoco's predecessor-in-interest, to perform the plugging, abandoning, and decommissioning of the Wells and Platform Holly. *Id.* at 44-49. Finally, even assuming there was an emergency, the Trustee asserts, an emergency implicating the police power ceased to exist when Beacon West began operating the EOF. *Id.* at 35.

Even assuming support for each contention in the record, none of these facts or circumstances can establish clear error. The fact that the Commission negotiated with Venoco for a period of time, to prevent Venoco from leaving the EOF unmanned and therefore avert peril, did not obviate the continuing risk that the EOF presented. The existence of possible alternatives to assuming control of the EOF did not obviate the risk either. The Commission's ability to compel ExxonMobil to operate the privately-owned EOF and is unsupported by the record, as is the Trustee's speculation that ExxonMobil might have reached a commercial arrangement with Venoco in time to avert an emergency. Finally, it is unclear how Beacon West's operation of the EOF requires a different outcome. Only agents certified to work in an $H_2S$ environment could operate the EOF. The State

Defendants assumed control of the EOF to avert public harm; while their agent's occupation and operation of the EOF was required to manage the threat, it did not end the threat. "While there may be evidence and inferences to the contrary, we cannot say that the findings are devoid of credible evidentiary support or that they lack a rational relationship to the evidentiary data." *DiFederico v. Rolm Co.*, 201 F.3d 200, 208 (3d Cir. 2000). The Trustee's remaining arguments are rejected.[10]

## IV. CONCLUSION

In assuming operations of the EOF, the State Defendants acted to avert harm

---

[10] The Trustee's reply brief raised the argument that the EOF's occupation was not a valid exercise of police power because the EOF itself did not pose a threat to the public's health or safety. *See* D.I. 35 at 9, 14-16. Rather, Trustee asserts, the gas posing a risk emanates from the Wells owned by the State Defendants. The Trustee cites testimony by Beacon West's representatives that $H_2S$ "does not occur naturally at [the] EOF," that it must "be brought to the EOF for it to be present" there (A0349), and that the EOF does not "generate emissions if it is not running" (A0225). Thus, the State Defendants did not occupy the EOF "to remedy a risk to human health, safety, or the environment emanating therefrom," the Trustee argues; rather, "[t]hey took the EOF to remedy a potential risk emanating from their own property." *Id.* at 14. According to the Trustee, the State Defendants cite no case holding that the government can exercise its police power to occupy one property for the purpose of abating a hazard emanating from a different property. *Id.* at 16. At oral argument, the court inquired as to whether this argument was presented to the Bankruptcy Court. *See* D.I. 39 at 26:15-25:2. Counsel to the Trustee responded: "all the underlying facts were presented" and "it's undisputed that these are two separate properties." *Id.* at 27:5-7. Counsel further indicated that the argument "was raised more in the summary judgment papers." *Id.* at 27:23-25. The Court did not locate this argument in the summary judgment briefing or elsewhere in the record. Adv. D.I. 135, 168, 182, 185, 218, & 237. *See In re Natale*, 280 Fed. App'x 227, 229 (3d Cir. 2008) (issue not raised below waived on appeal). Nor was it raised in the Trustee's opening brief on appeal. *In re Revstone Indus., LLC*, 690 Fed. App'x 88, 90 (3d Cir. 2017) (arguments raised for first time in a reply brief are waived on appeal). Accordingly, the argument is waived.

21

to both the public and the environment, a valid exercise of police power. The Trustee's argument that there was no emergency presenting an imminent threat fails. The Bankruptcy Court's finding that "Venoco created an emergency when it threatened to leave unmanned a facility that required constant monitoring to ensure public safety emergency" is not clearly erroneous, and the record supports a finding that the emergency presented an imminent threat to the public and the environment. The Court will issue a separate Order consistent with this Opinion affirming Final Judgment in favor of the State Defendants.